IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE INCLUSIVE COMMUNITIES        §
PROJECT, INC.,                   §
                                 §
                    Plaintiff,   §
                                 § Civil Action No. 3:08-CV-0546-D
VS.                              §
                                 §
THE TEXAS DEPARTMENT OF          §
HOUSING AND COMMUNITY            §
AFFAIRS, et al.,                 §
                                 §
                 Defendants.     §

MEMORANDUM OPINION
AND ORDER

The questions presented by defendants' motion to dismiss are whether plaintiff has standing and whether it must join two additional parties-defendant. Concluding that plaintiff has standing and that it need not join additional parties, the court denies defendants' motion.

I

Plaintiff The Inclusive Communities Project, Inc. ("ICP") seeks injunctive relief against defendant the Texas Department of Housing and Community Affairs ("TDHCA")——a state entity that administers a federal program that promotes investment in low-income housing developments——and TDHCA's Executive Director and board members, in their official capacities,[1] under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, and 42 U.S.C. §§ 1982

_____

[1]Unless the context indicates that TDHCA refers only to the Department itself, the court will refer to all defendants, collectively, as TDHCA.

and 1983.  According to the complaint, ICP is a Dallas-based, not-for-profit organization that seeks to eliminate barriers to racial and socioeconomic integration in housing.  To further this goal, ICP helps low-income African-American families eligible for the Dallas Housing Authority's Section 8 Housing Choice Voucher program ("Section 8") secure rental housing in predominantly Caucasian, suburban areas of Dallas.  ICP provides its clients with move-related counseling and financial assistance, including payment of application fees, deposits, and reasonable moving expenses, and may negotiate with landlords on their behalf.

TDHCA is the state entity responsible for administering the federal Low Income Housing Tax Credit ("LIHTC") program in Texas.  The LIHTC program is designed to encourage investment in low-income, multifamily rental housing by providing a tax credit that offsets an investor's federal income taxes.  *See* I.R.C. § 42 (discussing "low-income housing credit").  Developers finance construction of a project by selling the credits.  TDHCA administers varying amounts of LIHTC funds each year——$43 million in 2007--and has the authority to approve or deny tax credit applications for proposed housing developments.  In evaluating applications, TDHCA follows an annual Qualified Allocation Plan ("QAP") that prescribes complex requirements relating to threshold eligibility and selection criteria.  *See id*. § 42(m) (requiring allocation of tax credits according to a "qualified allocation

plan").

ICP avers that despite the QAP's requirements, TDHCA is permitted under Texas law to exercise discretion in making final decisions regarding tax credit allocation and that TDHCA takes into account race and ethnicity, both of the geographical area that surrounds a proposed development and of its probable residents. ICP alleges that TDHCA perpetuates housing segregation by disproportionately allocating tax credits for proposed developments in low-income, predominantly minority areas and denying tax credits for proposed developments in higher-income, predominantly Caucasian areas. ICP contends that this practice makes it more difficult for low-income minority families to obtain rental housing in neighborhoods not plagued with high crime, widespread poverty, and industrial uses.

ICP avers that TDHCA's consideration of race in allocating tax credits violates two provisions of the FHA, the Fourteenth Amendment (actionable through 42 U.S.C. § 1983), and 42 U.S.C. § 1982. ICP seeks broad equitable relief, including an injunction that prohibits TDHCA from using race or ethnicity as a factor in allocating tax credits; an injunction that requires TDHCA to allocate tax credits in a manner that creates as many LIHTC units in predominantly Caucasian areas as in minority-concentrated areas; and an injunction that prohibits TDHCA from allocating tax credits for proposed developments in areas with undesirable conditions,

including high crime and industrial uses.

TDHCA moves under Fed. R. Civ. P. 12(b)(1) to dismiss ICP's claims for lack of standing based on failure to establish injury-in-fact. TDHCA also moves under Rule 12(b)(7) to dismiss this suit for failure to join as defendants the Internal Revenue Service ("IRS") and the City of Dallas ("City").

## II

Because standing is a prerequisite to the exercise of federal jurisdiction, the court considers this issue first and evaluates each of ICP's claims in turn. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007).

## A

The doctrine of standing addresses the question of who may properly bring suit in federal court. It "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To satisfy the case-or-controversy requirement of Article III of the Constitution, the plaintiff must show that it has "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). An injury in fact must be "concrete and . . . actual or imminent, not conjectural or

hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).[2] Moreover, "the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1.

In its prudential dimension, standing encompasses "several judicially self-imposed limits on the exercise of federal jurisdiction." *Allen v. Wright*, 468 U.S. 737, 751 (1984). These include:

> whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999). Congress may, however, "by legislation, expand standing to the full extent permitted by Art. III," thus proscribing the judicial cognizance of prudential standing considerations. *Gladstone, Realtors v. Vill. of Bellwood,* 441 U.S. 91, 100 (1979); *accord Bennett*, 520 U.S. at 162.

As the party seeking to invoke federal jurisdiction, ICP bears the burden of proving its standing. *Lujan*, 504 U.S. at 561. Because TDHCA filed its motion to dismiss without supporting

---

[2]This tripartite test applies to all plaintiffs in federal court, whether individual or organizational. *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).

evidence, its attack on the court's jurisdiction is considered facial, rather than factual, and the court must presume that the allegations of ICP's complaint are true. *See Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *2 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)). Further, "[t]he court must deny the motion if the allegations are sufficient to allege jurisdiction." *Id*. On a motion to dismiss for lack of standing, "'general factual allegations of injury resulting from the defendant's conduct may suffice'" because the court presumes that "'general allegations embrace those specific facts that are necessary to support the claim.'" *Bennett*, 520 U.S. at 168 (quoting *Lujan*, 504 U.S. at 561)).

B

ICP and TDHCA dispute whether ICP has sufficiently alleged injury in fact.[3] ICP pleads injury in that TDHCA's allocation of tax credits increases the time and money that ICP must spend to help its clients secure affordable, integrated housing. According to ICP, the landlords of LIHTC projects, unlike other landlords, cannot refuse to rent to Section 8 participants. Because TDHCA's

---

[3]ICP asserts standing only on the basis of its own alleged injury. It does not allege that it has associational standing to sue on behalf of its clients in the absence of injury to itself. Therefore, the court does not consider this question. *See, e.g., Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587-88 (5th Cir. 2006) (discussing requirements for associational standing).

tax credit allocation has allegedly resulted in fewer LIHTC units in predominantly Caucasian areas, ICP asserts that its staff must spend more time locating housing in these areas for its Section 8 clients.  Further, it must provide them with greater financial assistance due to higher rents and must sometimes make "landlord incentive bonus payments" to landlords who agree to accept Section 8 tenants.  P. Compl. ¶ 30.

TDHCA counters that ICP does not allege any cognizable injury. It posits that ICP's alleged injury is merely an indirect consequence of putative injury to its clients.  TDHCA maintains that such indirect injury is insufficient to support standing.

C

The court first evaluates ICP's standing under the FHA.  ICP alleges that TDHCA's tax credit allocation violates the FHA because it makes both dwellings and financial assistance for constructing dwellings unavailable because of race.  *See* 42 U.S.C. § 3604(a) (making it unlawful to "make unavailable" a dwelling to "any person because of race"); *id.* § 3605(a) (making it unlawful to "discriminate against any person in making available [a residential real estate-related] transaction" because of race).

The FHA affords a cause of action to an "aggrieved person," *id.* § 3613(a)(1)(A), and defines this term as any person who "claims to have been injured by a discriminatory housing practice" or who "believes that such person will be injured by a

discriminatory housing practice that is about to occur," *id.*
§ 3602(i).   Through these provisions, Congress has abrogated
prudential standing under the FHA, thus extending standing to the
limits of Article III.  *See Lincoln v. Case*, 340 F.3d 283, 289 (5th
Cir. 2003) ("The Supreme Court has held that the sole requirement
for standing under the FHA is the Article III minima.") (citing
*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).  On its
FHA claims, therefore, ICP will have standing if it can establish
injury in fact, causation, and redressability——without regard to
any prudential limitations.

1

*Havens Realty* involved a claim of injury similar to that
presented in the instant case.  A fair housing organization,
Housing Opportunities Made Equal ("HOME"), contended that the
defendant realty corporation had engaged in racial steering, a
practice of guiding racial and ethnic groups to neighborhoods
occupied predominantly by those same groups.  *Havens Realty*, 455
U.S. at 366-67.  HOME alleged that this practice frustrated "its
efforts to assist equal access in housing through counseling and
other referral services" and required it to "devote significant
resources to identify and counteract the defendant's racially
discriminatory steering practices."  *Id*. at 379.  The Supreme Court
held that these allegations were sufficient to establish standing.
*Id*.  It reasoned:

- 8 -

> If, as broadly alleged, petitioners' steering
> practices have perceptibly impaired HOME's
> ability to provide counseling and referral
> services for low- and moderate-income
> homeseekers, there can be no question that the
> organization has suffered injury in fact.
> Such concrete and demonstrable injury to the
> organization's activities——with the consequent
> drain on the organization's
> resources——constitutes far more than simply a
> setback to the organization's abstract social
> interests, *see Sierra Club v. Morton*, 405 U.S.
> [727], 739 [(1972) (holding that environmental
> organization could not establish standing
> based only on a mere "bona fide special
> interest" in the subject matter of the suit)].

*Id.; see also Fair Housing of Marin v. Combs*, 285 F.3d 899, 904-05 (9th Cir. 2002) (holding that fair housing organization had standing under FHA based on frustration of mission and diversion of resources, and collecting similar cases).

The gravamen of the allegations in *Havens Realty* and of those in the instant case are analogous. Like the *Havens Realty* organization, ICP alleges that the challenged unlawful conduct has a segregative effect that frustrates its mission of promoting equal housing opportunities and requires it to spend more time and money in performing its activities than it otherwise would. These are more concrete allegations than a mere intangible setback to ICP's general interest in desegregation. Moreover, going a step beyond the *Havens Realty* organization, ICP pleads specific facts that support its claim of a drain on resources: that higher rents and reluctant landlords make it more difficult to place its Section 8

clients in non-LIHTC housing.[4]   Therefore, ICP has established

injury at the pleadings stage.[5]

This conclusion is not altered by TDHCA's contention that

ICP's alleged injury is insufficient to establish standing because

it is indirect.  It is true that the injury is indirect in that

TDHCA's alleged discrimination is directed not against ICP but

against African-Americans, such as ICP's clients.  Stated another

way, the right to be free from discrimination based on race belongs

to ICP's clients rather than to ICP.  But the indirectness of ICP's

injury does not render it irrelevant under the FHA.  Rather,

---

[4]The Fifth Circuit has held that an organization may not
"bootstrap standing" by claiming a drain on its resources as a
result of costs incurred for the particular lawsuit in which it
claims standing.  *See Ass'n for Retarded Citizens of Dallas v.
Dallas County Mental Health and Mental Retardation Ctr. Bd. of
Trustees*, 19 F.3d 241, 244 (5th Cir. 1994).  ICP does not allege
standing based on the costs of the instant lawsuit, and in its
brief it specifically disclaims reliance on them.

[5]At a later stage of this litigation, of course, ICP must
adduce evidence that shows a drain on its resources resulting from
TDHCA's tax credit allocation.  *See Fowler*, 178 F.3d at 360
(holding that organization failed to establish standing where there
was no summary judgment evidence of any "concrete or identifiable
resources that [it] could reallocate to other uses" if the
defendant ceased its putatively unlawful conduct); *La. ACORN Fair
Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000) (holding that
organization failed to establish standing where there was no
evidence at trial that it was required to put any "specific
projects" on hold or "re-double efforts" in response to the
defendant's conduct); *cf. Lujan*, 504 U.S. at 561 ("[E]ach element
[of standing] must be supported in the same way as any other matter
on which the plaintiff bears the burden of proof, *i.e.*, with the
manner and degree of evidence required at the successive stages of
the litigation.").

because under that statute Congress has abrogated the prudential standing rules, ICP "may have standing to seek relief on the basis of the legal rights and interests of others"—so-called "third party standing." *Warth*, 422 U.S. at 501; *see also Gladstone, Realtors*, 441 U.S. at 103 n.9 (interpreting the FHA) ("[A]s long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed."); *Havens Realty*, 455 U.S. at 375-78 (holding that individual plaintiffs had standing under FHA based on alleged "indirect" injury of being deprived of living in an integrated community due to defendant's racial steering of other persons), *id.* at 375 ("The distinction [between "third-party" and "first-party" standing] is of little significance" under the FHA.).[6]

2

To satisfy the causation element of standing, ICP must establish that its putative injury is fairly traceable to TDHCA's allocation of tax credits. The injury must not be the result of

_____

[6]TDHCA cites two cases to argue that ICP's indirect injury does not support standing. Both cases, however, are factually distinguishable. See *Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 347-48 (5th Cir. 2008) (discussing the standing of a class representative under the "juridical link" doctrine); *Garzes v. Lopez*, 281 Fed. Appx. 323, 325-26 (5th Cir. June 9, 2008) (per curiam) (applying rule that constituent of corporation does not have standing based on economic harm that is merely a consequence of injury to corporation). Moreover, although these cases state the general rule that a litigant must assert his own rights rather than the rights of others, this rule has been abrogated under the FHA and, as will be discussed below, does not bar ICP's claims under §§ 1982 and 1983.

the independent action of some third party not before the court. *Lujan*, 504 U.S. at 560. ICP alleges that TDHCA's disproportionate denial of tax credit applications for proposed developments in predominantly Caucasian areas causes a relative scarcity of LIHTC units there that makes it more difficult and expensive for ICP to secure integrative housing for its clients. ICP cites numerous statistics related to the location and occupancy of LIHTC developments that purportedly demonstrate that they are disproportionately located in census tracts with above-average minority populations. *See*, *e.g.*, P. Compl. ¶ 16 ("While 19% of all renter occupied units in the City of Dallas are located in predominantly [Caucasian] 70% to 100% [Caucasian] census tracts, only 2.9% of TDHCA's [LIHTC] units in the City are in those 70% to 100% [Caucasian] census tracts."). ICP also alleges that a committee of the Texas House of Representatives found that TDHCA's tax credit allocation compounded housing segregation.

Assumed true, ICP's allegations permit the reasonable inference that, absent TDHCA's consideration of race in tax credit allocation, there is a substantial probability that more LIHTC units would be available in predominantly Caucasian areas. This, in turn, would make it easier for ICP to secure housing for its clients in these areas. *Cf. Warth*, 422 U.S. at 504 (involving challenge to zoning regulations that allegedly excluded persons of low or moderate income) ("Petitioners must allege facts from which

- 12 -

it reasonably could be inferred that, absent the respondents'
restrictive zoning practices, there is a substantial probability
that they would have been able to purchase or lease in [the
city]."). Because no facts alleged suggest the existence of any
independent, race-neutral reasons why TDHCA would
disproportionately deny tax credit applications for proposed
developments in Caucasian neighborhoods, it is fair and not merely
speculative to trace this imbalance to the alleged consideration of
race. *Cf. Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43
(1976) (challenge to IRS regulations that allegedly encouraged
hospitals to deny services to indigents) ("It is purely speculative
whether the denials of service specified in the complaint fairly
can be traced to petitioners' 'encouragement' or instead result
from decisions made by the hospitals without regard to the tax
implications."). Further, although granting tax credits for a
proposed development may not guarantee that it ultimately will be
constructed, the court reasonably may infer that an increase in tax
credits allocated for proposed developments in predominantly
Caucasian areas would over time increase the number of LIHTC units
available in these areas. Therefore, the court holds that ICP
sufficiently alleged the causation element of standing.

Finally, ICP must establish that it is likely, as opposed to merely speculative, that its injury will be redressed by a favorable decision. *See Lujan*, 504 U.S. at 561. Clearly, the broad relief that ICP requests, *e.g.*, an injunction that requires TDHCA to allocate tax credits so as to create as many LIHTC units in areas predominantly Caucasian as there are in areas that are predominantly minority, would redress the injury. As suggested in the foregoing causation analysis, however, even more moderate relief——enjoining TDHCA from considering race——would likely lead to more LIHTC units in predominantly Caucasian areas. Therefore, ICP has established the redressability element of standing.

D

Having determined that ICP has standing under the FHA, the court now turns to ICP's claims under 42 U.S.C. §§ 1982 and 1983. ICP maintains that TDHCA's consideration of race violates § 1982 by denying non-Caucasian citizens an equal right to lease real property and violates the Fourteenth Amendment to the U.S. Constitution by denying non-Caucasian citizens the equal protection of the laws. *See* § 1982 (declaring that all citizens of the United States "shall have the same right . . . as is enjoyed by white citizens" to lease real property, *inter alia*); § 1983 (providing cause of action for violation of constitutional and other federal rights).

The foregoing analysis of constitutional standing also applies to ICP's §§ 1982 and 1983 claims: ICP has sufficiently alleged increased resource costs that are both fairly traceable to TDHCA's alleged discriminatory tax credit allocation and judicially redressable. The critical question, however, is whether the prudential rule against asserting the rights of others——inapplicable under the FHA——bars ICP's standing under these statutes. *See Fowler*, 178 F.3d at 363; *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) ("'Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party.'" (quoting *Barrows v. Jackson*, 346 U.S. 249, 255 (1953))).

ICP's §§ 1982 and 1983 claims implicate its African-American clients' right to be free of race discrimination in housing opportunities. The limitation on "third-party standing" is not a constitutional mandate, however, but is merely a "salutary rule of self-restraint." *Craig v. Boren*, 429 U.S. 190, 193 (1976) (internal quotation marks omitted). As such, courts have carved out exceptions to the rule where its justifications lack force. *See Singleton*, 428 U.S. at 114 ("Like any general rule, however, [the rule against third-party standing] should not be applied where its underlying justifications are absent."); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 333 (Former 5th Cir. 1981) ("In cases where these justifications are inapplicable, the general rule should be excepted, and assertion of third party rights

permitted."); *see generally* Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.4 (4th ed. 2003). Consideration of these justifications leads the court to conclude that prudential standing does not bar ICP from asserting its clients' rights under §§ 1982 and 1983.

1

The Supreme Court in *Singleton* discussed the two principles that animate the rule against third-party standing. *See Singleton*, 428 U.S. at 113-16. First, the rule prevents courts from unnecessary or undesired adjudication of rights. Two "factual elements" help resolve this question in a particular case: the relationship between the litigant and the third party and the third party's ability to assert his own right. *Id.* at 114-16. If the litigant and the third party have a close relationship and the litigant is a part of the third party's exercise of the right, then the court's "construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." *Id.* at 114-15. Moreover, if a genuine obstacle prevents the third party from asserting the right, then his absence from court "loses its tendency to suggest that his right is not truly at stake, or truly important to him." *Id.* at 116.

Second, the rule against third-party standing tends to ensure that the most effective advocate for the right is before the court, which relies on the vigorous argument of litigants. Generally, "third parties themselves . . . will be the best proponents of

their own rights." *Id*. at 114.  This will not always be the case, however.  Rather, "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Id*. at 115.

2

In the instant case, precluding ICP from asserting under §§ 1982 and 1983 its African-American clients' rights would not serve the purposes of the prudential rule against third-party standing. Taken as true, ICP's allegations indicate that it has a close, essentially representative relationship with its clients.  It acts like their agent in locating integrated rental housing, and, at times, negotiating housing terms.  ICP is therefore an integral part of its clients' exercise of their equal housing-related rights.  For this reason, the outcome of ICP's suit will not leave unaffected its clients' enjoyment of their rights.  Rather, a decision in ICP's favor would increase its clients' ability to access equal housing opportunities.  Further, although ICP, rather than a client, is the litigant before the court, the representative, advocacy-based relationship between them makes this logical and obviates any implication that ICP's clients do not wish to assert their rights.  Therefore, the court's consideration of ICP's §§ 1982 and 1983 claims will not be an unnecessary or undesired adjudication of rights.

Moreover, ICP's relationship with its clients as well as its

own organizational purpose suggest that it would be as effective as its clients in advocating their rights. ICP's mission is to achieve housing desegregation, eliminating the obstacles that confront African-Americans and other minorities in their pursuit of equal housing opportunities. The instant lawsuit is completely consistent with this mission and with ICP's advocacy-based relationship with its clients. Under these circumstances, ICP can be expected to be a vigorous proponent of its clients' rights. *Cf. Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982) (holding that not-for-profit theatrical corporation organized to reflect cultural interests of African-American and Hispanic communities had standing under § 1983, *inter alia*, as the most effective party to challenge denial of grant funds as discrimination based on race of its patrons) ("When a corporation meets the constitutional test of standing . . . prudential considerations should not prohibit its asserting that defendants, on racial grounds, are frustrating specific acts of the sort which the corporation was founded to accomplish."); *City of Evanston v. Baird & Wagner, Inc.*, 1990 WL 186575, at *4 (N.D. Ill. Nov. 15, 1990) (holding that fair housing organization established constitutional and prudential standing under § 1982 to challenge racial steering practices). *But see Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1054 (E.D. Va. 1986).

The court now turns to TDHCA's motion to dismiss for failure to comply with Rule 19.

Rule 19 seeks to ensure that lawsuits are disposed of fairly and completely. *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1308 (5th Cir. 1986) (citing Rule 19 Advisory Committee's note). To this end, it establishes a two-part process to identify persons who are needed for just adjudication of the action. First, it provides that certain persons are required to be joined as parties, if feasible. These include persons who are subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction if "in that person's absence, the court cannot afford complete relief among existing parties." Rule 19(a)(1). This is a "highly practical, fact-based decision." *Pulitzer-Polster*, 784 F.2d at 1309. Second, if joinder is not feasible, the court must decide whether that person is indispensable. Specifically, considering certain non-exhaustive factors, the court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Rule 19(b).

ICP and TDHCA dispute whether the IRS and the City are parties required to be joined, if feasible, under Rule 19(a) in order for

the court to provide complete relief to ICP, and whether failure to join them warrants dismissal. As to the IRS, TDHCA posits that the Tax Code provides certain incentives for developers of LIHTC housing to select low-cost land, which is primarily located in minority neighborhoods. TDHCA maintains that because developers select the land before submitting tax credit applications, it has no control over their decisions to build in predominantly minority areas. Therefore, TDHCA contends that the court cannot afford complete relief without amending the Tax Code to remove these incentives, requiring the joinder of the IRS.

ICP counters that joinder of the IRS is not necessary for complete relief. ICP argues that its claims are aimed at TDHCA's disproportionate approval of tax credits for proposed developments in minority neighborhoods compared to those in Caucasian neighborhoods, that this imbalanced approval rate can be remedied without any change to the Tax Code, and that recent amendments to the Tax Code have diminished certain incentives that TDHCA cites.

TDHCA also maintains that the City must be joined if the court is to afford complete relief. It posits that it cannot provide final approval for a tax credit application unless the developer obtains a resolution from the City approving the project and receives permission from the zoning authority to build in the desired area, and that the Dallas City Council recently enforced a moratorium on new LIHTC developments.

ICP disputes this contention.  It points out that the Dallas City Council is no longer enforcing the moratorium, and it maintains that there is adequate zoned land in Caucasian neighborhoods on which to build LIHTC units, arguing that the distribution of all rental units throughout Dallas is less segregated than that of LIHTC units.

C

The court holds that ICP's claims should not be dismissed for failure to join the IRS or the City because neither is a party required to be joined if feasible under Rule 19(a) for the court to afford complete relief.  The gravamen of ICP's complaint is that TDHCA is unlawfully discriminating based on race in tax credit allocation——not merely that there are fewer LIHTC units in Caucasian neighborhoods.  Assuming that ICP proves its claims, the court will be able to afford meaningful relief——enjoining TDHCA from considering race——without the presence of either the IRS or the City.  *See* Rule 19 Advisory Committee's note (explaining that "complete relief" is relief that is not "partial" or "hollow").  The court is not persuaded that an injunction against the consideration of race would be rendered meaningless or hollow either by tax incentives favoring land in minority neighborhoods or by the City's consistently blocking the construction of LIHTC housing in Caucasian neighborhoods.  TDHCA does not dispute that, despite contrary tax incentives, there have been some LIHTC

developments constructed in predominantly Caucasian areas, and it presents no evidence to suggest that the City will employ either its approval or zoning power so as to consistently exclude LIHTC housing from these areas.[7]

Because the court concludes that it will be able to afford complete relief in the absence of the IRS and the City, it does not reach the Rule 19(b) inquiry. Even assuming, however, that the IRS and the City are parties required to be joined if feasible, TDHCA has submitted no argument or evidence on whether they can be joined or, if not, on the equitable Rule 19(b) factors the court should consider to decide whether the action should proceed in their absence. *Cf. Imperial v. Castruita*, 418 F.Supp.2d 1174, 1178 (C.D. Cal. 2006) (declining to dismiss action for nonjoinder where defendant did not present any evidence that certain persons were required to be joined under Rule 19(a) and, even if so, they "failed to even argue, much less prove, that [the persons] cannot

_____

[7]Although TDHCA maintains that the Dallas City Council recently enforced a moratorium against new LIHTC developments in the City, it presents no evidence to support this assertion or to contradict ICP's proof that the Dallas City Council is now "willing to review applications on all tax credit transactions individually, based upon supply and demand in the project's submarket." P. App. 51 (quoting Dallas City Council Res. Jan. 23, 2008).

TDHCA also argues that the City must be joined because it offers bond programs that are a source of funding for low-income housing projects in addition to the tax credits available to developers. ICP's allegations, however, focus on TDHCA's alleged disproportionate approval of developers' tax credit applications, and the court can remedy this, if proved, without involving the City's bond programs.

be joined in the action"). Federal courts are reluctant to grant motions to dismiss based on nonjoinder, and the court declines to do so here. *See Teacher Retirement Sys. of Tex. v. Reilly Mortgage Group, Inc.*, 154 F.R.D. 156, 159 (W.D. Tex. 1994) (citing 7 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1609 (1986)).

                              *    *    *

Accordingly, for the reasons explained, the court denies defendants' June 27, 2008 motion to dismiss.

**SO ORDERED.**

December 11, 2008.

                              _____
                              SIDNEY A. FITZWATER
                              CHIEF JUDGE