IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE INCLUSIVE COMMUNITIES          §
PROJECT, INC.,                     §
                                   §
                    Plaintiff,     §
                                   §  Civil Action No. 3:08-CV-0546-D
VS.                                §
                                   §
THE TEXAS DEPARTMENT OF            §
HOUSING AND COMMUNITY              §
AFFAIRS, et al.,                   §
                                   §
                    Defendants.    §

MEMORANDUM OPINION
AND ORDER

In this action alleging that defendant Texas Department of Housing and Community Affairs ("TDHCA") perpetuates racial segregation and discrimination through the allocation of Low Income Housing Tax Credits ("LIHTC"), the court must decide whether plaintiff The Inclusive Communities Project, Inc. ("ICP") has standing and whether it has established prima facie cases under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604(a) and 3605(a), the Fourteenth Amendment (actionable under 42 U.S.C. § 1983), and 42 U.S.C. § 1982. Concluding that ICP has demonstrated its standing beyond peradventure, has established a prima facie case for each of its claims, and has adduced evidence that would enable a reasonable jury to find in its favor on each of its claims, the court grants ICP's motion for partial summary judgment and denies defendants'

motions for judgment on the pleadings and for summary judgment.[1]

I

The background facts and procedural history of this case are set out in the court's prior memorandum opinion and order. *See Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2008 WL 5191935, at *1 (N.D. Tex. Dec. 11, 2008) (Fitzwater, C.J.) ("*ICP I*"). The court therefore adds to *ICP I* the facts and procedural history pertinent to the court's present decision.

ICP is a Dallas-based non-profit organization that assists low-income persons in finding affordable housing and seeks racial and socioeconomic integration in Dallas housing. In particular, ICP works with African-American families who are eligible for the Dallas Housing Authority's Section 8 Housing Choice Voucher program ("Section 8"). ICP assists Section 8 participants in obtaining apartments in predominately Caucasian,[2] suburban neighborhoods[3] by

---

[1]Also pending is ICP's November 9, 2009 motion for leave to file supplemental appendix. The proposed appendix addresses a counterclaim—immunity under the Eleventh Amendment—subsequently withdrawn on November 20, 2009. Accordingly, the court denies ICP's motion as moot.

[2]Throughout this memorandum opinion and order, the court uses the term "Caucasian" to refer to the 2000 U.S. Census category for white persons who are neither Hispanic nor Latino.

[3]ICP encourages its clients to obtain housing in areas that meet the criteria for "Walker Target Area Tracts," defined in the Settlement Stipulation and Order in *Walker v. U.S. Department of Housing and Urban Development*, No. 3:85-CV-1210-R, at 4 (N.D. Tex. Mar. 8, 2001) (Buchmeyer, C.J.). A qualifying census tract

offering counseling, assisting in negotiations with landlords, and providing financial assistance (for example, security deposits). At times, ICP must provide "landlord incentive bonus payments" to landlords to secure housing for Section 8 participants.

TDHCA[4] is the state entity that administers the federal LIHTC program, granting tax credits under 26 U.S.C. § 42 to low-income housing developers to encourage investment in low-income, multifamily rental housing. Developers can sell their tax credits to finance housing construction. The tax credits are allocated according to the federal statute, which requires the state agency to act according to an annual "Qualified Allocation Plan" ("QAP") developed by the agency. *See* 26 U.S.C. § 42(m); 10 Tex. Admin. Code § 50.1 *et seq.* (2010) (setting forth QAP developed by TDHCA). TDHCA receives applications for proposed developments and has the sole authority to approve or deny tax credits for those

---

"according to the most recent decennial census, (i) has a black population at or below the average black population of the City of Dallas, (ii) has no public housing, and (iii) has a poverty rate at or below the average for the City of Dallas." *Id.* In addition, ICP looks for neighborhoods that (1) have a poverty population of 10% or less; (2) have a median family income of at least 80% of the 2000 U.S. Census Dallas Primary Metropolitan Statistical Area median family income; and (3) are in a public elementary school attendance zone for an elementary school that has either "Recognized" or "Exemplary" status.

[4]Unless the context otherwise requires, the term "TDHCA" includes TDHCA and its Executive Director and board members in their official capacities.

developments.[5]  The agency receives more applications than it can fund, and the exact amount of tax credits allocated to Texas varies each year (for example, $43 million in tax credits was allocated to Texas in 2007).  Any developer who receives LIHTC must accept as tenants otherwise-eligible Section 8 participants who use Section 8 vouchers to help pay rent.  *See* 26 U.S.C. § 42(h)(6)(B)(iv).  According to ICP, Section 8 participants struggle to obtain housing in non-LIHTC developments.

ICP alleges that TDHCA has disproportionately approved tax credits for low-income housing in minority neighborhoods and has denied applications for non-elderly[6] low-income housing in predominately Caucasian neighborhoods; that 92% percent of all LIHTC units in the city of Dallas are in census tracts where more than one-half of the population is minority; that TDHCA has discretion in determining which proposed projects receive tax credits, and that TDHCA improperly takes race into account (both of the neighborhood and of potential residents), perpetuating racial segregation in Dallas housing; that defendants made housing and

_____

[5]According to Texas regulations, "Developments will be ineligible if the Development is located on a site that is determined to be unacceptable by the [TDHCA].  This determination will be made at the sole discretion of the [TDHCA] . . . ."  10 Tex. Admin. Code § 50.6(j) (2010).

[6]The distinction between elderly and non-elderly units is salient because the potential tenants of non-elderly LIHTC units are more likely to be minority than the potential tenants of elderly LIHTC units.

financial assistance for housing construction unavailable because of race, in violation of the FHA; and that defendants used race as a factor in their allocation of tax credits, in violation of the Fourteenth Amendment, actionable under § 1983, and § 1982, which requires that defendants give all United States citizens the same right to lease property as Caucasian citizens. ICP requests broad equitable relief, including, *inter alia*, an injunction requiring TDHCA to create as many LIHTC units in non-minority census tracts as in minority census tracts; forbidding TDHCA from considering the racial composition of the area or potential residents; and enjoining TDHCA from perpetuating racial segregation.

ICP moves for partial summary judgment, asking the court to hold that ICP has standing to bring its claims, that it has established a prima facie case of racial discrimination based on a pattern of racial segregation in LIHTC units, and that, under the circumstantial evidence framework of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), defendants' actions have a greater effect on non-Caucasians than on Caucasians. Defendants move for judgment on the pleadings and for summary judgment, asserting that ICP lacks standing and that it is not entitled to relief on the merits.

II

The court begins by summarizing the standards under which the parties' motions are to be decided.

A

Defendants move under Rule 12(c) for judgment on the pleadings. A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam) (internal citations omitted). The motion "should be granted only if there is no issue of material fact and if the pleadings show that the moving party is entitled to prevail as a matter of law." *Greenberg v. Gen. Mills Fun Grp., Inc.*, 478 F.2d 254, 256 (5th Cir. 1973) (per curiam). The standard for deciding a motion under Rule 12(c) is the same as the one for deciding a motion to dismiss under Rule 12(b)(6). *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n.8 (5th Cir. 2002) ("A number of courts have held that the standard to be applied in a Rule 12(c) motion is identical to that used in a Rule 12(b)(6) motion." (footnote and internal quotation marks omitted)).

B

ICP and defendants both move for summary judgment. Their summary judgment burdens depend on whether they are moving for

summary judgment on a claim for which they will have the burden of proof at trial.

ICP moves for summary judgment on claims for which it will bear the burden of proof at trial. To be entitled to summary judgment, ICP "must establish 'beyond peradventure all of the essential elements of the claim[.]'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

Defendants move for summary judgment on claims for which they will not bear the burden of proof at trial.[7] They need only point to the absence of evidence of an essential element of ICP's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once defendants do so, ICP must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.

_____

[7]Insofar as defendants move for summary judgment on matters for which they bear the burden of proof at trial (e.g., in the content of ICP's FHA claim, the burden of proving that TDHCA's actions were in furtherance of a compelling government interest), they must satisfy the beyond-peradventure standard to obtain summary judgment. *See infra* note 18.

1994) (en banc) (per curiam).  An issue is genuine if the evidence
is such that a reasonable jury could return a verdict in ICP's
favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986).  ICP's failure to produce proof as to any essential element
of a claim renders all other facts immaterial.  *See Trugreen
Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007)
(Fitzwater, J.).  Summary judgment is mandatory if ICP fails to
meet this burden.  *See Little*, 37 F.3d at 1076.

                              III

                               A

     ICP and defendants both bring motions that require that the
court decide whether ICP has standing to bring suit.  In *ICP I* the
court held that it does.  *See ICP I*, 2008 WL 5191935, at *6, *9
(denying defendants' motion to dismiss ICP's claim for lack of
standing).  Defendants' Rule 12(c) and summary judgment motions
essentially urge the court to reconsider the analysis of *ICP I*,
which the court declines to do.  But because ICP now moves for
summary judgment establishing that it has standing, the court will
decide the question under the summary judgment standard.

     To determine whether ICP had standing in the context of a
motion to dismiss, the court presumed that the allegations of ICP's
complaint were true.  *See ICP I*, 2008 WL 5191935, at *3 (citing
*Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *2 (N.D. Tex.
Aug. 28, 2007) (Fitzwater, J.)).  But at the summary judgment

                            - 8 -

stage, "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court therefore will consider evidence offered by ICP to support its summary judgment motion on standing.

B

The doctrine of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To satisfy the requirements of Article III of the Constitution, ICP must show, at an "'irreducible constitutional minimum,'" that it has "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant[s], and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan*, 504 U.S. at 560-61). The injury in fact, moreover, must be "concrete and . . . actual or imminent, not conjectural or hypothetical," and "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 & 561 n.1 (citations omitted).

Only Article III standing is required to bring a claim under the FHA. *See ICP I*, 2008 WL 5191935, at *3 (quoting *Lincoln v. Case*, 340 F.3d 283, 289 (5th Cir. 2003) ("The Supreme Court has

held that the sole requirement for standing under the FHA is the Article III minima.")). But ICP also asserts claims under 42 U.S.C. §§ 1982 and 1983, for which there are prudential limitations on standing. *See ICP I*, 2008 WL 5191935, at *6 ("The critical question, however, is whether the prudential rule against asserting the rights of others——inapplicable under the FHA——bars ICP's standing under these statutes."). Under the prudential limitations, "[o]rdinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party." *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) (quoting *Barrows v. Jackson*, 346 U.S. 249, 255 (1953)). In *ICP I* the court held that precluding ICP from asserting its §§ 1982 and 1983 claims would not serve the purposes of the prudential rule against third-party standing. *See ICP I*, 2008 WL 5191935, at *7. Because the court is not reconsidering that holding (and the parties do not urge the court to do so), it will only consider at the summary judgment stage whether ICP has established beyond peradventure that it has Article III standing.

C

1

To satisfy Article III standing, ICP must first establish injury in fact. In *ICP I* the court cited *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), in which the Supreme Court held if "[defendants'] steering practices have perceptibly impaired [a fair

housing organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id.* at 379. The Court pointed specifically to the "consequent drain on the organization's resources" as evidence of that injury. *Id.* ICP seeks to place its clients in Walker Target Area Tracts, *see supra* note 3, or other high-opportunity (predominately Caucasian) areas. To place Section 8 participants in LIHTC housing, ICP spent an average of $491.00 per capita. To place clients in non-LIHTC housing, ICP expended an average of $993.00 per capita. ICP's average cost to secure non-LIHTC housing is much greater than the cost to obtain LIHTC housing because ICP often must pay non-LIHTC landlords bonus payments to convince them to participate in Section 8 or to lower the rent, and it must make a larger security deposit. This cost difference is even greater than these numbers reflect, because ICP must expend more time and effort to find non-LIHTC units that will even accept Section 8 vouchers. ICP has presented evidence that 86.6% of LIHTC developments informed ICP they would accept Section 8 vouchers, while only 11.9% of non-LIHTC developments would accept them. ICP has thus presented uncontroverted summary judgment evidence that the unavailability of LIHTC units in Walker Target Area Tracts drains the organization's resources. This demonstrates that ICP suffered injury in fact due to TDHCA's allegedly disproportionate denial of tax credits for

developments in those areas.

To establish causation, ICP presents evidence that TDHCA disproportionately denies tax credits to proposed developments in Caucasian neighborhoods, making it more difficult for ICP to find Section 8-participating housing in those areas.[8] Because TDHCA is the sole entity with authority to award tax credits to developers, its decisions directly affect the availability and geographical distribution of low-income housing. Moreover, TDHCA need not be the sole cause of injury to be liable for that injury. *See, e.g., Gautreaux v. Romney*, 448 F.2d 731, 739 (7th Cir. 1971) (holding that defendant played "significant" role in Chicago's racially discriminatory housing system). The court held in *ICP I* that it could reasonably infer that "an increase in tax credits allocated for proposed developments in predominately Caucasian areas would over time increase the number of LIHTC units available in these areas." *ICP I*, 2008 WL 5191935, at *5. If ICP is injured by the existing distribution of low-income housing, and TDHCA's actions directly and significantly affect that distribution, it follows that ICP has established causation.

Defendants argue that TDHCA does not solely control the location of low-income housing in Dallas because the developers choose where to locate housing. But this argument misconstrues the

---

[8]*See supra* § III(C)(1).

nature of ICP's claims.  ICP does not complain of the distribution of low-income housing in general; ICP challenges the allegedly discriminatory actions of TDHCA in disproportionately denying tax credits to proposed developments in Caucasian neighborhoods.  TDHCA does control the approval or denial of applications actually submitted.

Defendants also point to *Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086 (6th Cir. 1985).  In *Jaimes* the court held that plaintiffs (potential low-income housing tenants) could not establish causation sufficient for standing even though they were excluded from Toledo's suburbs, where there was no public housing. *See id.* at 1096.  But in *Jaimes* the court noted that, even if defendants had sought to build such public housing, it was "still a matter of speculation and conjecture as to whether [] third party, non-defendant [suburban town governments] would grant approval for construction of units that plaintiffs could afford, qualify for, or be eligible to obtain."  *Id.*  The court also emphasized that plaintiffs had pointed to "no specific proposed project, location or site that might have been approved[.]"  *Id.*; *see also id.* at 1096-97 ("[C]ourts have looked to a particular project or housing site which may have been affected by particular actions or failures to act on the part of government entities or officials.").

In the present case, no government agencies other than TDHCA

have the authority to grant or deny tax credits. Although TDHCA must follow the mandates of § 42, it has final discretion in allocating tax credits. In addition, ICP presents evidence that proposed developments in Caucasian areas were disproportionately denied tax credits. The direct actions of TDHCA in denying those tax credits, for reasons to be analyzed below, to *actual proposed developments* distinguishes this case from the more hypothetical injury presented in *Jaimes*.

Defendants point to this sentence in *ICP I*: "Because no facts alleged suggest the existence of any independent, race-neutral reasons why TDHCA would disproportionately deny tax credit applications for proposed developments in Caucasian neighborhoods, it is fair and not merely speculative to trace this imbalance to the alleged consideration of race." *ICP I*, 2008 WL 5191935, at *5. Defendants argue that § 42's stated preference for development in low-income areas is a race-neutral explanation for the disproportionate denial of tax credit applications of proposed developments in predominately Caucasian neighborhoods. They assert that this race-neutral reason indicates that ICP cannot prove causation. But defendants' race-neutral explanation, and whether it is pretextual, goes to the merits of ICP's claim, not to standing. ICP has demonstrated beyond peradventure that TDHCA's approval or denial of tax credits to developers directly affects the distribution of low-income housing in Dallas, which injures

ICP.  The court holds that ICP has established the element of causation.

3

The third element is whether the injury to ICP will likely be redressed by a favorable decision.  As discussed in *ICP I*, the broad equitable remedies available to this court would redress the alleged injury.  *See ICP I*, 2008 WL 5191935, at *6.  The court need not address any further evidence because its analysis in *ICP I* is sufficient.

Accordingly, the court holds ICP has established standing beyond peradventure, and it grants ICP summary judgment in this respect.  The court denies defendants' Rule 12(c) motion and motion for summary judgment to the extent they seek dismissal based on ICP's alleged lack of standing.

IV

The court now turns to ICP's contention in its motion for partial summary judgment that it has established prima facie cases of discrimination under the FHA, § 1982, and § 1983.

A

As a threshold matter, the court notes that, in some instances, the existence of a prima facie case is not relevant. *See Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607 (5th Cir. 2007) ("Because this case was fully tried on the merits, the *McDonnell Douglas* burden-shifting framework drops from

the case . . . . [T]he sufficiency of the prima facie case as such is no longer relevant." (internal quotation marks and citations omitted)); *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 575 (5th Cir. 2004) (noting that while prima facie case is irrelevant after trial on the merits, it is applicable in context of motions for judgment as a matter of law and summary judgment). The Supreme Court has held that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). But to evaluate the parties' summary judgment motions in this case, the court will consider ICP's motion for partial summary judgment as it relates to whether ICP has established prima facie cases. Under Fed. R. Civ. P. 56(d)(1), "the court should, to the extent practicable, determine what material facts are not genuinely at issue." If ICP can establish a prima facie case in support of its FHA claim, the burden shifts to defendants to prove that TDHCA's actions furthered a compelling government interest. Moreover, the question whether ICP has established a prima facie case of intentional discrimination under §§ 1982 and 1983 is relevant to other disputed issues in defendants' motions, such as whether defendants' justification for TDHCA's actions is pretextual. The existence of the prima facie case, together with evidence that defendants' proffered explanation

for its challenged conduct is pretextual, is sufficient to find intentional discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). Additionally, the strength of the prima facie case can be relevant in determining whether defendants' proffered explanation for their actions is in fact pretextual. *See, e.g., Prejean v. Radiology Assocs. of Sw. La. Inc.*, 342 Fed. Appx. 946, 950 (5th Cir. 2009) (per curiam). Therefore, the court will evaluate ICP's prima facie cases to decide defendants' motion for summary judgment. Because defendants essentially do not contest ICP's prima facie cases, the court will analyze this question in the context of ICP's partial summary judgment motion instead of considering it in the context of defendants' Rule 12(c) or summary judgment motions.

B

The court first turns to ICP's FHA claim. The FHA prohibits discrimination in the provision of housing. *See* 42 U.S.C. §§ 3604(a) and 3605(a).[9] "A plaintiff seeking recovery under [the FHA] may proceed under either a theory of disparate treatment or

---

[9]Section 3604(a) makes it unlawful, *inter alia,* to "make unavailable or deny, a dwelling to any person because of race[.]" 42 U.S.C. § 3604(a). Section 3605(a) makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race[.]" § 3605(a). A residential real estate-related transaction includes providing financial assistance for the construction of a dwelling. *See* § 3605(b).

disparate impact."[10] *Arbor Bend Villas Hous., L.P. v. Tarrant Cnty. Hous. Fin. Corp.*, 2005 WL 548104, at *12 (N.D. Tex. Mar. 9, 2005) (Means, J.); *see also Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 934 (2d Cir. 1988), *aff'd*, 488 U.S. 15 (1988) (per curiam) ("The [FHA's] stated purpose to end discrimination requires a discriminatory effect standard; an intent requirement would strip the statute of all impact on de facto segregation.").

C

ICP maintains in its motion for partial summary judgment that it has established beyond peradventure a prima facie case of racial discrimination under the FHA. To establish a prima facie case of discriminatory impact (also referred to as discriminatory effect), ICP must show "adverse impact on a particular minority group" or "harm to the community generally by the perpetuation of segregation." *Huntington Branch*, 844 F.2d at 937; *see also Arbor Bend*, 2005 WL 548104, at *12. ICP need not show that TDHCA acted with discriminatory intent or motive. *See Arbor Bend*, 2005 WL

---

[10]The court addresses only ICP's discriminatory impact claim under the FHA. ICP did not specifically plead in its complaint or request summary judgment on an intentional discrimination claim under the FHA. Defendants did not respond in their answer to an intentional discrimination claim brought under the FHA. The court will thus examine ICP's intentional discrimination claim under 42 U.S.C. §§ 1982 and 1983.

548104, at *12.  ICP's prima facie burden is not a heavy one.[11]  *See*

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

ICP need only provide evidence that raises an inference of

discrimination because "we presume these acts, if otherwise

unexplained, are more likely than not based on the consideration of

impermissible factors."  *See id.* at 254 (citations omitted).  If

ICP establishes its prima facie case of discriminatory effect,

discrimination is presumed.  *See id.*

ICP has established that its clients are African-Americans,

members of a protected class, who rely on government assistance

with housing, and that TDHCA has disproportionately approved tax

credits for non-elderly developments in minority neighborhoods and,

conversely, has disproportionately denied tax credits for non-

elderly housing in predominately Caucasian neighborhoods.

---

[11]In determining whether a plaintiff has established a prima
facie case of discrimination under the FHA, some courts have
utilized factors set forth by the Seventh Circuit in *Metropolitan
Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d
1283 (7th Cir. 1977).  *See Huntington Branch, NAACP v. Town of
Huntington*, 668 F. Supp. 762, 785-87 (E.D.N.Y. 1987) (considering
(1) strength of plaintiff's showing of discriminatory effect, (2)
whether there is some evidence of discriminatory intent, (3)
defendant's interest in taking action complained of, and (4)
whether plaintiff seeks to compel defendant to provide housing or
restrain defendant from interfering with other property owners),
*rev'd*, 844 F.2d 926 (2d Cir. 1988).  But these factors are not
properly part of plaintiff's prima facie case; instead, they should
be considered as part of the "final determination on the merits."
*Huntington Branch*, 844 F.2d at 935-36 ("[T]reating the four factors
as steps necessary to make out a prima facie case places too
onerous a burden on [plaintiffs].").  Accordingly, the court will
not consider the *Village of Arlington Heights* factors when deciding
whether ICP has demonstrated a prima facie case.

According to ICP's evidence, from 1999-2008, TDHCA approved tax credits for 49.7%[12] of proposed non-elderly units in 0% to 9.9% Caucasian areas, but only approved 37.4% of proposed non-elderly units in 90% to 100% Caucasian areas.[13]  ICP also analyzed data produced by defendants in discovery that indicates that 92.29% of LIHTC units in the city of Dallas were located in census tracts with less than 50% Caucasian residents.

ICP's evidence is supported by the "Talton Report," a report of the House Committee on Urban Affairs prepared for the House of Representatives, 80th Texas Legislature, which found that TDHCA "disproportionately allocate[s] federal low income housing tax credit funds . . . to developments located in [areas with above average minority concentrations]." P. Oct. 2, 2009 App. 95.  The Talton Report notes that, as of 2006, 77% of LIHTC units in the city of Dallas were in above-average minority areas, leading to "concentration problems." *Id*.  A study by the U.S. Department of Housing and Urban Development ("HUD") reached a similar conclusion.  *See id.* at 435, 486 (reporting that, from 1995-2006, 67% of LIHTC

---

[12]"Statistical analysis is admissible to establish disparate impact*." Budnick v. Town of Carefree*, 518 F.3d 1109, 1118 (9th Cir. 2008).  The disparate impact analysis will "of necessity, rely heavily on statistical proof." *Owens v. Nationwide Mut. Ins. Co.*, 2005 WL 1837959, at *13 (N.D. Tex. Aug. 2, 2005) (Sanders, J.).

[13]Although the table that contains this information is presented as part of Dr. Thompson's report, he did not compile this information, and none of defendants' objections to his report applies.  Further, defendants have not objected to the reliability of this data.

units in Texas were in greater than 50% minority areas, as opposed to 47% of all units; similarly, 69% of all LIHTC units in the city of Dallas were in greater than 50% minority areas, as opposed to 45% of all units).

This evidence establishes that TDHCA disproportionately approves applications for non-elderly LIHTC units in minority neighborhoods, leading to a concentration of such units in these areas. This concentration increases the burden on ICP as it seeks to place African-American Section 8 clients in LIHTC housing in predominately Caucasian neighborhoods. Other courts have held that actions that cause disproportionate harm to African-Americans and produce a segregative impact on the entire community create a strong prima facie case. *See, e.g., Huntington Branch,* 844 F.2d at 938 (holding that failure to re-zone Caucasian neighborhood for LIHTC apartments perpetuated segregation and had adverse impact on Section 8 participants who were disproportionately minorities); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1288 (7th Cir. 1977) (same); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1219-20 (2d Cir. 1987) (holding that city perpetuated racial segregation in housing, in violation of FHA, where 96.6% of subsidized housing was in areas with 40% or greater minority population); *see also Dews v. Town of Sunnyvale*, 109 F.Supp.2d 526, 565-68 (N.D. Tex. 2000) (Buchmeyer, C.J.). Because ICP has adduced evidence that is uncontested, it has established

beyond peradventure its prima facie case of discrimination under the FHA.[14]  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 n.3 (1993) (noting that prima facie case can be established as a matter of law where plaintiff's facts are uncontested).  The court therefore grants partial summary judgment holding that ICP has made a prima facie showing that defendants violated the FHA.

D

The court turns next to ICP's intentional discrimination claim brought under 42 U.S.C. §§ 1982 and 1983.  ICP may use direct or circumstantial evidence to establish its prima facie case of intentional discrimination under §§ 1982 and 1983.  *See Vill. of Arlington Heights*, 429 U.S. at 266.  ICP has presented no direct evidence of discrimination, so the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  *See Arbor Bend*, 2005 WL 548104, at *6.

E

ICP moves for summary judgment establishing its prima facie case of discrimination under § 1982 and the Fourteenth Amendment,

---

[14]ICP also requests that the court grant summary judgment holding that defendants' actions bear more heavily on minorities than on Caucasians, one factor in the *Village of Arlington Heights* circumstantial evidence framework.  Although the court has authority to enter a partial summary judgment determining that material facts are not genuinely at issue, *see* Rule 56(d), it declines to do so as to this single circumstantial-evidence factor.

actionable under § 1983.[15]

Section 1982 "prohibits 'all racial discrimination, private as well as public,' with respect to property rights." *Evans v. Tubbe*, 657 F.2d 661, 663 n.2 (5th Cir. Unit A Sept. 1981) (quoting *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413 (1968)). "To state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Dallas Indep. Sch. Dist.*, 557 F.Supp.2d 755, 761 (N.D. Tex. 2008) (Fitzwater, C.J.) (quoting *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994)), *aff'd*, 370 Fed. Appx. 455 (5th Cir. 2010). ICP alleges that defendants have violated the Equal Protection Clause of the Fourteenth Amendment, which prohibits intentional racial segregation in government-assisted housing. *See, e.g., Banks v. Dallas Hous. Auth.*, 119 F.Supp.2d 636, 638 n.3 (N.D. Tex. 2000) (Kaplan, J.).

To prove claims under § 1982 and the Equal Protection Clause,

_____

[15]The court uses the term "prima facie" to mean the establishment of a legally mandatory, rebuttable presumption in the *McDonnell Douglas* framework, recognizing that in the more general sense, "prima facie" is a phrase used to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue. *See Burdine*, 450 U.S. at 254 n.7; *see also Askin v. Firestone Tire & Rubber Co.*, 600 F. Supp. 751, 755 (D. Ky. 1985) ("Even though the prima facie case may have been enough to shift the burden of production to the defendant, it is not necessarily enough to entitle the plaintiff to submit his or her case to the jury.").

ICP must demonstrate discriminatory intent, not merely discriminatory effect. *See City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S 188, 195 (2003) (quoting *Vill. of Arlington Heights*, 429 U.S. at 265 ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.")); *see also Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (noting that although FHA claim requires only showing of discriminatory effect, § 1982 claim requires finding of intentional racial discrimination); *Dews*, 109 F.Supp.2d at 570 ("In contrast to claims brought under the [FHA], plaintiffs suing under §§ 1981, 1982, 1983 and 2000d must prove discriminatory intent.").

ICP need only present enough evidence to give rise to an inference of discrimination. *See Kennedy v. City of Zanesville*, 505 F.Supp.2d 456, 493 (S.D. Ohio 2007). The prima facie case is not inflexible, and the specific facts required to be proved may vary depending on the factual situation. *See id.* at 493-94. "It is relatively easy . . . for a plaintiff to establish a *prima facie* case[.][16] *Arbor Bend*, 2005 WL 548104, at *7 (quoting *Britt v. Grocers Supply Co.*, 978 F.2d 1441, 1450 (5th Cir. 1992)).

---

[16]When a summary judgment motion on a discrimination claim is evaluated in the *McDonnell Douglas* framework, summary judgment is most appropriate at the pretext stage, not when addressing the plaintiff's prima facie case or the defendant's burden of producing evidence of a legitimate, nondiscriminatory reason. *See Arbor Bend*, 2005 WL 548104, at *7. It is thus relatively easy for ICP to establish a prima facie case and for TDHCA to meet its burden of production. *See id.*

ICP has presented enough evidence to give rise to an inference that TDHCA discriminated on the basis of race. Evidence that may give rise to an inference of discrimination includes statistical proof, comparative evidence, proof of a suspect sequence of events, or evidence of a subjective decisionmaking process. *See Kennedy*, 505 F.Supp.2d at 493-94.

First, ICP has presented statistical and comparative evidence that may give rise to an inference of discriminatory intent. ICP alleges that TDHCA is more likely to approve LIHTC developments in Caucasian neighborhoods if the likely tenants are Caucasian. ICP highlights the fact that, in Caucasian neighborhoods, elderly LIHTC housing is approved more often than non-elderly LIHTC housing, and elderly residents are more likely to be Caucasian. According to TDHCA data, from 1999 to 2008, TDHCA approved tax credits for 70.2% of the proposed elderly units in 90% or greater Caucasian census tracts. TDHCA approved just 37.4% of proposed non-elderly units in the same tracts.

ICP also presents evidence of a suspect sequence of events, and that TDHCA employs a subjective decisionmaking process. ICP relies on evidence that, from 1991-1993, TDHCA considered as one of its LIHTC selection criteria whether a development would provide desegregated housing opportunities. In 1994, TDHCA eliminated this criterion despite the concern about segregation in Dallas housing

widely noted at the time due to the contemporaneous Dallas housing desegregation case. *See Walker v. City of Mesquite*, No. 3:85-CV-1210-R (N.D. Tex. Filed June 25, 1985) (Buchmeyer, C.J.). ICP suggests that the "repeal" of TDHCA's written desegregation preference in favor of TDHCA's discretion is related directly to TDHCA's intentional discrimination. P. Oct. 22, 2009 Br. 18.

For direct evidence of intent, ICP relies on contemporary statements made by TDHCA officials in board meetings as indications that race influenced defendants' actions. For example, at a February 2003 board meeting, TDHCA board member Shadrick Bogany ("Bogany") stated: "I'm tired of [these projects] being put in minority communities all the time."[17] P. Oct. 2, 2009 App. 871. Later in the board meeting, he repeated, "And you know, it's just——it's amazing to me how we constantly concentrate these all over——in just the minority communities." *Id.* at 873. Bogany also protested at a later meeting that the board was creating a "tax-credit city" in a minority neighborhood in Houston. He argued that the TDHCA should not approve a proposed development because the minority neighborhood already contained 17 LIHTC developments, and that the next QAP needed to address the concentration issue. He pointed to the underdevelopment and lack of retail in the area, and

---

[17]ICP points to other statements by board members, but the court's review indicates that they refer to the over-saturation of LIHTC units in some areas in Dallas; they express no concern that is specific to minority areas.

noted that the city representatives arguing for the development were not from the area. "[C]ontemporary statements by members of the decisionmaking body, minutes of its meetings, or reports" may be "highly relevant" in establishing discriminatory intent. *Vill. of Arlington Heights*, 429 U.S. at 267-68. Although Bogany's statements are not admissions of racial discrimination, the totality of the evidence presented by ICP gives rise to an inference of discriminatory intent.

The court holds that ICP has presented enough evidence to establish beyond peradventure an inference of discriminatory intent. The court thus grants ICP summary judgment as to its prima facie case under §§ 1982 and 1983.

V

The court now turns to the remaining parts of defendants' Rule 12(c) motion and motion for summary judgment.

A

In their Rule 12(c) motion and motion for summary judgment, defendants request that the court hold that there is no genuine issue of material fact that their actions serve a compelling government interest, as required for ICP's FHA claim,[18] and that ICP

---

[18]Although defendants' motion for summary judgment is styled a "no evidence" motion, under the applicable law, once ICP demonstrated a prima facie case of discrimination, the burden shifted to defendants to prove that their actions serve a compelling government interest. *See AHF Cmty. Dev., LLC v. City of Dallas*, 633 F.Supp.2d 287, 304 (N.D. Tex. 2009) (Fitzwater, C.J.). Therefore, to be entitled to summary judgment as to ICP's FHA

has presented no evidence that defendants' actions are pretextual, as required for ICP's §§ 1982 and 1983 claims. Because, as explained below, the court holds that there are genuine issues of material fact as to whether defendants' reason is pretextual and as to whether TDHCA's actions serve a compelling government interest, the court denies defendants' Rule 12(c) motion for judgment on the pleadings. The court must go beyond the pleadings and consider the evidence. The court will, however, consider defendants' arguments made in support of their Rule 12(c) motion in deciding their summary judgment motion.

B

The court considers first defendants' motion for summary judgment as to ICP's FHA claim. Because ICP has established its prima facie case of discriminatory impact under the FHA, the burden shifts to defendants to prove that TDHCA's actions were in furtherance of a compelling government interest. *See AHF Cmty. Dev., LLC v. City of Dallas*, 633 F.Supp.2d 287, 304 (N.D. Tex. 2009) (Fitzwater, C.J.); *see also Arbor Bend*, 2005 WL 548104, at *12; *Huntington Branch*, 844 F.2d at 939. This interest must be bona fide and legitimate, and there must be no less discriminatory alternatives. *See Huntington Branch*, 844 F.2d at 939 (holding that "[t]he *McDonnell Douglas* test, however, is an intent-based standard

claim, defendants must establish beyond peradventure that their actions further a compelling government interest.

- 28 -

for disparate treatment cases inapposite to the disparate impact claim asserted here.  No circuit, in an impact case, has required plaintiffs to prove that defendants' justifications were pretextual.").

Defendants concede for purposes of their summary judgment motion that ICP has established a prima facie case, and they maintain that their actions further a compelling government interest.  Defendants argue that the concentration of LIHTC developments in inner-city areas serves a compelling government interest; that 26 U.S.C. § 42, the statute that establishes low-income housing tax credits, compels defendants to locate developments in the most impoverished areas; that it is impossible for defendants to comply with § 42 and achieve ICP's request that 50% of LIHTC developments be located in the suburbs; and that to the extent they conflict, § 42 controls over the FHA and § 1982.

To determine whether defendants' justification rises to the level of a compelling government interest, the court will consider "(1) whether [TDHCA's actions] in fact further[] the governmental interest asserted; (2) whether the public interest served by [TDHCA's actions] is constitutionally permissible and is substantial enough to outweigh the private detriment caused by it; and (3) whether less drastic means are available whereby the stated governmental interest may be attained."  *See Arbor Bend*, 2005 WL 548104, at *12 (internal quotation marks omitted).  The court holds

that TDHCA has not established beyond peradventure that its actions furthered a compelling government interest.

Defendants have failed to establish that TDHCA cannot comply with § 42 in a way that has less discriminatory impact on the community. They offer as their justification TDHCA's compliance with § 42(m)(1)(B)(ii), which provides that a qualified allocation plan gives preference to projects serving lowest-income tenants and projects that are located in qualified census tracts (areas designated by HUD as low-income). Defendants have failed to establish without genuine dispute that TDHCA cannot comply with both § 42 and the FHA. Defendants in fact acknowledge that there is no conflict between § 42 and the FHA. The court therefore denies defendants' motion for summary judgment as to ICP's FHA claim. *See, e.g., Huntington Branch*, 844 F.2d at 941 (holding that defendant town violated the FHA, reversing district court, and entering judgment for plaintiff NAACP).[19]

---

[19]In *Arbor Bend* the plaintiff housing development filed an application with the defendant housing finance corporation seeking to become a participant in a tax-credit low-income housing program. *Arbor Bend*, 2005 WL 548104, at *1. The defendant denied the plaintiff's application for funding. *See id.* at *3. The plaintiff sued, alleging that the defendant's decision not to fund the development was motivated by race and familial status of the likely tenants. *See id.* The court held that, regardless of the plaintiff's establishment of a prima facie case of discrimination, the defendant's actions furthered the compelling government interest of not increasing the burden on already-overcrowded schools in the area. *See id.* at *12. The court thus granted defendant's motion for summary judgment. *See id.* at *17.

But in *Dews* Chief Judge Buchmeyer held that the defendant town's justifications for its zoning plan, which had a

The court now considers defendants' motion for summary judgment as to ICP's §§ 1982 and 1983 claims. Because ICP has established its prima facie case of discriminatory effect under *McDonnell Douglas*, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their actions. *See St. Mary's Honor Ctr.*, 509 U.S. at 506-07 (addressing racial discrimination claim under Title VII). Defendants' burden is one of production, not proof, and involves no credibility assessments. *See, e.g.*, *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003) (age discrimination case). "It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant[s], '[t]he ultimate burden of persuading the trier of fact that the defendant[s] intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Ctr.*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 253) (emphasis in original); *see also Simms v. First Gibraltar Bank*, 83 F.3d 1546,

---

discriminatory effect, were not bona fide, legitimate, or the least discriminatory means of accomplishing zoning objectives. *Dews*, 109 F.Supp.2d at 568-69. The defendant maintained that its "one-unit-per-acre" zoning was necessary to protect public health and comply with regional obligations of environmental protection, transportation, air quality, and agricultural protection. *See id.* Chief Judge Buchmeyer found that this justification was pretextual and that less discriminatory zoning plans were available. *See id.* He held that the plaintiff had established liability under the FHA. *See id.* at 569.

1559 (5th Cir. 1996) (holding that plaintiff did not present sufficient evidence of discrimination to find a violation of the FHA). "It is relatively easy . . . for a defendant to articulate a legitimate, non-discriminatory reason for his decision." *Arbor Bend*, 2005 WL 548104, at *7 (quoting *Britt*, 978 F.2d at 1450).

Once defendants have produced a nondiscriminatory reason, the burden shifts back to ICP to prove that defendants' proffered reason is pretextual, which is circumstantial evidence of discrimination. *See West*, 330 F.3d at 385 ("It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." (internal quotation marks omitted)); *St. Mary's Honor Ctr.*, 509 U.S. at 511 (Title VII case) (holding that "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . . But the [appellate court's] holding that rejection of the defendant's proffered reasons *compels* judgment for the plaintiff" is incorrect). "[P]laintiffs must present evidence that would allow a rational factfinder to make a reasonable inference that race was a determinative reason for the housing decision." *Jim Sowell Constr. Co. v. City of Coppell*, 61 F.Supp.2d 542, 546 (N.D. Tex. 1999) (Fitzwater, J.) (citing *Simms*, 83 F.3d at 1556). But the Supreme Court has held that "discrimination may well be the most likely alternative explanation" for defendants' actions once the plaintiff offers

evidence that defendants' reason is pretextual. *See Reeves*, 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *see also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 (5th Cir. 2000). The Court cautioned, however, that there are instances where although plaintiff has established a prima facie case of discrimination and offered evidence that defendants' justification is false, no rational factfinder could conclude that defendants' actions were discriminatory. *See Reeves*, 530 U.S. at 148.

D

Defendants offer a nondiscriminatory reason for their actions by pointing to the statute establishing low-income housing tax credits, 26 U.S.C. § 42.[20] They argue that the statute specifically encourages awarding tax credits to developments in the most impoverished neighborhoods, which are often minority areas.[21] In

---

[20]*See also supra* § V(B).

[21]Defendants suggest that this case should be resolved under principles of statutory construction. Because they maintain that they are simply following the mandates of § 42, they argue that their actions must be legal, even if they violate the FHA or § 1982, because § 42 is the most recent and specific statute. The court declines to evaluate this case on this basis.

First, ICP alleges violations of statutes and of the Fourteenth Amendment. Second, the FHA, § 1982, and § 42 are not in direct tension, and it is not clear that TDHCA could not comply with the three statutes. Nothing in § 42 requires that entities like TDHCA act in a discriminatory manner or in violation of the

other words, they maintain that the concentration of LIHTC units in minority areas is the direct result of the mandate of § 42, which requires that defendants give preference to developments "serving the lowest income tenants" and "located in 'qualified census tracts.'" Ds. Oct. 2, 2009 Br. 13.[22]  Because defendants have produced a nondiscriminatory reason for their actions, the court need not make any credibility assessment of this proffered reason at this time.  *See Kretchmer v. Eveden, Inc.*, 374 Fed. Appx. 493, 495 (5th Cir. 2010) (per curiam).  The court holds that defendants have met their burden of production as to the second step of *McDonnell Douglas*.

E

The court now turns to the third step and holds that ICP has presented sufficient evidence that defendants' proffered reason is pretextual to require a trial.  *See, e.g., Britt*, 978 F.2d at 1450 (age discrimination case) ("In the context of summary judgment . . ., the question is not whether the plaintiff proves pretext,

---

FHA or § 1982.  "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  *Morton v. Mancari*, 417 U.S. 535, 551 (1974).  Therefore, the jury must decide whether defendants' actions violated the FHA, § 1982, and § 1983, even if they demonstrate that TDHCA followed § 42.

[22]In particular, §§ 42(d)(5)(B)(i) and (ii) specifically allow a proposed development in a "qualified census tract" (a low-income area) to receive 130% of the tax credits a LIHTC development not in such an area would receive.

but rather whether the plaintiff raises a genuine issue of fact regarding pretext."). The following examples are illustrative.[23]

First, ICP has produced evidence that only 34% of all LIHTC units are in qualified census tracts, and that only 39.8% of all LIHTC units in qualified census tracts received the 130% bonus. Under TDHCA's QAP, applications are awarded points if they meet desirable selection criteria, and can receive over 200 points. *See* 10 Tex. Admin. Code § 50.9. A proposed location in a qualified census tract earns an application just one point, equal to the bonus given to developments with a gazebo. *See* 10 Tex. Admin. Code §§ 50.9(i)(25) and (h)(4)(A)(ii)(III). Thus ICP has presented evidence that TDHCA's primary justification, that its actions are required by § 42, is relevant to only 34% of TDHCA's developments.

Second, ICP points again to the evidence of discriminatory intent discussed *supra* at § IV(F). Circumstantial evidence of discriminatory intent allows a jury to make a reasonable inference that race was a determinative reason for the housing decision. *See Vill. of Arlington Heights*, 429 U.S. at 266-68; *Jim Sowell Constr. Co.*, 61 F.Supp.2d at 546-47 (listing non-exhaustive guiding factors, including (1) the discriminatory effect of the official action, (2) the historical background of the decision, (3) the

---

[23]When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact. *See, e.g., Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.).

specific sequence of events leading up to the challenged decision, (4) departures from the normal procedure, (5) departures from the normal substantive factors, and (6) the legislative or administrative history of the decision). ICP has presented evidence of the discriminatory effect of TDHCA's tax credit allocation. ICP has also produced minutes from TDHCA board meetings in which tax credits for minority-area developments were approved even though the areas had a high concentration of low-income housing developments and despite some board members' objections.

Considering all of this evidence together, the court holds that ICP has raised a genuine issue of material fact as to the pretextual nature of defendants' proferred justification. ICP has presented some evidence that defendants' QAP and actual practices do not corroborate their contention that building in qualified census tracts is a true priority. Instead, the disproportionate approval of units in Caucasian areas when the likely tenants are Caucasian allows a reasonable jury to infer that defendants' reason is pretextual. Because there are genuine issues of material fact, the court denies defendants' motion for summary judgment as to ICP's §§ 1982 and 1983 claims.

* * *

ICP's October 2, 2009 motion for partial summary judgment is granted. Defendants' October 2, 2009 motion for judgment on the pleadings and their October 2, 2009 motion for summary judgment are denied. ICP's November 9, 2009 motion for leave to file supplemental appendix is denied as moot.

**SO ORDERED.**

September 28, 2010.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE