IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC., | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:08-CV-0546-D |
| VS. | § § | |
| THE TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS, et al., | § § § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
AND ORDER

This lawsuit challenging the Texas Department of Housing and Community Affairs'

("TDHCA's") allocation of Low Income Housing Tax Credits ("LIHTC") in the Dallas

metropolitan area requires the court to decide whether plaintiff has proved that TDHCA

intentionally discriminated based on race, in violation of the Equal Protection Clause of the

Fourteenth Amendment and 42 U.S.C. § 1982, or that TDHCA's allocation decisions had a

disparate racial impact, in violation of §§ 3604(a) and 3605(a) of the Fair Housing Act

("FHA"). Following a summary judgment decision and a bench trial, and for the reasons that

follow,[1] the court finds that plaintiff has proved its disparate impact claim under the FHA,

---

[1]The court sets out in this memorandum opinion and order its findings of fact and
conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). Although the court has carefully
considered the trial testimony and exhibits, this memorandum opinion and order has been
written to comply with the level of detail required in this circuit for findings of fact and
conclusions of law. *See, e.g., Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th
Cir. 1998) (discussing standards). The court has not set out its findings and conclusions in

but it otherwise finds in favor of defendants.

## I

## A

This is an action by plaintiff The Inclusive Communities Project, Inc. ("ICP") against defendants TDHCA and its Executive Director and board members in their official capacities under the FHA, the Fourteenth Amendment (actionable under 42 U.S.C. § 1983), and 42 U.S.C. § 1982. ICP is a non-profit organization that seeks racial and socioeconomic integration in the Dallas metropolitan area. In particular, ICP assists low-income, predominately African-American families who are eligible for the Dallas Housing Authority's Section 8 Housing Choice Voucher program ("Section 8") in finding affordable housing in predominately Caucasian,[2] suburban neighborhoods. Because under the LIHTC program a development that receives tax credits cannot refuse housing solely because a person is using a Section 8 voucher, it is important to ICP where the developments are located in the Dallas metropolitan area.

This lawsuit arises from TDHCA's allocation of LIHTC in the Dallas metropolitan area. Under § 42 of the Internal Revenue Code ("I.R.C."), the government provides tax

_____

punctilious detail, slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis. It has instead written a memorandum opinion and order that contains findings and conclusions that provide a clear understanding of the basis for the court's decision. *See id.*

[2]In this memorandum opinion and order, the term "Caucasian" means white persons who are neither Hispanic nor Latino.

- 2 -

credits that a state distributes to developers through a designated state agency. *See id.* TDHCA is the agency designated by the Texas Legislature to administer the program in Texas. *See* Tex. Gov't Code Ann. § 2306.053(b)(10) (West 2008) ("The department may . . . administer federal housing, community affairs, or community development programs, including the low income housing tax credit program."). Developers apply to TDHCA for tax credits, which can be sold to finance construction of a housing project.

TDHCA issues two types of LIHTC: 4% tax credits[3] and 9% tax credits. The 9% tax credits are distributed on an annual cycle and are generally oversubscribed. Certain federal and state laws dictate, at least in part, the manner in which TDHCA can select the applications that will receive 9% tax credits. First, I.R.C. § 42 requires that the designated state agency adopt a "Qualified Allocation Plan" ("QAP") that prescribes the "selection criteria." *See id.* at § 42(m)(1)(A)-(B).[4] The QAP must include, *inter alia*, certain selection criteria, *see id.* at § 42(m)(1)(C),[5] and preferences, *see id.* at § 42(m)(1)(B);[6] otherwise,

---

[3]It appears that the actual name of 4% tax credits is "Tax-Exempt Bond." *See* Tr. 2:12 (referring to P. Ex. 125 at 60 and noting that the term "Tax-Exempt Bond Developments" is "4% tax credits."); P. Ex. 1 at 19; P. Ex. 125 at 28. The court will use the terms "4% tax credit" and "4% tax credits" because the parties and TDHCA appear to do so. *See* P. Ex. 490 at 17 ("[T]he non-competitive, or the 4 percent credits, as you'll normally hear us refer to them in the Board meetings . . . [are] allocated with private activity bonds."); *see also, e.g.,* Tr. 4:11-15.

[4]ICP also calls the selection criteria the 9% point scoring and ranking system. This may result from the fact that Texas law obligates TDHCA to score and rank applications against selection criteria that prioritize certain criteria. *See* Tex. Gov't Code Ann. § 2306.6710(b) (West 2001).

[5]I.R.C. § 42(m)(1)(C) provides, in relevant part:

- 3 -

"zero" housing credit dollars will be provided, *see id.* at § 42(m)(1)(A).  Second, the Texas

Government Code regulates how  TDHCA administers the LIHTC program.  The Code

requires TDHCA to adopt annually a QAP and corresponding manual.  *Id.* at § 2306.67022.[7]

_____

> The selection criteria set forth in a qualified allocation plan must
> include—
> (i) project location,
> (ii) housing needs characteristics,
> (iii)  project  characteristics,  including  whether  the  project
> includes  the  use  of  existing  housing  as  part  of  a  community
> revitalization plan,
> (iv) sponsor characteristics,
> (v) tenant populations with special housing needs,
> (vi) public housing waiting lists,
> (vii) tenant populations of individuals with children,
> (viii) projects intended for eventual tenant ownership,
> (ix) the energy efficiency of the project, and
> (x) the historic nature of the project.

*Id.*

> [6]I.R.C. § 42(m)(1)(B) provides, in relevant part:

> [T]he term "qualified allocation plan" means any plan— . . .
> which . . . gives preference in allocating housing credit dollar
> amounts among selected projects to--
> (I) projects serving the lowest income tenants,
> (II) projects obligated to serve qualified tenants for the longest
> periods, and
> (III) projects which are located in qualified census tracts (as
> defined in subsection (d)(5)(C)) and the development of which
> contributes to a concerted community revitalization plan[.]

*Id.*

> [7]Section 2306.67022 was amended in 2011.  It now requires TDHCA to adopt a QAP
> and corresponding manual only biennially, with the discretion to do so annually.  *See* Tex.
> Gov't Code Ann. § 2306.67022 (West 2011).  The court refers to the 2001 version, instead
> of the 2011 amended version, because the parties rely on the 2001 version.  And the court

It also sets out how TDHCA is to evaluate applications. TDHCA must first "determine whether the application satisfies the threshold criteria" in the QAP. *Id.* at § 2306.6710(a). Applications that meet the threshold criteria are then "score[d] and rank[ed]" by "a point system" that "prioritizes in descending order" ten listed statutory criteria (also called "above-the-line criteria"), which directly affects TDHCA's discretion in creating the "selection criteria" in each QAP. *Id.* at § 2306.6710(b).[8] The Texas Attorney General has interpreted

is primarily relying on the statute to provide a basic understanding of the Texas LIHTC program during the period that preceded the filing of this lawsuit. As of the date of this memorandum opinion and order, it appears that it is still the TDHCA's practice to adopt a QAP annually. *See* Ds. Dec. 7, 2011 Br. 13 ("The TDHCA administers its LIHTC program through a unique, legislatively-mandated QAP re-written each year.").

[8]The ten statutory criteria are:

> (A) financial feasibility of the development based on the supporting financial data required in the application that will include a project underwriting pro forma from the permanent or construction lender;
> (B) quantifiable community participation with respect to the development, evaluated on the basis of written statements from any neighborhood organizations on record with the state or county in which the development is to be located and whose boundaries contain the proposed development site;
> (C) the income levels of tenants of the development;
> (D) the size and quality of the units;
> (E) the commitment of development funding by local political subdivisions;
> (F) the level of community support for the application, evaluated on the basis of written statements from the state representative or the state senator that represents the district containing the proposed development site;
> (G) the rent levels of the units;
> (H) the cost of the development by square foot;
> (I) the services to be provided to tenants of the development;

this provision to obligate TDHCA to "use a point system that prioritizes the [statutory] criteria in that specific order." Tex. Att'y Gen. Op. No. GA-0208, 2004 WL 1434796, at *4 (2004). Although the Texas Government Code does not mandate the points to be accorded each statutory criterion, "the statute must be construed to require [TDHCA] to assign more points to the first criterion than to the second, and so on, in order to effectuate the mandate that the scoring system 'prioritiz[e the criteria] in descending order.'" *Id.* (quoting Tex. Gov't Code Ann. § 2306.6710(b)(1) (West 2004)). And while TDHCA can consider other criteria and preferences (also called "below-the-line" criteria), it "lacks discretionary authority to intersperse other factors into the ranking system that will have greater points than" the statutory criteria. *Id.* at *6 (citation and internal quotation omitted). Once TDHCA adopts a QAP, it submits the plan to the Governor, who can "approve, reject, or modify and approve" it. Tex. Gov't Code Ann. § 2306.6724(b)-(c) (West 2001). Once approved, TDHCA staff review the applications in accordance with the QAP, underwrite applications in order "to determine the financial feasibility of the development and an appropriate level of housing tax credits," *id.* at § 2306.6710(b)(1)(A) & (d), and submit their recommendations to TDHCA. *See id.* at § 2306.6724(e). TDHCA then reviews the staff recommendations and

---

> and
> (J) whether, at the time the complete application is submitted or at any time within the two-year period preceding the date of submission, the proposed development site is located in an area declared to be a disaster under Section 418.014[.]

Tex. Gov't Code Ann. § 2306.6710(b) (West 2007).

issues final commitments in accordance with the QAP.  *See id.* at § 2306.6724(e)-(f).

The 4% tax credit, on the other hand, is a non-competitive program, available to applicants on a year-round basis.  *See* P. Ex. 1 at 19, 46.  The federal government provides states private activity bonds, *see* I.R.C. §§ 42 and 142, that are distributed in Texas by several issuers, including TDHCA.  Developers can apply to TDHCA for a 4% tax credit to be allocated in addition to a bond, particularly the multifamily housing bond.  In awarding the tax credit, TDHCA "reviews the application for threshold, eligibility and then the development is underwritten."  P. Ex. 1 at 20; *see also* Tex. Gov't Code Ann. § 2306.67021 (West 2001) (providing that, with the exception of § 2306.6703 regarding eligibility, subchapter 2306 DD (i.e., from § 2306.6701-.6723) "does not apply to the allocation of housing tax credits to developments financed through the private activity bond program").  In particular, applications for the 4% tax credit are not subject to scoring under the selection criteria.  *See* P. Ex. 125 at 64 (the 2008 QAP, for example, relieves 4% tax credit applications or "Tax-Exempt Bond Developments" from certain sections of the QAP, including § 50.9(I) regarding "Selection Criteria."); *see also* Tr. 4:12 ("[4% applications] do[] [not] go through a competitive scoring model where the Board makes a decision on a particular group of projects at any given time.")  If a developer seeks a multifamily bond allocation from TDHCA, it applies to TDHCA, which reviews the application and submits it to the Bond Review Board ("BRB"), a separate agency, for the final determination of whether to issue an underlying bond.

B

ICP alleges that, despite federal and state laws governing the QAP, TDHCA is permitted under Texas law to exercise discretion in making final decisions regarding the allocation of both 4% and 9% tax credits. It maintains that TDHCA uses this discretion to make housing and financial assistance for housing construction unavailable because of race, in violation of §§ 3604(a) and 3605(a) of the FHA. ICP also alleges that TDHCA has used race as a factor in allocating tax credits under the LIHTC program, in violation of the Fourteenth Amendment and of § 1982, which requires that defendants give all United States citizens the same right to lease property as Caucasian citizens.

In a prior opinion in this case, the court addressed the parties' cross-motions for summary judgment. *See Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 749 F.Supp.2d 486 (N.D. Tex. 2010) (Fitzwater, C.J.) ("*ICP II*"). It held that ICP was entitled to partial summary judgment establishing the prima facie case component of its claims under the FHA, § 1982, and the Fourteenth Amendment (actionable through § 1983). *Id.* at 500 (FHA) and 502 (§ 1982 and Fourteenth Amendment (actionable through § 1983)).

Because ICP had met this burden, defendants were obligated with respect to ICP's FHA claim (which was limited to a disparate impact claim, *id.* at 498 n.10) to prove that TDHCA's actions were in furtherance of a compelling government interest that was bona fide and legitimate, and that there were no less discriminatory alternatives. *Id.* at 503. The court held that defendants had not met their summary judgment burden of establishing that TDHCA's actions furthered a compelling government interest. In particular, they did not

- 8 -

establish that TDHCA could not comply with both I.R.C. § 42 and the FHA. *Id.* at 504.

Concerning ICP's intentional discrimination claims under § 1982 and the Fourteenth Amendment (§ 1983), the court held that defendants had met their burden of producing evidence of a nondiscriminatory reason for their actions, *id.* at 506, but that ICP had "presented sufficient evidence that defendants' proffered reason is pretextual to require a trial." *Id.*

The parties presented this case in a bench trial that commenced on August 29, 2011 and concluded on September 1, 2011. The court granted the parties' requests that they present their closing arguments by written submissions. The final submissions were filed on December 21, 2011.[9]

_____

[9]The parties have lodged numerous objections to the testimony and exhibits. Many objections are immaterial because the court did not rely on the evidence in question when making its decisions on the merits, or the court relied on the evidence for a limited purpose that is unaffected by whether the objection is well taken. In a bench trial, it is permissible for the court to hear evidence that it later determines is inadmissible or immaterial to its decisions on the merits. *See Harris v. Rivera*, 454 U.S. 339, 346 (1981) (holding that, in a bench trial, the court is presumed capable of hearing otherwise inadmissible evidence and disregarding that evidence when making decisions). Regarding the evidence on which the court did rely in reaching its decision, the principal objections appear to challenge the relevance of certain evidence and the qualifications of certain witnesses to give expert testimony. The court overrules the relevance objections that are related to the evidence on which the court has relied in reaching its decision. The court concludes that the evidence is relevant, within the meaning of Fed. R. Evid. 401, to whether defendants' actions violated the FHA, the Fourteenth Amendment, and/or § 1982. To the extent the parties challenge the admissibility of witnesses who were offered as experts, the court holds that the party offering the testimony has either satisfied the requirements for expert testimony under Fed. R. Evid. 702 or that the witness was testifying based on personal knowledge as a fact witness rather than offering scientific, technical, or other specialized knowledge.

II

The court considers together ICP's claims for intentional discrimination under the Equal Protection Clause of the Fourteenth Amendment (actionable under § 1983) and § 1982.

A

The Equal Protection Clause of the Fourteenth Amendment "prohibits intentional racial segregation in government-assisted housing." *ICP II*, 749 F.Supp.2d at 501 (citing *Banks v. Dall. Hous. Auth.*, 119 F.Supp.2d 636, 638 n. 3 (N.D. Tex. 2000) (Kaplan, J.)). "To state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Id.* (quoting *Moore v. Dall. Indep. Sch. Dist.,* 557 F.Supp.2d 755, 761 (N.D. Tex. 2008) (Fitzwater, C.J.), *aff'd*, 370 Fed. Appx. 455 (5th Cir. 2010)). Section 1982 "prohibits all racial discrimination, private as well as public, with respect to property rights." *Id.* (quoting *Evans v. Tubbe*, 657 F.2d 661, 663 n. 2 (5th Cir. Unit A Sept. 1981)) (internal quotation marks omitted). "To prove claims under § 1982 and the Equal Protection Clause, ICP must demonstrate discriminatory intent, not merely discriminatory effect." *Id.* (citing *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 195 (2003)); *see also Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (noting that although FHA claim requires only showing of discriminatory effect, § 1982 claim requires finding of intentional racial discrimination).

ICP has not introduced direct evidence of intentional discrimination. Discriminatory intent can be proved, however, by circumstantial evidence. *See Vill. of Arlington Heights v.*

*Metro. Hous. Dep't*, 429 U.S. 252, 266-68 (1977); *Jim Sowell Constr. Co. v. City of Coppell*, 61 F.Supp.2d 542, 546-47 (N.D. Tex. 1999) (Fitzwater, J.) (listing non-exhaustive guiding factors, including (1) the discriminatory effect of the official action, (2) the historical background of the decision, (3) the specific sequence of events leading up to the challenged decision, (4) departures from the normal procedure, (5) departures from the normal substantive factors, and (6) the legislative or administrative history of the decision). When a plaintiff does not present direct evidence of discrimination, the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *ICP II*, 749 F.Supp.2d at 500. The court granted partial summary judgment in *ICP II*, holding that ICP had established a prima facie case of discriminatory intent. *Id.* at 502. The court recognizes that the "*McDonnell Douglas* formula . . . is applicable only in a directed verdict or summary judgment situation, and is not the proper vehicle for evaluating a case that has been fully tried on the merits." *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 575 (5th Cir. 2004) (internal quotation marks omitted) (quoting *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285 (5th Cir. 1986)). But the court as trier of fact can consider ICP's prima facie showing, and defendants' explanation for their challenged conduct, when deciding whether ICP has proved intentional discrimination. "The existence of the prima facie case, together with evidence that defendants' proffered explanation for its challenged conduct is pretextual, is sufficient to find intentional discrimination." *ICP II*, 749 F.Supp.2d at 498 (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)). And "the strength of the prima facie case can be relevant in determining whether defendants' proffered explanation

- 11 -

for their actions is in fact pretextual." *Id.* (citing *Prejean v. Radiology Assocs. of Sw. La. Inc.*, 342 Fed. Appx. 946, 950 (5th Cir. 2009) (per curiam)).

B

ICP alleges that TDHCA intentionally discriminates based on race by disproportionately approving LIHTC in predominantly minority neighborhoods and disproportionately denying LIHTC in predominantly Caucasian neighborhoods. As noted, ICP has not offered direct evidence of discriminatory intent; instead, it relies on circumstantial proof, including evidence that TDHCA's justifications for the discriminatory impact of its LIHTC decisions are pretextual.

ICP failed to prove by a preponderance of the evidence that TDHCA intentionally discriminates based on race in its LIHTC decisions. Without discussing the trial evidence in punctilious detail, *see supra* note 1, the court finds that TDHCA offered evidence of its obligation to create the selection criteria of each QAP in accordance with governing federal and state law. TDHCA also introduced proof that its staff are responsible for initially scoring applications according to the QAP and presenting recommendations for TDHCA's approval or denial. Multiple witnesses credibly testified that, in making decisions, TDHCA does not act with intent to discriminate.

Moreover, ICP did not prove that TDHCA intentionally discriminates when exercising its limited discretion. ICP asserts that TDHCA can in its discretion ignore the selection criteria made mandatory by the Texas Legislature by issuing forward commitments to 9% tax credit applications and by approving 4% tax credit applications, and that this discretion

- 12 -

is used to intentionally discriminate.  The court finds that TDHCA offered credible evidence of nondiscriminatory reasons for approving or denying every application that ICP alleges was improperly approved or denied.[10]  For example, ICP maintains that TDHCA intentionally discriminated in denying a 4% tax credit to the Primrose at Stonebrook project located in a majority Caucasian area.  The court finds that TDHCA denied this application because the proposed project consisted of only three-bedroom units, and that in 2004 TDHCA was using its limited 4% tax credit allocations for projects that had a mix of different size units so that, among other reasons, single mothers could afford units in the development.[11]

ICP also failed to prove that TDHCA withheld its discretionary authority with the intent to perpetuate a disparate impact.  In fact, there are several instances when the TDHCA Board attempted to use its limited discretion to deconcentrate LIHTC developments in high-minority areas and encourage development in "high opportunity areas" preferred by ICP and

_____

[10]Although the court finds below, *see infra* § III(C), that TDHCA could have used its discretion to issue forward commitments in order to decrease the disparate impact of its decisions, ICP did not prove by a preponderance of the evidence that TDHCA intentionally discriminates on the basis of race when deciding whether to make a forward commitment.

[11]The court finds that other challenged examples were also approved or denied for nondiscriminatory reasons.  For instance, the Chaparral Townhomes project was a 9% tax credit applicant that scored well enough to receive LIHTC, but TDHCA denied the application because the developer was a former TDHCA board member who had in the past received four LIHTC allocations.  In response to recent criminal charges against a former TDHCA board member and pressure from the Texas Legislature to spread tax credits among developers, TDHCA determined that it should avoid the appearance of impropriety and adhere to the Legislature's request by not awarding tax credits to a former board member who had received LIHTC on four prior occasions.  The credits were given instead to a developer who had never received LIHTC.

other organizations.  For example, in 2003, TDHCA board member Shadrick Bogany stated during a Board meeting that he was "tired" of the Board's approving LIHTC projects in a manner that led to the concentration of LIHTC projects in high-minority areas.  Shortly thereafter, the Texas Legislature responded to concerns about the concentration of LIHTC in high-minority areas by amending the statutes that governed the LIHTC program, and those changes were implemented by TDHCA in the 2004 QAP.  The new rules sought to deconcentrate housing by imposing certain limitations on LIHTC project concentrations, such as the one mile/one year rule, the one mile/three year rule, and the twice per capita rule.  The one mile/one year rule prevents TDHCA from approving two LIHTC projects within one linear mile of each other within the same allocation year in counties with populations exceeding one million.  The one mile/three year rule prevents TDHCA from approving an LIHTC project that is within one linear mile of the same type of LIHTC project built within three years preceding the new project application, unless the local government votes specifically to allow the construction.  And the twice per capita rule requires developers who propose a project in a municipality or county that contains more than twice the state average of units per capita supported by LIHTC to obtain a resolution from the municipality or county approving the new development.

Moreover, TDHCA independently took steps to deconcentrate LIHTC projects in high-minority areas.  After ICP's President testified before TDHCA in 2004 and requested that, as part of the selection criteria, TDHCA give four additional points to projects that further fair housing goals, TDHCA changed the 2005 QAP to include the granting of points

- 14 -

to projects in "high opportunity areas," and it increased from four to seven the requested points for certain "high opportunity area" categories.[12] These changes, along with evidence of other TDHCA attempts to deconcentrate LIHTC projects in high-minority areas, demonstrate that TDHCA did not intentionally discriminate by withholding its discretionary authority to perpetuate a discriminatory impact. And there are other examples of how TDHCA attempted to address the concentration issue, such as the 130% basis boost given for projects in high opportunity areas. *See* Ds. Nov. 9, 2011 Br. 23-28 (addressing trial evidence regarding several examples).

ICP has failed to prove that TDHCA used the inclusive capture rate[13] to intentionally discriminate by steering developers to propose LIHTC projects in high-minority areas. The inclusive capture rate is not part of the 9% selection criteria, but is instead used during the underwriting process to ensure that projects are financially feasible.[14] The inclusive capture rate is calculated by comparing the supply of units in a given area to tenant demand for low-income housing in the area. ICP alleges that the use of the inclusive capture rate leads to concentrations of LIHTC projects in high-minority areas because that is where a

---

[12]In response to a complaint to the Governor by Representative Robert Talton that granting seven points for developments in certain high opportunity areas encouraged development in high-income areas rather than low-income areas where the housing was needed, the Governor rejected the 2005 QAP. After TDHCA lowered the seven point categories to four points, the Governor approved the QAP.

[13]TDHCA no longer uses the term "inclusive capture rate." It renamed and simplified the formula.

[14]A project will not be allocated LIHTC until it passes the underwriting analysis.

disproportionate number of low-income housing tenants live; thus if a developer wants to increase the chances of passing the underwriting analysis, it will propose a project in a high-minority area.  The court finds that TDHCA uses the inclusive capture rate to measure the financial feasibility of a proposed development, not to intentionally discriminate based on race.  Financial feasibility is of great concern to TDHCA because LIHTC allocated to projects that fail are largely lost; those lost credits in most instances cannot be allocated to other projects.  Thus if a LIHTC project fails, Texas loses low-income housing units that would otherwise have been constructed and available.

Finally, ICP failed to prove that TDHCA's justifications for the prima facie showing of disparate impact are pretextual.  Again, the court need not explain its reasoning for rejecting each of ICP's arguments.  *See supra* note 1.  These two are illustrative.

ICP posits that one of TDHCA's asserted justifications for the disparate impact—that TDHCA does not control the locations of LIHTC projects because developers choose them—is pretextual because TDHCA, through the use of the inclusive capture rate, steers developers to propose projects in high-minority neighborhoods.  According to ICP, the inclusive capture rate has this effect because the rate TDHCA requires for a project to pass the underwriting analysis effectively dictates that a high number of low-income tenants must live in the area of the proposed development.  As the court has already discussed, however, TDHCA uses the inclusive capture rate during the underwriting process as a measurement of a project's financial feasibility.  ICP has therefore failed to prove that TDHCA's

justification that developers choose the LIHTC sites is pretextual.[15]

ICP also maintains that TDHCA's justification that developers choose project sites is pretextual because TDHCA uses a less demanding inclusive capture rate for elderly projects, which typically have fewer minority residents, than for non-elderly projects, which typically have more minority residents. ICP contends that this results in steering only non-elderly projects into high-minority areas. The court finds from the credible evidence, however, that TDHCA used different rates because, *inter alia*, the turnover rate in elderly units is much lower than in non-elderly units, thus requiring a lower inclusive capture rate to ensure the financial feasibility of the project. Accordingly, the court finds that TDHCA's justification that developers choose project sites is not pretextual.

Because ICP has failed to prove by a preponderance of the evidence that TDHCA intentionally discriminates on the basis of race when allocating LIHTC, the court finds that it has failed to prove its intentional discrimination claims under the Fourteenth Amendment (actionable under § 1983) and § 1982.

---

[15]TDHCA does influence the locations of the LIHTC projects by selecting which projects are awarded LIHTC. To the extent TDHCA's contention that developers choose the location of LIHTC projects is not in all respects precise, this inaccuracy does not belie an attempt by TDHCA to conceal discriminatory intent.

III

ICP also alleges that defendants are liable under §§ 3604(a) and 3605(a) of the FHA based on a claim for disparate impact.

A

"The [FHA] prohibits discrimination in the provision of housing." *Artisan/Am. Corp. v. City of Alvin, Tex.*, 588 F.3d 291, 295 (5th Cir. 2009). Section 3604(a) of the FHA makes it unlawful, *inter alia*, to "make unavailable or deny, a dwelling to any person because of race[.]" Section 3605(a) provides that it is unlawful, *inter alia*, "for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race[.]" A "residential real estate-related transaction" includes providing financial assistance for the construction of a dwelling. *Id.* § 3605(b).

In *ICP II* the court held that ICP was entitled to summary judgment establishing that it had made a prima facie showing of disparate impact. *See ICP II*, 749 F.Supp.2d at 499-500. In particular, the court relied on evidence that, "from 1999–2008, TDHCA approved tax credits for 49.7% of proposed non-elderly units in 0% to 9.9% Caucasian areas, but only approved 37.4% of proposed non-elderly units in 90% to 100% Caucasian areas." *Id.* at 499.[16] Because ICP has made this showing, the burden has shifted to defendants to prove by

_____

[16]The court relied on other evidence as well, including the "Talton Report," a report of the House Committee on Urban Affairs prepared for the House of Representatives, 80th

- 18 -

a preponderance of the evidence that their actions were in furtherance of a legitimate

governmental interest. *See Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d

926, 939 (2d Cir. 1988) (citing *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 149 (3d Cir.

1977)), *aff'd in part*, 488 U.S. 15 (1988); *Rizzo*, 564 F.2d at 149.[17]  To meet this burden,

_____

Texas Legislature, and a study by the U.S. Department of Housing and Urban Development.
*See ICP II*, 749 F.Supp.2d at 500.

[17]The Fifth Circuit has not yet adopted a standard and proof regime for FHA-based disparate impact claims.  The circuits that have done so have adopted at least three different standards and proof regimes.  In *ICP II* this court essentially followed the approach of the Second Circuit in *Huntington Branch*, 844 F.2d 926, although, unlike *Huntington Branch*, the court did not engage in a process of balancing factors identified in *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977).  *See ICP II*, 749 F.Supp.2d at 503.  The approach taken in *ICP II* was consistent with that found in other decisions of this court.  *See, e.g., AHF Cmty. Dev., LLC v. City of Dallas*, 633 F.Supp.2d 287, 304 (N.D. Tex. 2009) (Fitzwater, C.J.) ("Once the plaintiff has made out a prima facie case of discriminatory effect . . . the burden shifts to the defendant to prove a compelling government interest.") (internal quotation omitted) (citing *Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp.2d 526, 532 (N.D. Tex. 2000) (Buchmeyer, C.J.)).

It appeared that the Supreme Court might clarify this unsettled area of the law.  After this case was tried, and while the parties were making post-trial submissions, the Court granted certiorari in *Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010), *cert. granted*, 132 S.Ct. 548 (U.S. Nov. 7, 2011) (No. 10-1032), *and cert. dism'd*, ___ S.Ct. ____, 2012 WL 469885 (U.S. Feb. 14, 2012), to decide two questions: "Are disparate impact claims cognizable under the Fair Housing Act?" and "If such claims are cognizable, should they be analyzed under the burden shifting approach used by three circuits, under the balancing test used by four circuits, under a hybrid approach used by two circuits, or by some other test?" Petition for Writ of Certiorari at i, *Magner v. Gallagher*, 2011 WL 549171 (Feb. 14, 2011) (No. 10-1032).  On February 14, 2012 this court entered an order deferring its decision in this case until *Magner* was decided.  Feb. 14, 2012 Order at 1.  But the Supreme Court dismissed the petition the same day this court entered its order.  *Magner v. Gallagher*, ___ S.Ct. ____, 2012 WL 469885 (Feb. 14, 2012).

Absent controlling authority of the Supreme Court or the Fifth Circuit, the court will apply the law of the case, as set out in *ICP II*, and allocate to defendants the burden of proof regarding ICP's disparate impact claim because ICP has satisfied its burden of establishing a prima facie case.  The court will not, however, require that defendants prove a *compelling*

- 19 -

defendants must prove two essential elements. First, they must prove that their interest is bona fide and legitimate. Second, they must prove there are no less discriminatory alternatives, meaning that "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *See Dews v. Town of Sunnyvale, Tex.*, 109 F.Supp.2d 526, 565, 568 (N.D. Tex. 2000) (Buchmeyer, C.J.); *see also Huntington Branch*, 844 F.2d at 939; *Rizzo*, 564 F.2d at 149. "[In] the end there must be a weighing of the adverse impact against the defendant's justification." *Huntington Branch*, 844 F.2d at 936; *see also Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F.Supp.2d 12, 16 (D. Conn. 2011) ("After the defendant presents a legitimate justification, the court must weigh the defendant's justification against the degree of adverse effect shown by the plaintiff.").[18]

_____

governmental interest rather than a *legitimate* governmental interest, despite the use of the *compelling* standard in *ICP II. See ICP II*, 749 F.Supp.2d at 503; *see also AHF Cmty. Dev.*, 633 F.Supp.2d at 304 ("Once the plaintiff has made out a prima facie case of discriminatory effect . . . the burden shifts to the defendant to prove a compelling government interest.") (internal quotation omitted). Because defendants maintain that the court should apply a *legitimate* governmental interest standard absent Fifth Circuit precedent that requires the higher *compelling* governmental interest, and because the result of today's case is the same under the *legitimate* governmental interest standard, the court opts to decide the claim under the lower standard.

[18]Some courts balance objectives in order to determine whether a discriminatory impact violates the FHA. *See, e.g., Vill. of Arlington Heights*, 558 F.2d at 1290 (examining "(1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v. Davis*; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing"). This court has not adopted

B

1

Defendants assert that they acted in furtherance of a compelling, or at least legitimate, governmental interest: the awarding of tax credits in an objective, transparent, predictable, and race-neutral manner, in accordance with federal and state law.[19] Defendants point out that the Texas Legislature, likely in response to the indictment and conviction of a TDHCA board

_____

this approach. *See Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 51 (1st Cir. 2000) (rejecting balancing approach adopted by *Village of Arlington Heights* because "we do not think that the courts' job is to 'balance' objectives, with individual judges deciding which seem to them more worthy" and "to have federal judges make such policy choices is essentially to impose on them the job of making decisions that are properly made by Congress or its executive-branch delegates; and the balancing approach is in tension with the course taken by the Supreme Court and Congress under Title VII where a *standard* of justification is constructed and applied") (emphasis in original).

[19]As one of their asserted interests, defendants contend that they seek to award tax credits in a race-neutral manner. But a disparate *impact* claim does not require proof of discriminatory *intent*. *See, e.g., Homebuilders Ass'n of Miss. v. City of Brandon, Miss.*, 640 F.Supp.2d 835, 841 (S.D. Miss. 2009); *Arbor Bend Villas Hous., L.P. v. Tarrant Cnty. Hous. Fin. Corp.*, 2005 WL 548104, at *12 (N.D. Tex. Mar. 9, 2005) (Means, J.). And although facially neutral, a policy or practice can still violate the FHA because of its discriminatory impact. *See Homebuilders Ass'n*, 640 F.Supp.2d at 841 ("[A] discriminatory effect claim challenges neutral policies that create statistical disparities which are equivalent to intentional discrimination".); *Luckett v. Town of Bentonia*, 2007 WL 1673570, at *6 (S.D. Miss. June 7, 2007) ("To succeed on [an FHA disparate impact claim], the plaintiff must identify a policy or practice that is facially neutral in its treatment of different groups but that in fact falls more harshly on one group than another and cannot be justified by business necessity.") (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977))*; Owens v. Nationwide Mut. Ins. Co.*, 2005 WL 1837959, at *13 (N.D. Tex. Aug. 2, 2005) (Sanders, J.) ("To establish a [*prima facie*] case supporting a disparate impact or effect claim related to the discriminatory provision of insurance under § 3604 [of the FHA], a plaintiff must prove that a specific facially neutral policy or practice created statistical disparities so great as to be 'functionally equivalent to intentional discrimination,' thereby disadvantaging members of a protected group.") (citing cases).

- 21 -

member for bribery in connection with the LIHTC program, amended the Texas Government Code in 2001 and 2003 to provide the now-existing mandatory statutory requirements for the issuance of tax credits under the LIHTC program. According to TDHCA, these amendments were adopted for the purpose of creating an objective and transparent system, and TDHCA acts with these goals in mind.  Although defendants rely principally on the foregoing interests, they also posit that the public interest is served by ensuring that tax credits are awarded to developments that will provide quality, sustainable housing for low-income individuals, and by providing the public an opportunity to participate in creating the QAP in an open and transparent manner, thereby enabling the LIHTC program to represent different policy viewpoints, in compliance with public expectations.

Defendants also maintain that, because of the strict requirements of federal and state law, TDHCA has only limited discretion, found in its ability (1) to modify strictly the below-the-line criteria, and not the statutory above-the-line criteria, and (2) to "forward commit" by awarding tax credits from the following year's allocation of tax credits to a 9% tax credit application that would not otherwise succeed due to its low score under the selection criteria.[20]  According to defendants, forward commitments have been used sparingly, with

---

[20]To the extent defendants are arguing that their discretion is limited because they do not select the location of their projects, defendants are misconstruing the issue in this case. As the court noted in *ICP II*, "ICP does not complain of the distribution of low-income housing in general; ICP challenges the allegedly discriminatory actions of TDHCA in disproportionately denying tax credits to proposed developments in Caucasian neighborhoods.  TDHCA does control the approval or denial of applications actually submitted."  *ICP II*, 749 F.Supp.2d at 496.

only three made in 2003 to 2007 in the region that includes Dallas.  Defendants also maintain

that this discretion cannot be used in a manner that subverts federal and state law; otherwise,

it would render meaningless the intent of the Legislature in creating an objective, transparent,

and predictable system.

Defendants also note TDHCA's actions in response to the Housing and Economic

Recovery Act of 2008 ("HERA").  Before the enactment of HERA, states were limited to

awarding 30% basis boosts only to developments located in qualified census tracts or

difficult development areas.  But after HERA, states were permitted to choose the

developments to receive the boost.  TDHCA exercised this authority in the 2009 QAP to

target developments in "high opportunity areas."  A "high opportunity area" is defined as:

> an area that includes:
> (A) existing major bus transfer centers and/or regional or local
> commuter rail transportation stations that are accessible to all
> residents including Persons with Disabilities; or
> (B) a census tract which has an [Area Median Gross Income
> ("AMGI")] that is higher than the AMGI of the county or place
> in which the census tract is located; or
> (C) a school attendance zone that has an academic rating of
> "Exemplary" or "Recognized" rating (as determined by the
> Texas Education Agency) as of the first day of the Application
> Submission Acceptance Period; or
> (D) a census tract that has no greater than 10% poverty
> population according to the most recent census data (these
> census tracts are designated in the 2010 Housing Tax Credit Site
> Demographic Characteristics Report).

P. Ex. 127 at 6-7.  Defendants suggest that this change "is likely to have a positive effect in

increasing the number of LIHTC developments in [high opportunity areas]."  *See* Ds. Dec.

21, 2011 Reply Br. 3.

- 23 -

In addressing the second prong—which requires proof of no less discriminatory alternatives—defendants assert that "[t]here is no alternative that would serve the interest[s] with less discriminatory effect than the racially-neutral objective scoring system that is now in effect (and has been since 2003)."  Ds. Dec. 21, 2011 Reply Br. 6.  They criticize ICP's requested relief of establishing a set-aside for projects in high opportunity areas, suggesting that this remedy cannot qualify as a less discriminatory alternative because it would conflict with governing law and contravene *Regents of University of California v. Bakke*, 438 U.S. 265 (1978).

Defendants next compare the justification against the resulting harm.  They assert that ICP's claim of injury is diminished by evidence that over 5,600 affordable, Section 8 housing units, although not necessarily LIHTC units, are available; a significant number of LIHTC units are located in Walker Target Area Tracts;[21] developments in high opportunity neighborhoods have suffered high vacancy rates, such as 9.5% and 14.28%; and if the court were to broaden its comparison of approval rates from 0% to 9.9% and 90% to 100% Caucasian areas, as relied upon in its summary judgment opinion, *see ICP II*, 749 F.Supp.2d at 499-500, it would better illustrate the alleged impact, since TDHCA approved tax credits for 42.5% of proposed non-elderly units in 0% to 19.9% Caucasian areas and 50.0% for 80%

---

[21]The term "Walker Target Area Tracts" is defined in the Settlement Stipulation and Order in *Walker v. U.S. Department of Housing and Urban Development*, No. 3:85-CV-1210-R, at 4 (N.D. Tex. Mar. 8, 2001) (Buchmeyer, C.J.).  A qualifying census tract "according to the most recent decennial census, (i) has a black population at or below the average black population of the City of Dallas, (ii) has no public housing, and (iii) has a poverty rate at or below the average for the City of Dallas."  *Id.*

to 100% Caucasian areas, and approved tax credits for 39.8% of the 0% to 29.9% and 48.6%

for 70% to 100% Caucasian areas.  Thus they argue that the harm to ICP cannot outweigh

the substantial interests served by TDHCA.

2

ICP contends that defendants are presenting only interests that are furthered by the

application of the Texas Legislature's mandatory statutory requirements, in particular the

selection criteria that apply only to the 9% tax credits.  It asserts that the action that must be

justified is the *disproportionate approval* of tax credits for non-elderly developments in

minority neighborhoods, the issue giving rise to the FHA discriminatory impact claim.  ICP

also posits that the Texas Legislature's mandatory selection criteria cannot be the cause of

the discriminatory impact because the impact did not significantly increase after the

implementation of the framework in 2003, and the 4% tax credits, which are not subject to

the mandatory selection criteria, nonetheless contribute to the discriminatory impact.  Last,

ICP argues that defendants have not presented evidence regarding whether there are less

discriminatory alternatives and, therefore, have failed to satisfy their burden.

C

The court will assume that defendants' proffered interests are bona fide and legitimate.

*See Huntington Branch*, 844 F.2d at 939 (deciding to consider second prong first "[f]or

analytical ease").  The court will therefore focus on whether defendants have met their

burden of proving the second of the two essential elements: that there are no other less

discriminatory alternatives to advancing their proffered interests, i.e., that "no alternative

- 25 -

course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Dews*, 109 F.Supp.2d at 532.

Defendants have not presented arguments regarding the second element. Instead, they rely on the conclusory assertion that "[t]here is no alternative that would serve the interest[s] with less discriminatory effect." Ds. Dec. 21, 2011 Reply Br. 6. They then criticize ICP's requested set-aside remedy. But even assuming that defendants' criticism of this remedy is correct, the fact that *one* possible alternative course of action is not viable does not prove that there are *no* other less discriminatory alternatives that could be adopted that would enable the interest to be served with less discriminatory impact.

Defendants have also failed to prove by a preponderance of the evidence that allocating tax credits in a nondiscriminatory and nonsegregative manner would impair any of the asserted interests. *Cf. Huntington Branch*, 844 F.2d at 940 (noting that two of town's reasons for refusing to rezone plaintiff's site were that it was inconsistent with defendant's housing assistance plan and zoning ordinance, and rejecting these interests because the town simply relied on the existence of the plan and zoning ordinance without presenting evidence indicating why building the project would impair the interests sought to be advanced by the plan and zoning ordinance). Nor is there a basis for finding that TDHCA cannot allocate LIHTC in a manner that is objective, predictable, and transparent, follows federal and state law, and furthers the public interest, without disproportionately approving LIHTC in predominantly minority neighborhoods and disproportionately denying LIHTC in

predominantly Caucasian neighborhoods.[22]

TDHCA also retains certain limited types of discretion that can be relied on to address the discriminatory impact. Defendants have not proved that, in using this discretion, TDHCA has adopted the least discriminatory alternative to further the legitimate governmental interest. Regarding the selection criteria of each QAP, which applies only to the 9% tax credits, defendants maintain that TDHCA has discretion only in modifying below-the-line criteria. They posit that this discretion is limited in that the points accorded to below-the-line criteria cannot exceed the lowest-ranked statutory above-the-line criterion, and the Governor must approve of the QAP. Although TDHCA contends that it has added certain below-the-line criteria with the purpose of affirmatively furthering fair housing goals (e.g., providing a score enhancement for projects located in a "high opportunity area," *see* Ds. Nov. 9, 2011 Br. 25), defendants have not proved that these criteria are the least discriminatory alternatives, and that TDHCA cannot add other below-the-line criteria that will effectively reduce the discriminatory impact while still furthering its interests.[23] For

---

[22]Similarly, at the summary judgment stage, the court held in *ICP II* that defendants' proffered compelling governmental interest—adherence to I.R.C. § 42—was insufficient because "[d]efendants . . . failed to establish that TDHCA cannot comply with § 42 in a way that has less discriminatory impact on the community" and that "TDHCA cannot comply with both § 42 and the FHA." *ICP II*, 749 F.Supp.2d at 504.

[23]The "Talton Report," a report of the House Committee on Urban Affairs prepared for the House of Representatives, 80th Texas Legislature, also concluded that TDHCA and the BRB "disproportionately allocate federal [LIHTC] funds and the tax-exempt bond funds to developments located in impacted areas (above average minority concentration and below average income levels)" and similarly recommended that TDHCA, BRB, and the legislature, among other things, "consider adding provisions to the QAP and the bond rules that give

example, in the 2010 QAP, an application could receive four points under the "Development

Location" below-the-line criterion if its proposed development site was located within one

of six geographical areas: (1) "an Economically Distressed Area; a Colonia; or a Difficult

Development Area";[24] (2) a county that has received an award within the last three years

significant point scoring and/or set-aside of credits for affirmatively furthering assimilation outside of impacted areas."  P. Ex. 1 at 48-49.

[24]An "Economically Distressed Area" is defined as:

> an Area in which:
> (A) Water supply or sewer services are inadequate to meet minimal needs of residential users as defined by Texas Water Development Board rules;
> (B) Financial resources are inadequate to provide water supply or sewer services that will satisfy those needs; and
> (C) An established residential subdivision was located on June 1, 1989, as determined by the Texas Water Development Board.

P. Ex. 127 at 6.  A "Colonia" is defined as:

> A geographic Area that is located in a county some part of which is within 150 miles of the international border of this state, that consists of 11 or more dwellings that are located in close proximity to each other in an area that may be described as a community or neighborhood, and that: (§2306.581)
> (A) Has a majority population composed of individuals and families of low-income and very low income, based on the federal Office of Management and Budget poverty index, and meets the qualifications of an economically distressed Area under §17.921, Texas Water Code; or
> (B) Has the physical and economic characteristics of a colonia, as determined by the Department.

*Id.* at 5.  A "Difficult Development Area" is an area "specifically designated by the Secretary of HUD at the time of Application submission."  *Id.* at 52.

from the Texas Department of Agriculture's Rural Municipal Finance Program or Real Estate Development and Infrastructure Program; (3) "a census tract which has a median family income . . . that is higher than the median family income for the county in which the census tract is located"; (4) "an elementary school attendance zone of an elementary school that has an academic rating of 'Exemplary' or 'Recognized,' or comparable rating" and "[t]he . . . Development will serve families with children"; (5) a "census tract . . . which . . . has no greater than 10% poverty population" and "the development will expand affordable housing opportunities for low-income families with children outside of poverty areas"; and (6) "an Urban Core."[25]  P. Ex. 127 at 52-53.  In other words, the "Development Location" criterion is a "menu option" where an applicant need only fulfill *one* of the six to receive the four points; fulfilling more than one would still result in four points.  Thus even assuming that the third, fourth, and fifth options could reduce the asserted discriminatory impact, as suggested

---

[25]An "Urban Core" is defined as

> [a] compact and contiguous geographical area that is located in a Metropolitan Statistical Area within the city limits of a city with a population of no less than 150,000 composed of adjacent block groups in which at least 90% of the land not in public ownership is zoned to accommodate a mix of medium or high density residential and commercial uses and at least 50% of such land is actually being used for such purposes based on high density residential structures and/or commercial structures already constructed.

P. Ex. 127 at 12.

by defendants,[26] an applicant could instead opt for the first one, which covers "Economically Distressed" locations and could further exacerbate the discriminatory impact. Further, even if an applicant satisfied the third, fourth, or fifth option, it could receive four points at most because the QAP does not permit the award of four points for each option. Similar to how TDHCA made the below-the-line criterion "Developments in Census Tracts with No Other Existing Same Type Developments Supported by Tax Credits" its own criterion worth six points, TDHCA can further reduce the discriminatory impact by converting the types of development locations suggested to reduce the discriminatory impact into its own scoring items.[27]

Moreover, although defendants maintain that TDHCA's discretion in creating the selection criteria is limited to adopting below-the-line criteria, it appears that this discretion is actually broader. It appears to extend to the authority to choose the number of points to

---

[26]This is based on defendants' underlying assumption that "there's a known association between race and income and poverty levels in Texas," as Mary Whiteside, Ph.D. testified at trial and stated in her initial and second reports. *See, e.g.,* Tr. 2:161; Ds. Ex. 224 at 1-4; Ds. Ex. 225 at 4. ICP raised numerous objections against the use of her testimony and reports. *See, e.g.,* P. Nov. 9, 2011 at 20-22; Tr. 2:162. Because the court relies on her testimony and expert reports to *support* ICP's disparate impact claim (i.e., to suggest that the evidence supports the existence of less discriminatory alternatives), it need not resolve ICP's objections before relying on this evidence in this context.

[27]To the extent defendants argue that TDHCA's discretion in reducing the discriminatory impact is restricted by the requirement of gubernatorial approval of QAP changes, and they rely on a specific instance when the Governor in fact rejected a QAP change, there is no evidence that the Governor would decline to approve a change necessary for TDHCA to comply with a federal court order directing defendants to remedy a violation of the FHA.

be accorded each above- and below-the-line criterion, so long as the priority of statutory above-the-line criteria is maintained and the Governor approves. This suggests that TDHCA can accord more points to below-the-line criteria that reduce the discriminatory impact, as long as the points do not exceed the lowest above-the-line criterion, while still furthering TDHCA's interests. For example, given that the lowest above-the-line criterion, "Declared Disaster Areas," was worth seven points in the 2010 QAP, below-the-line critiera that assisted in reducing the discriminatory impact could have been allotted six points while respecting the priority of the statutory above-the-line criteria. A proposed development that falls within the guidelines of one of the "Development Location[s]" that could reduce the discriminatory impact is worth only *four* points. *See* P. Ex. 127 at 52-53. In comparison, the "Community Revitalization" below-the-line criterion awards six points. *See id.* at 51. To satisfy the "Community Revitalization" criterion, the proposed development must "use . . . an Existing Residential Development" and "propose[] any Rehabilitation or any Reconstruction that is part of a Community Revitalization Plan." *Id.* Because "Rehabilitation, (which includes reconstruction) or Adaptive Reuse" serves as its own below-the-line criterion separate from the "Community Revitalization" criterion and is worth three points, an applicant fulfilling the "Community Revitalization" criterion appears to be eligible for a total of *nine* points. *See id.* Given the trial evidence of the connection between race and income, communities seeking revitalization are potentially high-minority areas. Thus the criteria "Community Revitalization" and "Rehabilitation (which includes reconstruction) or Adaptive Reuse" may exacerbate the discriminatory impact, especially since the

"Development Location" criterion is only worth four points and barely offsets nine points. Additionally, despite questioning from ICP concerning how more points could be allocated to above-the-line statutory criteria so that below-the-line criteria (in particular, criteria that would reduce the discriminatory impact) could also be given more points and result in greater weight in comparison to total points available, defendants do not address this area of discretion. Thus defendants have failed to prove that TDHCA has adopted the least discriminatory alternative that will still advance its interests.

Defendants have also failed to prove that forward commitments could not have been used in a less discriminatory manner while still advancing TDHCA's legitimate governmental interests.[28] Defendants contend that forward commitments are sparingly used and suggest that this is so because TDHCA must be careful not to use them in a way that would thwart legislative intent that the system be objective, transparent, and predictable. The fact that this authority is granted to TDHCA and that it has used it in certain circumstances suggests that it can be applied while still advancing TDHCA's interests. And even if it is sparingly used, this does not address the disputed issue whether forward commitments have been used in the least discriminatory manner. For example, Fairway Crossing, one of the three applications that defendants state received a forward commitment from 2003 to 2007,

---

[28]Defendants maintain that Governor Rick Perry ("Governor Perry") modified the 2012 QAP to eliminate forward commitments. Assuming *arguendo* that this is true, defendants have still failed to prove that, during the time when forward commitments were available, TDHCA approved them in the least discriminatory manner, while still advancing its proffered interests.

is alleged by ICP to be located in a 0% to 9.9% Caucasian area. *See* P. Ex. 157 at 3. Although defendants assert that "[t]his project scored high enough to be awarded credits," *see* Ds. Nov. 9, 2011 Br. at 10 n.8, it is not necessary for the development to score well under the selection criteria for it to be awarded a forward commitment. And it remains unclear whether a forward commitment to another application that year could have reduced the discriminatory impact while advancing TDHCA's interests.

Although TDHCA selected "high opportunity areas" to be the recipient of the 30% basis boost, the definition of "high opportunity areas" suggests that further steps can be taken to reduce the discriminatory impact while still promoting TDHCA's legitimate governmental interests. A high opportunity area includes an area that has a major bus or rail station, a census tract with a higher AMGI than the tract's county or place, a school attendance zone with an academic rating of "Exemplary" or "Recognized," *or* a census tract with no greater than 10% poverty rate. *See* P. Ex. 127 at 6-7. As an example, were TDHCA to require an applicant to meet all four criteria rather than just one to receive a basis boost, this would appear to reduce the discriminatory impact.

TDHCA also has discretion under at least one QAP that can be used to reduce the discriminatory impact of LIHTC. Section 50.10(a)(2) of the 2008 QAP authorized TDHCA, in considering staff recommendations for both 4% and 9% tax credits, to "not rely solely on the number of points scored by an Application" under the QAP and to "take into account, as it deem[ed] appropriate," certain listed discretionary factors, including location, proximity to other low-income housing developments, and other good causes as determined by

TDHCA.[29]   *See* P. Ex. 125 at 60-61; Ds. Ex. 14 at 60-61; *see also* Tr. 2:10, 12.[30]   This

---

[29]It is unclear whether Governor Perry eliminated this authority in the 2012 QAP. *See* Ds. Dec. 7, 2011 Br. 6-7 (noting that Governor Perry eliminated TDHCA's ability to "waive internal rules," without clarifying which internal rules). Even assuming that Governor Perry eliminated this area of discretion, the court concludes, at it does *supra* at note 28, that defendants have failed to prove that TDHCA used this discretion, when it was available, in the least discriminatory manner, while still advancing its proffered interests.

[30]Section 55.10(a)(2) of the 2008 QAP provided, in relevant part:

> In making a determination to allocate tax credits, the Board shall be authorized to not rely solely on the number of points scored by an Application. It shall in addition, be entitled to take into account, as it deems appropriate, the discretionary factors listed in this paragraph. . . . If the Board disapproves or fails to act upon an Application, the Department shall issue to the Applicant a written notice stating the reason(s) for the Board's disapproval or failure to act. In making tax credit decisions . . . , the Board, in its discretion, may evaluate, consider and apply any one or more of the following discretionary factors: . . .
> (A) The Developer market study;
> (B) The location;
> (C) The compliance history of the Developer;
> (D) The financial feasibility;
> (E) The appropriateness of the Development's size and configuration in relation to the housing needs of the community in which the Development is located;
> (F) The Development's proximity to other low-income housing Developments;
> (G) The availability of adequate public facilities and services;
> (H) The anticipated impact on local school districts;
> (I) Zoning and other land use considerations;
> (J) Any matter considered by the Board to be relevant to the approval decision and in furtherance of the Department's purposes; and
> (K) Other good cause as determined by the Board.

P. Ex. 125 at 60-61; Ds. Ex. 14 at 60-61.

suggests that, despite an application's score under the selection critiera, TDHCA was authorized under the 2008 QAP to take into account factors such as "location" of developments or "other good causes" in the award of tax credits.  Because defendants have not addressed whether TDHCA used the least discriminatory means while still furthering its interests in exercising this discretion, the question remains whether it has been used in a manner that would reduce the discriminatory impact.[31]

Accordingly, because defendants have failed to meet their burden of proving that there are no less discriminatory alternatives, meaning that no alternative course of action could be adopted that would enable TDHCA's interest to be served with less discriminatory impact, the court finds in favor of ICP on its discriminatory impact claim under the FHA.

---

[31]Although ICP contends that the allocation of 4% tax credits also results in a discriminatory impact, defendants do not address whether TDHCA has adopted the least discriminatory alternative to further its legitimate governmental interests as to the 4% tax credits.  Defendants stress their limited discretion in changing the mandatory selection when the 4% tax credits are not bound to scoring under that criteria.  Four percent tax credits are non-competitive and reviewed solely for "threshold, eligibility, and then . . . underwrit[ing]," P. Ex. 1 at 20.  And unlike the mandatory selection criteria, it does not appear that the Texas Government Code similarly limits TDHCA's discretion in choosing the threshold criteria. *Cf.* Tex. Gov't Code Ann. § 2306.6702(a)(15) (West 2003) (defining "Threshold criteria" as "criteria used to determine whether the development satisfies the minimum level of acceptability for consideration established in the department's qualified allocation plan"); *id.* at § 2306.6710(a) (requiring TDHCA to "determine whether the application satisfies the threshold criteria required by the board in the qualified allocation plan").  This leaves TDHCA greater discretion in adding criteria that could reduce the discriminatory impact.

- 35 -

IV

The court considers next defendants' contention that ICP's FHA claim is barred by the statute of limitations.

A complaint under the FHA is timely when it is filed within two years after the occurrence or termination of an alleged discriminatory housing practice.  *See* 42 U.S.C. § 3613(a)(1)(A).  If a plaintiff challenges "an unlawful practice that continues into the limitations period, the complaint is timely if filed within [two years] of the *last asserted occurrence* of that practice." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) (emphasis added); § 3613(a)(1)(A); *see also Pecan Acres Ltd. P'ship I v. City of Lake Charles*, 54 Fed. Appx. 592, 2002 WL 31730433, at *1 (5th Cir. 2002) (per curiam).

ICP's FHA claim is founded on an unlawful practice: TDHCA's disproportionate approval of tax credits for non-elderly developments in minority neighborhoods, and, conversely, its disproportionate denial of tax credits for non-elderly housing in predominantly Caucasian neighborhoods.  ICP has presented evidence from 1999 to 2008 to support this unlawful practice.  Thus even assuming that the violation terminated in 2008, it is clear that ICP's lawsuit was timely filed on March 28, 2008.  Defendants have failed to prove their limitations defense by a preponderance of the evidence.

V

Finally, TDHCA relies on the affirmative defense of Eleventh Amendment immunity. TDHCA asserts that it is an arm of the State of Texas and is therefore entitled to Eleventh Amendment immunity.

TDHCA bears the burden of proving that it is entitled to Eleventh Amendment immunity. *See Skelton v. Camp*, 234 F.3d 292, 297-98 (5th Cir. 2000). Such immunity is proper if "a suit is really against the state itself." *Id.* at 297 (citing *Laje v. R.E. Thomason Gen. Hosp.*, 665 F.2d 724, 727 (5th Cir. 1982)). To make this determination courts weigh numerous factors, such as:

> (1) whether state statutes and case law characterize the agency as an arm of the state; (2) the source of funds for the entity; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

*Vogt v. Bd. of Comm'rs Orleans Levee Dist.*, 294 F.3d 684, 689 (5th Cir. 2002) (citations omitted). "The most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds." *Id.* (brackets and citations omitted).

The Fifth Circuit has previously held that a predecessor agency of TDHCA—the Texas Housing Agency—is not an arm of the state. *See Tex. Dep't of Hous. & Cmty. Affairs v. Verex Assur., Inc.*, 68 F.3d 922, 926-28 (5th Cir. 1995), *overruled on other grounds by Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 413 n.19 (5th Cir. 2009).[32] TDHCA does not specifically address any of the *Vogt* factors or argue that the factors relied upon in *Verex* should be assessed differently. Thus much of the analysis in *Verex* is uncontested. For

---

[32]Although the analysis in *Vogt* and *Verex* is not identical, the Fifth Circuit relies on many of the same factors when determining whether an agency is an arm of the state for the purposes of Eleventh Amendment immunity. *Compare Vogt*, 294 F.3d at 692-96 *with Verex*, 68 F.3d at 926-28.

example, TDHCA can sue and be sued in its own name, *see* Tex. Gov't Code Ann. § 2306.053(b), has the right to hold and use property, *see* § 2306.174, and is funded primarily by the federal government and by borrowing private capital that is not debt against the State of Texas, *see* P. Ex. 162 at 78-83; P. Ex. 381 at 13.  Moreover, TDHCA's funds, excluding appropriations for the Texas Legislature, are maintained outside of the state treasury.  *See* Tex. Gov't Code Ann. § 2306.071.  Even though two factors weigh in TDHCA's favor (TDHCA is concerned with statewide problems rather than local problems and does not have local autonomy), the court finds that these factors do not outweigh the ones that favor finding that TDHCA is not an arm of the state.  *See Verex*, 68 F.3d at 928 (holding that even though Texas Housing Agency was concerned with statewide rather than local issues, it was not an arm of the state).  The court therefore finds that TDHCA has not met its burden of proving that it is entitled to Eleventh Amendment immunity.

VI

As ICP recognizes in the Pretrial Order, it is appropriate to afford TDHCA an opportunity to present a plan to remedy its violation of the FHA.  Accordingly, TDHCA must submit a remedial plan that sets out how it will bring its allocation decisions into compliance with the FHA.  This remedial plan need be no "more intrusive than is necessary to remedy proved [FHA] violations."   *Rizzo*, 564 F.2d at 149 (holding that Supreme Court's admonitions that federal equitable belief be carefully tailored to proven constitutional violations is "no less forceful" when applied to statutory violations).  The court encourages the parties to work cooperatively in formulating a remedial plan so that as many potential

objections as possible can be resolved before the plan is submitted to the court for consideration and approval.

*   *   *

For the reasons explained, the court finds in favor of ICP on its disparate impact claim under the FHA and otherwise finds in favor of defendants.  Within 60 days of the date this memorandum opinion and order is filed, defendants must file their remedial plan.  ICP may submit objections within 30 days after the remedial plan is filed.  If objections are filed, the court will establish any necessary additional procedures by separate order.

**SO ORDERED**.

March 20, 2012.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE