IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:08-CV-0546-D |
| VS. | § | |
| | § | |
| THE TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS, et al., | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

Having found in favor of plaintiff The Inclusive Communities Project, Inc. ("ICP") on its disparate impact claim under §§ 3604(a) and 3605(a) of the Fair Housing Act ("FHA"), the court now addresses the appropriate remedy for awarding Low Income Housing Tax Credits ("LIHTC") in the Dallas metropolitan area.

I

As directed, defendants Texas Department of Housing and Community Affairs and its Executive Director and board members in their official capacities (collectively, ("TDHCA"), have submitted a proposed remedial plan ("Plan"). According to TDHCA, operating under the constraints of federal and state law, the Plan does the following:

focuses on: (1) according proposed developments located in defined high opportunity areas the greatest incentives allowed by state law; and, (2) according developments in Qualified Census Tracts (QCTs) that are part of true concerted revitalization plans co-equal incentives in order to provide the preference created by Internal Revenue Code §42(m).  It is envisioned that the revitalization incentive will set a very high threshold, making it unlikely to yield a number of successful applicants in QCTs such that would perpetuate any discriminatory patterns found to have occurred unintentionally.

Ds. Plan 4.  The Plan contains the following twelve-points:

1.      TDHCA states that Governor Perry, in approving the 2012 Qualified Allocation Plan ("QAP"), determined that forward commitments were not desirable and that waivers should only be granted when "necessary to further a purpose or policy enunciated in Tex. Gov't Code, Chapter 2306."  *Id.*

2.      TDHCA proposes to further strengthen the definition of a high opportunity area ("HOA") by adopting the following "Opportunity Index":

| Points | Population Served | Poverty Factor | Income Factor | School Quality Factor |
|---|---|---|---|---|
| 7 | General | <15% for all individuals | Top quartile of median household income for county or top quartile for Metropolitan Statistical Area ("MSA") | Exemplary or recognized |
| 5 | General | <15% for all individuals | Top 2 quartiles of median household income for county or top 2 quartiles for MSA | Exemplary or recognized |
| 5 | Any | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | Exemplary or recognized |
| 3 | Any | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | n/a |
| 1 | Any | <15% for all individuals | Top 2 quartiles of median household income for county or top 2 quartiles for MSA | n/a |

*Id.* at 6-7.

TDHCA also suggests adding certain below-the-line criteria, which it maintains are "indicative of educational quality and opportunity or lack of affordable housing." *Id.* at 7. Moreover, it offers to remove all other "Development Location" options in the below-the-line criterion unless the option is required by statute so that it will maintain high incentives to target HOAs.

- 3 -

3.      TDHCA proposes to continue including a 130% basis boost for applications proposing development sites located in HOAs.

4.      In order to effectuate the preference in I.R.C. § 42(m) for developments located in QCTs and which contribute to a concerted community revitalization plan, TDHCA proposes the following "Revitalization Index":

| Points | Population Served | Criteria |
|---|---|---|
| 7 | Any | The proposed development site is located in a QCT in which there is in effect a concerted revitalization plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $25,000 per unit in the proposed development. |
| 3 | Any | The proposed development site is located in a QCT in which there is in effect a concerted revitalization plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $10,000 per unit but are less than $25,000 per unit |
| 2 | Any | The proposed development site is not located in a QCT but there is in effect a concerted revitalization plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $10,000 per unit. |

*Id.* at 10-11.

5.      TDHCA offers to continue including criteria for disqualifying proposed sites that have undesirable features.  It also proposes to require an applicant to obtain pre-

clearance if the proposed development is located at or within 1000 feet of certain negative site features.

6.       In line with the "Revitalization Index," TDHCA proposes to strengthen the requirements to establish a concerted revitalization plan in order to insure that "true community revitalization is occurring." *Id.* at 15.

7.       TDHCA proposes to promulgate by rule a fair housing choice disclosure to advise prospective tenants of alternative housing and fair housing rights. TDHCA also proposes to maintain a website with relevant information.

8.       TDHCA proposes to conduct an annual analysis, which will be made public, of the "effects of its prior QAP to determine if that QAP . . . contribut[es] to a disparate impact[,]" in order to "take appropriate and lawfully permitted measures to amend the next and subsequent QAPs . . . to avoid [the] present and potentially developing disparate impact." *Id.* at 18.

9.       TDHCA proposes adding a mechanism to challenge the grounds for public comments that could lead to the negative scoring of 9% applications or constitute opposition to proposed 4% developments. Additionally, applications in HOAs receiving statements of support or neutrality from a neighborhood organization that previously opposed a development, causing it to lose points, will receive two additional points. TDHCA must also amend its debarment rules so that if any applicant attempts to create opposition to an application, they will be subject to debarment.

10.    TDHCA proposes that "[i]n the event of a tie in scoring, the tie breaker will be a preference for the developments that are located the greatest distance from the nearest development that is assisted by either 4% or 9% [LIHTCs]." *Id.* at 20.

11.    TDHCA proposes to "continue to make available on its website proposed and final QAPs with comments and responses, applications, underwriting reports, application and award logs, scoring logs by subject, inventories, and appeal materials." *Id.* at 20.  It also proposes to "post market studies, Phase I Environmental Site Assessments and property condition assessments on its website." *Id.*

12.    TDHCA acknowledges that it is subject to statutory constraints, including "adherence to the Texas Administrative Procedures Act; the Texas General Appropriations Act; Chapter 2306 of the Texas Government Code; and adherence to various federal requirements regarding the administration of other sources of funding impacting [TDHCA's] ability to address such matters." *Id.* at 20.

ICP and intervenor Frazier Revitalization Inc. ("FRI") object to components of the Plan.[1]

---

[1]On August 3, 2012 FRI filed a motion for leave to file supplement to objections to defendants' proposed remedial plan, which the court has granted today.  Although the court has considered the supplement to objections and brief in adopting the remedial plan, because nothing in them changes the reasoning or decisions of this memorandum opinion and order, the court will not separately discuss the supplement to objections and brief.

II

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). This power, however, is not plenary and may be exercised only on the basis of the violation. *See, e.g., Dayton v. Bd. of Educ. v. Brinkman*, 433 U.S. 406, 419-20 (1977); *Swann*, 402 U.S. at 16. The scope of the remedy must be tailored to fit "the nature of the violation" and cannot be "broader than that necessary to remove the violation and its effects." *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 145 (3d Cir. 1977) (quoting *Brinkman*, 433 U.S. at 419). "A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." *Freeman v. Pitts*, 503 U.S. 467, 489 (1992). Moreover, "the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quoting *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977)).

It is within the court's authority to "order[] such affirmative action as may be appropriate" in order to remedy a FHA violation. 42 U.S.C. § 3613(c)(1). "Appropriate relief for violations of the [FHA] is to be determined on a case-by-case basis with relief tailored in each instance to the needs of the particular situation." *United States v. Jamestown Center-in-the-Grove Apartments*, 557 F.2d 1079, 1080 (5th Cir. 1977) (citations omitted). "Relief should be aimed toward twin goals insuring that no future violations of the [FHA]

- 7 -

occur and removing any lingering effects of past discrimination." *See id.* (collecting cases).

III

A

As proposed by TDHCA, the court adopts by judgment filed today the following remedy for TDHCA's violation of the FHA.  Pending further order of this court, TDHCA must apply the following remedy as to the Dallas metropolitan area in accordance with TDHCA's proposal:[2]

1.     include in the QAP the additional below-the-line criteria provided by the "Opportunity Index";

2.     include in the QAP the additional below-the-line criteria regarding the quality of public education and anti-concentration, and remove all other "Development

---

[2]Although TDHCA functions on a statewide basis, its obligation under this remedy extends only to the Dallas metropolitan area because ICP's disparate impact claim is founded solely on that region.  *See Brinkman*, 433 U.S. at 420 ("[O]nly if there has been a systemwide impact may there be a systemwide remedy."); *see also Horne v. Glores*, 557 U.S. 433, 129 S.Ct. 2579, 2607 (2009) (because violation was proved only as to single district, vacating statewide injunction to extent it extended beyond district on grounds that "a statewide injunction . . . intruded deeply into the State's budgetary processes" and "obscured accountability for the drastic remedy" since the state legislature or state courts have the authority to decide this issue and not the lower court).  The court concludes that the remedy ordered by this court does not apply statewide.  *Cf.* Ds. Plan 19 ("[TDHCA] will endeavor to apply the principles and objectives in this Plan on a statewide basis.").  This does not bar TDHCA from following its usual processes to apply this remedy to areas outside of the Dallas metropolitan area.  The court, however, cannot order a statewide remedy, which would circumvent TDHCA's usual processes, because it must be careful to minimize federal intrusion and to decree a remedy only to the extent it will cure the violation.  *See, e.g., Brinkman*, 433 U.S. at 420; *Jamestown*, 557 F.2d at 1081; *United States v. W. Peachtree Tenth Corp.*, 437 F.2d 221, 228-29 (5th Cir. 1971).

- 8 -

Location" criteria set forth;

3.      continue to provide a 130% basis boost for developments in HOAs;

4.      continue to include in the QAP criteria for disqualifying proposed development sites that have undesirable features and incorporate the more robust process to identify and address other potentially undesirable site features;

5.      promulgate by rule a fair housing choice disclosure for prospective tenants and maintain a website providing information as to tax-credit assisted properties;

6.      conduct an annual disparate impact analysis;

7.      provide a mechanism to challenge public comments that cause proposed developments to receive negative points and include in the QAP the additional two-point below-the-line criterion regarding support or neutrality from a neighborhood organization that previously opposed a development and an associated debarment rule; and

8.      in the event of a tie in scoring a 9% application, adopt a tie breaker in favor of an application proposing development in an HOA.

B

TDHCA must also submit an annual report to the court so that the court can evaluate whether, during the reporting period, TDHCA has "insur[ed] that no future violations of the [FHA] occur[red] and remov[ed] any lingering effects of past discrimination." *See id.*

No later than 90 days after the date the judgment is filed, the parties must confer

regarding what information the report should contain.  No later than 120 days after the date the judgment is filed, the parties must make a joint submission to the court stating (1) whether they agree to the contents of the report, and, if they do not agree in all respects to the contents, (2) their specific agreements and disagreements and their reasons for disagreement.  The court will then issue an order prescribing the contents of the annual report.

Each calendar year, no later than 120 days after the TDHCA Board of Directors ("Board") issues final commitments for allocations of LIHTC, TDHCA must file the annual report with the clerk of court.[3]  Within 30 days of the date TDHCA files the annual report, any other party may comment on the report by filing the comments with the clerk of court and serving all other parties.  TDHCA may file a reply to a comment no later than 30 days after the comment is filed.  TDHCA may include in an annual report, and another party may include in a comment, a request to modify a provision of the remedial plan.  The request must set forth why the provision is no longer necessary or is insufficient to "insur[e] that no future violations of the [FHA] occur and remov[e] any lingering effects of past discrimination."  *Id.*; *see also Brown v. Plata*, ___ U.S. ___, 131 S.Ct. 1910, 1946 (2011) (quoting *N.Y. State Ass'n for Retarded Children v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983)) ("The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.").

---

[3]Based on Tex. Gov't Code Ann. § 2306.6724(f) (West 2008), the court anticipates that the 120-day deadline will occur 120 days after July 31 of the calendar year in question. If that date falls on a day when the clerk's office is closed, the report will be due the next day that the office is open.

For the reasons explained *infra* at § VII, the annual reporting procedure shall remain in effect during the period during which the court retains jurisdiction over this case.

## IV

The court turns first to the proper interpretation of § 42(m)(1)(B)(ii)(III) of the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 42(m)(1)(B)(ii)(III).  FRI objects to the Plan, contending that it violates § 42(m)(1)(B)(ii) by failing to give preference to developments that contribute to a concerted community revitalization plan.  FRI Objs. 3.  And in the Plan, TDHCA may be interpreting § 42(m)(1)(B)(ii) to impose a project selection preference.  *See* Ds. Plan 15 (stating that "Consistent with § 42(m) of the Internal Revenue Code, the 2012 QAP offers incentives for applications in qualified census tracts and for applications in areas where the housing is a necessary component of a community revitalization plan.").

## A

FRI contends that the Plan violates § 42(m)(1)(B)(ii) because it does not give preference to developments that are located in QCTs and that contribute to a concerted community revitalization plan.  FRI maintains that the Plan fails in several respects to give preference to such projects.  First, FRI argues that the most recent QAP already gives preference to developments to be located in an HOA rather than to developments focused on revitalization, and that the Plan only strengthens that preference.  FRI contends that this preference is in part demonstrated by the fact that, following the most recent QAP, TDHCA provided data showing the "virtual curtailment of QCT [applications]."  FRI Objs. 6 (quoting

Ds. Plan 9).[4]  Second, FRI argues that TDHCA does not give preference to revitalization developments because, in order to curtail revitalization development, it has intentionally established "high thresholds" that must be met for revitalization developments to qualify for available additional points.  Third, FRI argues that TDHCA's proposed remedy alters the scoring system by making additional points available to HOA developments without making similar points available to revitalization developments, and this demonstrates that revitalization developments are not given preference by the QAP.  In summary, FRI's objections are based on concerns that the Plan will significantly decrease the number of revitalization projects that are awarded LIHTC, and FRI contends that such a plan fails to give preference to revitalization projects, in violation of § 42(m)(1)(B)(ii).

B

In *Inclusive Communities Project, Inc. v. Texas Department of Housing and Community Affairs*, 749 F.Supp.2d 486 (N.D. Tex. 2010) (Fitzwater, C.J.), the court held that TDHCA had failed to demonstrate that it could not comply with both the FHA and § 42.  *Id.* at 506 n.21.  FRI argues that, despite this conclusion, § 42 governs the allocation of LIHTC and the Plan cannot require that TDHCA violate § 42, which FRI maintains the Plan does. The court agrees with FRI that the remedy in this case must comply with both the FHA and § 42.  But the court holds that the Plan *can* comply with the FHA without violating §

---

[4]TDHCA itself expressed a concern that these data were not consistent with the expressed preferences of Congress set forth in § 42.  This concern was at least one reason why TDHCA included the revitalization index in its proposed remedy.

42(m)(1)(B)(ii)(III).  This conclusion follows from a correct interpretation of I.R.C. § 42.

1

The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  The court's "inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992)).  "Unless exceptional circumstances dictate otherwise, '[w]hen [the court] find[s] the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington N. R.R. Co. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341 (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991)).

2

LIHTC are a type of general business credit.  *See* I.R.C. § 38(b)(5).  Section 42 sets forth the eligibility requirements for those seeking LIHTC, the method for calculating the amount of the credit, and the requirements of state housing agencies, such as TDHCA, in allocating their state's LIHTC.  One such requirement is that state housing agencies must allocate all LIHTC dollar amounts pursuant to a QAP.  *See* I.R.C. § 42(m)(1)(A)(i).  Under

- 13 -

I.R.C. § 42(m)(1)(B), a QAP

> means any plan—
> (i) which sets forth selection criteria to be used to determine housing priorities of the housing credit agency which are appropriate to local conditions,
> (ii) which also gives preference in allocating housing credit dollar amounts among selected projects to—
>> (I) projects serving the lowest income tenants,
>> (II) projects obligated to serve qualified tenants for the longest periods, and
>> (III) projects which are located in qualified census tracts (as defined in subsection (d)(5)(C)) and the development of which contributes to a concerted community revitalization plan, and
> (iii) which provides a procedure that the agency (or an agent or other private contractor of such agency) will follow in monitoring for noncompliance with the provisions of this section and in notifying the Internal Revenue Service of such noncompliance which such agency becomes aware of and in monitoring for noncompliance with habitability standards through regular site visits.

I.R.C. § 42(m)(1)(B).

Both Frazier and TDHCA interpret § 42(m)(1)(B)(ii)(III) as requiring TDHCA to give preference to projects located in QCTs that contribute to a concerted community revitalization plan by providing such projects with additional points in the QAP's competitive scoring system. But § 42(m)(1)(B)(ii)(III) requires that the QAP "give[] preference in allocating housing credit dollar amounts *among selected projects* to— . . . projects which are located in qualified census tracts (as defined in subsection (d)(5)(C)) and the development of which contributes to a concerted community revitalization plan[.]" *Id.* at § 42(m)(1)(B)(ii)(III) (emphasis added). The dictionary definition of "selected" is "[s]ingled out in preference: chosen." Webster's II New Riverside University Dictionary

- 14 -

1057 (1984).[5] Because "selected" is in the past tense, the statute mandates that the preference given to QCTs in allocating LIHTC dollar amounts occur *after* the projects have been selected.  In other words, § 42(m)(1)(B)(ii)(III) does not require that the QAP award additional points so that projects located in QCTs and the development of which contribute to a concerted community revitalization plan are preferred over other projects.[6]  Instead, § 42(m)(1)(B)(ii)(III) provides that, *after* projects have been selected,  projects located in QCTs, and the development of which contributes to a concerted community revitalization plan, must be given preference in allocating LIHTC dollar amounts among the projects that have already been selected.

This interpretation of § 42(m)(1)(B)(ii)(III) is supported by § 42(m)(1)(C), which specifies selection criteria that a QAP must include.  One selection criterion is the "project characteristics, including whether the project includes the use of existing housing as part of a community revitalization plan."  *Id.* at § 42(m)(1)(C)(iii).[7]  The inclusion of this criterion as one of several criteria confirms that Congress only intended revitalization projects that include the use of existing housing as part of a community revitalization plan to be one factor

---

[5]"When a term goes undefined in a statute, [it is given] its ordinary meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.*, ___ U.S. ___, 132 S. Ct. 1997, 2002 (2012) (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)) (using dictionaries to aid statutory interpretation).

[6]Subject, at least, to the requirements of the FHA, a QAP *can* award additional points to revitalization projects, but § 42(m)(1)(B)(ii)(III) *does not require* that the QAP do so.

[7]This is the only mandatory criterion related to revitalization, and TDHCA's 2012-13 QAP complies with this requirement.

in the selection process, not a dispositive or preferred one. Congress could have, but did not, require that a QAP effectively prefer revitalization projects in QCTs by including that requirement in § 42(m)(1)(C). Accordingly, under a correct interpretation of the statute, the preference mandated by § 42(m)(1)(B)(ii)(III) comes into play *after* projects are selected and when LIHTC dollar amounts are being allocated *among selected projects*.[8]

The court recognizes that, due to the LIHTC selection system adopted in the state of Texas and implemented in the Texas QAP, only in rare circumstances will proposed developments in QCTs benefit from the preference set forth in § 42(m)(1)(B)(ii). This is because TDHCA only selects projects for which it has sufficient LIHTC to allocate.[9] When a developer applies for LIHTC, TDHCA staff ("Staff") first ensures that the application satisfies the threshold criteria set forth in the QAP. *See* Tex. Gov't Code Ann. § 2306.6710(a) (West 2008). The Staff then scores and ranks the applications that meet the threshold criteria according to the detailed scoring system that the QAP prescribes. *See id.* § 2306.6710(b). Beginning with the highest scoring applications, the Staff underwrites enough projects to ensure that all LIHTC will be allocated, including by underwriting projects that the Board places on the waiting list. *See id.* § 2306.6710(d). After the Staff

---

[8]FRI also relies on § 42(d)(5)(B)(i) and (ii) as evidence of Congressional intent to give preference during the selection process to developments in QCTs. The court disagrees. These provisions make eligible for additional tax deductions (by increasing the property's basis) developments in QCTs that have been selected to receive LIHTC. *See id.*

[9]The court notes that TDHCA's scoring and ranking system only applies to 9% LIHTC. Applicants seeking 4% LIHTC are not subject to the scoring and ranking process that the court describes in this section.

makes its recommendations, the Board selects the projects that will receive a LIHTC commitment notice. If all of the available LIHTC are committed, the Board creates a waiting list that identifies which applicants will receive any additional LIHTC that become available. If an applicant who receives a commitment notice complies with the remaining obligations in the QAP, it will receive its LIHTC allocation. Therefore, under the QAP, *every* project that the Board selects is typically allocated LIHTC, meaning there is no opportunity for TDHCA to grant projects located in QCTs a "preference in allocating housing credit dollar amounts *among selected projects*," since every project selected by the Board is allocated the full amount of available LIHTC.

The court's interpretation of § 42(m)(1)(B)(ii)(III) does not necessarily nullify in Texas the preference that the I.R.C. mandates. Although Texas' method for distributing LIHTC rarely,[10] if ever, would require that the preference mandated by § 42(m)(1)(B)(ii)(III) affect the distribution of LIHTC among the selected projects, § 42 governs every state's housing agency. A state could adopt a system in which it selected more proposed developments to receive LIHTC than it had available credits. If that were the case, the state agency *would be required* to give preference to projects covered by § 42(m)(1)(B)(ii)(III). Such projects would be funded preferentially. Texas, however, has adopted a system in

---

[10]The court notes that if TDHCA selected more projects than it could allocate LIHTC to, it would be required to allocate the LIHTC dollar amounts in accordance with § 42(m)(1)(B)(ii)(III).

which projects are not selected if they are unlikely to receive LIHTC.[11]

Because the TDHCA Plan only changes how projects are selected and does not alter how LIHTC dollar amounts are allocated "among selected projects," TDHCA's proposed remedy does not violate § 42(m)(1)(B)(ii)(III).  Accordingly, the court holds that FRI's objections lack force.[12]

V

The court now turns to the TDHCA Plan and the parties' objections.

A

TDHCA begins its proposal with a statement regarding its discretion, as it pertains to forward commitments and waivers:

> In approving the 2012 QAP, Governor Perry determined that the continuation of the ability to make awards of forward commitments was not desirable and that in exercising its discretion to waive any aspect of the QAP the Board should only grant waivers when doing so was necessary to further a purpose or policy enunciated in Tex. Gov't. Code, Chapter 2306.

Ds. Plan 5.  In other words, TDHCA does not propose a remedy; instead, it describes the

---

[11]The court has no occasion in this case to determine whether, because Texas law and the QAP effectively foreclose TDHCA from having to consider the preference mandated by § 42(m)(1)(B)(ii)(III), Texas law is in tension with the I.R.C., but, to the extent that they are in tension, federal law is paramount.

[12]Because FRI's objections are based on an incorrect interpretation of § 42(m)(1)(B)(ii)(III), the court need not reach FRI's argument that the Plan is so vague that FRI and its experts have not had a meaningful opportunity to evaluate the proposed remedy. Even if FRI's experts were given additional time, FRI could not demonstrate that the remedy violates § 42(m)(1)(B)(ii)(III) because FRI only challenges how LIHTC developments are selected rather than how LIHTC dollar amounts are allocated among selected projects.

nature of the QAP as it now stands.  ICP contends that "TDHCA can and should use its discretion to remedy the violation."  P. Obj. 13.  In particular, it proposes that TDHCA use "its discretion in making allocation decisions that accomplish the remedial purpose of the plan."  *Id.*

It is within the court's authority to "order[] such affirmative action as may be appropriate" in order to remedy a FHA violation. 42 U.S.C. § 3613(c)(1).  The court declines at this time, however, to require that the QAP be amended to authorize TDHCA to award forward commitments and waivers.  Such a mandate would interfere with Texas' regulation of its own affairs.  *See, e.g., Spallone*, 493 U.S. at 276 ("[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.") (alteration in original) (quoting *Milliken*, 433 U.S. at 280-81).  And although the court is authorized to impose such a requirement—even one that interferes with Texas' regulation of its own affairs—if necessary to remedy the FHA violation, it is presently unclear whether such a remedy would have this effect.  *See Rizzo*, 564 F.2d at 145 (prohibiting remedies that are "broader than that necessary to remove the violation and its effects").  As stated above, the court retains the authority to approve amendments to the remedial plan after receiving TDHCA's report and the parties' proposals.  The court can determine later whether it is necessary to empower TDHCA to award forward commitments and waivers to remedy the disparate impact.

B

TDHCA proposes to further strengthen the definition of an HOA.  It posits that, in the

2012 QAP, HOA was defined to require "a development [to] be in a census tract that has

BOTH a low incidence of poverty AND an above median income as well as . . . located in

an area served by either recognized elementary schools or having a significant and accessible

element of public transportation."  Ds. Plan 5-6.  It now proposes "to strengthen the criteria

for locating developments within HOAs" by adopting the following "Opportunity Index":

| Points | Population Served | Poverty Factor | Income Factor | School Quality Factor |
|--------|-------------------|----------------|---------------|-----------------------|
| 7 | General | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | Exemplary or recognized |
| 5 | General | <15% for all individuals | Top 2 quartiles of median household income for county or top 2 quartiles for MSA | Exemplary or recognized |
| 5 | Any | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | Exemplary or recognized |
| 3 | Any | <15% for all individuals | Top quartile of median household income for county or top quartile for MSA | n/a |
| 1 | Any | <15% for all individuals | Top 2 quartiles of median household income for county or top 2 quartiles for MSA | n/a |

*Id.* at 6.  In the first line, a proposed project located in such a census tract will receive the highest number of points a below-the-line criterion may receive—here, 7 points.  An application located in an area that does not meet the stringent requirements of the first line may still receive points, to a lesser degree, if it satisfies the requirements of another line.

ICP does not object to the definition of HOAs or to the "Opportunity Index" to the extent that it provides "the highest value possible for below the line points for family units located in [HOAs]." P. Obj. 3.  It posits that, to the extent the "Opportunity Index" offers 1 to 3 points, it is insubstantial and is "unlikely to have any remedial effect" because "[t]hese are minor points and have not worked to boost 9% program point totals in the past." *Id.* at 16.  In support, ICP cites the Talton Report for the proposition that "the use of preference points for higher income areas has a 'tendency to create more local opposition' and have only a 'limited effect on a development's completed score.'" *Id.* at 17.  It also "object[s] to the inclusion of applications for elderly units" in the "Opportunity Index" because "additional points for the elderly restricted units . . . will not have any remedial effects and should not be part of the remedial plan."[13]  P. Obj. 16; P. App. 3.

---

[13]ICP also objects to including points in the "Opportunity Index" for proposed development sites in QCTs for which there is a concerted revitalization plan.  It appears, however, that these points are not offered in the "Opportunity Index" but in the "Revitalization Index," which the court discusses *infra* at § V(E).

ICP also contends that this proposal is insufficient because a "proposed plan that only adds below the line criteria and points to the current system will not bring the allocation process into compliance." P. Obj. 21.  ICP asserts that the points should be revalued so that the HOA criterion will have a higher value in comparison to the other criteria. The court addresses this *infra* at § VI.

The court adopts the TDHCA Plan's proposed "Opportunity Index," and overrules ICP's objections.  As stated *supra* at § V(A), the court is authorized to adopt amendments to the remedial plan after receiving TDHCA's report and the parties' proposals.  The court can determine later whether it is necessary to increase certain points offered in the "Opportunity Index"[14]or to limit the index only to elderly units in order to reduce the disparate impact.

C

TDHCA proposes the addition of the following below-the-line criteria, which it asserts are "indicative of educational quality and opportunity or lack of affordable housing":

> a. Location within the attendance zone of a public school with an academic rating of "Recognized" or "Exemplary" (or comparable rating) by the Texas Education Agency (up to 3 points):
>> A. 1 points if it is both an elementary school, and either a middle school or high school; or
>> B. 3 points if it is an elementary school, a middle school, and a high school.
> b. A municipality or, if outside of the boundaries of any municipality, a county that has never received a competitive tax credit allocation. The application must also comply with all other anti-concentration provisions (2 points for general use/family or supportive housing; 1 point for elderly).

Ds. Plan 7-8.  TDHCA also offers to remove all other "Development Location"  options in the below-the-line criterion, unless required by statute, in order to preserve high incentives

---

[14]Moreover, while ICP maintains that the proposed 1 to 3 points are insubstantial, its argument and evidence do not demonstrate that 1 or 3 points will not reduce the disparate impact, albeit perhaps by a lesser extent.

to target HOAs.  ICP does not object to these proposals.  Accordingly, the court adopts them as part of the remedy.

## D

TDHCA next states that, because the 2012 QAP offers a 130% basis boost for proposed development sites located in HOAs, it will continue to do so.  ICP supports this proposal but asserts that the basis boost should be limited to non-elderly units because "[t]he provision of the 130% basis boost for elderly and supportive housing will not remedy the violation of disproportionately allocating non-elderly units to locations in predominantly minority areas."  P. Obj. 14.

For the reasons stated *supra* at § V(B), the court overrules ICP's objection.

E

TDHCA next proposes the adoption of the following "Revitalization Index":

| Points | Population Served | Criteria |
|--------|-------------------|----------|
| 7 | Any | The proposed development site is located in a QCT in which there is in effect a concerted revitalization plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $25,000 per unit in the proposed development. |
| 3 | Any | The proposed development site is located in a QCT in which there is in effect a concerted revitalization plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $10,000 per unit but are less than $25,000 per unit |
| 2 | Any | The proposed development site is not located in a QCT but there is in effect a concerted revitalization plan consistent with the elements described in § 5 and the non-housing costs, as reflected in the local government certified plan budget, exceed $10,000 per unit. |

Ds. Plan 10-11. According to TDHCA, the failure to grant the same preference provided to

HOAs by the "Opportunity Index" to revitalization projects in QCTs is inconsistent with the

preference for revitalization projects set forth in I.R.C. § 42(m).

ICP objects to the inclusion of the "Revitalization Index" for several reasons. First,

it argues that, even according to TDHCA, the purpose of the "Revitalization Index" is not

to remedy the FHA violation but to comply with § 42(m). ICP therefore maintains that the

- 24 -

inclusion of the "Revitalization Index" in the remedy is improper because it makes the remedy broader than necessary to address the violation.  The court has already held that § 42(m)(1)(B)(ii)(III) does not require TDHCA to give preference to revitalization projects in QCTs when selecting which projects will receive LIHTC; thus TDHCA need not include the "Revitalization Index" in the scoring system to comply with § 42(m).  If the "Revitalization Index" need not be included to comply with the I.R.C., there is no reason for the court to make it part of the FHA remedy.  TDHCA, in fact, does not argue that the "Revitalization Index" is a necessary component of a plan to ameliorate the FHA violation, and ICP contends that the "Revitalization Index" may actually undercut the remedy that the court imposes. Because the "Revitalization Index" is not required by the I.R.C. and there has been no showing that it is a necessary component of a plan to remedy the FHA violation, its inclusion is impermissible because it will make the court's remedy broader than necessary.  *See Rizzo*, 564 F.2d at 145 (holding that scope of remedy must be tailored to fit "the nature of the violation" and cannot be "broader than that necessary to remove the violation and its effects").[15]  Accordingly, the court declines to include the "Revitalization Index" in the remedy.[16]

---

[15]Because the court is not including the "Revitalization Index" in the remedy, it need not address ICP's other arguments related to the "Revitalization Index."

[16]As discussed *supra* at note 2, this does not preclude TDHCA from following its usual processes to include the "Revitalization Index" in the QAP.

F

TDHCA proposes to strengthen the criteria for disqualifying proposed development sites that have undesirable features.  It states that the 2012 QAP "included criteria for disqualifying proposed sites that have undesirable features," such as "developments located adjacent to or within 300 feet of junkyards."  Ds. Plan 11-12.  And it represents that it "will continue to include the same or similar criteria in its QAPs."  *Id.* at 13.  ICP does not object to this component of the Plan, stating that "[r]estricting the availability of such sites may have a remedial effect."  P. Obj. 23.  The court adopts this proposal as part of the remedy.

TDHCA also proposes to "incorporate a more robust process to identify and address other potentially undesirable site features" by requiring "an applicant proposing development of multifamily housing with tax credits [to] disclose to [TDHCA] and . . . obtain [TDHCA's] written notification of pre-clearance if the site involves any negative site features," such as "significant or recurring flooding," " at . . . or within 1000 feet of the proposed site."  Ds. Plan 13.  TDHCA will then determine whether to issue or withhold preclearance by reviewing the matters disclosed and conducting a site inspection, if necessary.  ICP argues that "the use of a 1,000 feet distance as the primary measure for the ineligibility of a site under the criteria" is an inadequate measure of risk.  P. App. 3.  ICP maintains, instead, that "[t]he analysis should be on whether the condition poses such risk."  P. Obj. 23-24.  For the reasons stated *supra* at § V(B), the court overrules ICP's objection.

G

TDHCA next proposes strengthening the requirements for establishing a concerted revitalization plan in order to ensure that "true community revitalization is occurring." Ds. Plan 15. Under the proposal, TDHCA can determine at a public meeting that a plan substantively and meaningfully demonstrates a revitalization effort, even if one or more factors have not been met.

TDHCA includes this in the remedial plan in an attempt to be consistent with its view of the requirements of I.R.C. § 42(m). ICP objects to including these enhancements as part of the remedial plan. For the reasons stated *supra* at § IV, TDHCA has no legal obligation under § 42(m) to give a preference to revitalization developments when selecting which projects will receive LIHTC. Because TDHCA does not contend that this proposal is necessary to remedy the FHA violation, the court concludes that the proposed revitalization enhancement is "broader than that necessary to remove the violation and its effects." *Rizzo*, 564 F.2d at 145. Accordingly, the court declines to include in the remedy the point enhancements for developments that are part of a concerted community revitalization effort in the remedy.[17]

---

[17]As discussed *supra* at notes 2 and 16, this does not preclude TDHCA from following its usual processes to include such enhancements in the QAP.

H

TDHCA proposes to "promulgate by rule a fair housing disclosure . . ., advising prospective tenants in writing of a website or other method of contact where they can obtain information about alternative housing and their rights under fair housing laws." Ds. Plan 18. Under the Plan, this disclosure must be provided to prospective tenants before they can enter into a lease.  TDHCA also proposes to "maintain a website providing relevant information and identifying tax credit assisted properties." *Id.*

ICP posits that the disclosure and website "will not affect TDHCA's allocation decisions and will not contribute to bringing those decisions into compliance with the [FHA]." P. Obj. 24.  But it acknowledges that "some form of . . . notice that would be tailored for use in the Dallas remedial area would be appropriate once there are more tax credit units in Caucasian areas." *Id.*  ICP suggests that the parties together determine the content of the notice.

The court disagrees with ICP's position that the disclosure and website will not reduce the disparate impact.  Such initiatives could increase demand by tenants for developments located in HOAs, which could, in turn, encourage developers to propose such developments, and which then could result in increased approval rates for non-elderly developments located in predominantly Caucasian neighborhoods.  The court adopts TDHCA's proposal.  The content of the disclosure will be subject to periodic review as are the other provisions of the Plan.

I

TDHCA proposes to "annually conduct an analysis of the effects of its prior QAP to determine if that QAP . . . contribut[es] to disparate impact." Ds. Plan 18. ICP does not object to an annual disparate impact analysis, and the court adopts the proposal as an efficacious method of monitoring whether the court-ordered remedy is ensuring that no future violations of the FHA occur and removing any lingering effects of past discrimination. *See Jamestown*, 557 F.2d at 1080 (collecting cases).[18]

J

TDHCA proposes adding a mechanism to challenge the grounds for public comments that could lead to the negative scoring of 9% applications or constitute opposition to proposed 4% developments. Under the proposal, a party challenging a comment must state the basis for the challenge. The commenting party must then provide support for the

---

[18]ICP contests the use of "over-concentration" in TDHCA's heading, which states: "Annual analysis of effectiveness of plan and continued development and enhancement of a policy of avoidance of over-concentration of [LIHTC]." Ds. Plan 18. ICP asserts that "[a]ny analysis using . . . concentration and over-concentration will not assist in bringing TDHCA's allocation decisions into compliance with the [FHA]." P. Obj. 22. Instead, ICP maintains that the analysis should focus, not on concentration, but on disparate racial impact.

Although the heading refers to the "over-concentration" of LIHTC, the content of TDHCA's proposal demonstrates that its focus is on disparate impact, given that TDHCA intends to examine the extent that its changes reduce the disparate impact and whether it is necessary to adopt additional changes. Moreover, after the court receives the annual report and any requested modifications to the remedial plan, it will review under court-approved procedures all relevant evidence to determine whether the remedial plan should be amended. If information as to over-concentration is relevant, TDHCA can present it for court consideration.

ICP also requests that the annual report be used to request *the court* for modifications to the remedial plan. The court has established these procedures *supra* at § III.

accuracy of its comment.  A fact finder from TDHCA will make a final determination on the validity of the challenge.  ICP does not object to this proposal.  Because this proposal could offer an applicant proposing a development located in an HOA a manner to challenge negative comments, the court adopts the proposal.

TDHCA also proposes that applications in HOAs receiving statements of support or neutrality from a neighborhood organization that previously opposed a development (thus causing it to lose points) receive two additional points.  ICP objects to including these points in the remedy but does not justify its opposition.  Because this proposal could assist an applicant proposing a development in an HOA, the court adopts it as part of the remedy.

Finally, TDHCA proposes to amend its debarment rules so that if an applicant attempts to create opposition to an application, it will be subject to debarment.  ICP objects to including new debarment rules in the remedy, arguing that debarment and the actions that could lead to it are not related, and therefore not tailored, to the FHA violation.  The court disagrees, concluding that the proposed debarment rule could decrease impediments to applications for developments in HOAs.

K

TDHCA proposes that "[i]n the event of a tie in scoring, the tie breaker will be a preference for the developments that are located the greatest distance from the nearest development that is assisted by either 4% or 9% credits."  Ds. Plan 20.  ICP objects to this proposal.  Similar to its argument above, ICP asserts that "[t]he use of distance alone is a TDHCA concentration policy," which does not address the disparate impact violation.  P.

Obj. 31. Instead, it posits that the tie breaker should be in favor of "[a]n application for a family unit development in [an HOA] which would be consistent with . . . the [FHA]." *Id.* at 31-32. The court adopts ICP's proposal, concluding that it appears better tailored to reducing the disparate impact.

L

TDHCA proposes to "continue to make available on its website proposed and final QAPs with comments and responses, applications, underwriting reports, application and award logs, scoring logs by subject, inventories, and appeal materials." Ds. Plan 20. It also proposes to "post market studies, Phase I Environmental Site Assessments and property condition assessments on its website." *Id.* ICP does not object to this proposal, and it posits that the website could also offer "other documents necessary to monitor compliance with the Court ordered plan." P. Obj. 25.

The parties do not address, and the court cannot determine, how this proposal is intended to ensure that no future violations of the FHA occur or to remove any lingering effects of past discrimination. *See Jamestown*, 557 F.2d at 1080 (collecting cases). Accordingly, the court declines to include this proposal, concluding that it is outside the scope of the court's remedial power. *See Rizzo*, 564 F.2d at 145.[19]

---

[19]TDHCA is not precluded from implementing this proposal after following its usual processes. *See supra* at notes 2, 16, and 17.

M

Finally, TDHCA states that it is subject to statutory constraints, including "adherence to the Texas Administrative Procedures Act; the Texas General Appropriations Act; Chapter 2306 of the Texas Government Code; and adherence to various federal requirements regarding the administration of other sources of funding impacting [TDHCA's] ability to address such matters." Ds. Plan 20. ICP interprets this to be a proposal "that [the] court order[] compliance with state and federal law," asserts that this proposal has no "connection to the [FHA] violation or the appropriate remedy," and posits that "there is no basis for a Court order to require compliance with state and federal laws governing the general administration of the program." P. Obj. 32.

TDHCA does not appear to be offering a proposal. Instead, TDHCA's statement appears to reflect its position that it is subject to statutory restrictions derived from state and federal law. But 42 U.S.C. § 3615 states that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." *Id.* And TDHCA does not specify the federal laws on which it relies. The court therefore declines to include this proposal in the remedial plan.

VI

The court now turns to ICP's proposals. ICP asserts that "TDHCA has proposed no changes in the 4% program allocation and decision process." P. Obj. 33. The court recognizes that the Plan does not address 4% LIHTC specifically, but ICP's objection does

not identify a specific deficiency in the remedial plan that results from this omission. There are distinctions between 4% and 9% LIHTC in that 4% LIHTC are available to all who qualify. Additionally, parts of the remedial plan would have the effect of promoting 4% LIHTC in predominantly Caucasian areas (e.g., criteria for disqualifying proposed sites with undesirable features). Accordingly, the court will consider the adequacy of the remedial plan in relation to 4% LIHTC as part of its annual review process.

ICP next contends that, although TDHCA suggests one change to its threshold criteria—the exclusion of proposed development sites that have undesirable features—TDHCA should propose additional amendments to the threshold criteria in order to mitigate the disparate impact. ICP also proposes revaluing points to increase the weight of below-the-line criteria, especially criteria that would reduce the disparate impact. The court agrees that these changes *could* reduce the disparate impact, but it is unclear whether their adoption is *necessary* to reduce the disparate impact. The court will instead consider these proposals as part of its annual review process.

ICP also asserts that the use of TDHCA's discretion should be included in the remedial plan. The court has already declined to accept this argument.

VII

In the judgment filed today, the court implements the remedial plan adopted in this memorandum opinion and order and retains jurisdiction over this case for a period of five years after the first annual report is filed. Although no party moves for a temporal limit on the court-ordered remedy, the court concludes that one is necessary. *See, e.g., Ueno v.*

*Napolitano*, 2007 WL 1395517, at *6 (E.D.N.Y. May 11, 2007), *rec. adopted*, (E.D.N.Y. May 11, 2007) (although plaintiffs did not state a time-limit for injunctive relief, adopting a three-year limitation period because otherwise, "the court would be overseeing the defendants' rental activities for the rest of their lives").  The court, in its discretion, adopts a five-year limitation period. *Cf. United States v. Real Estate One, Inc.*, 433 F. Supp. 1140, 1156 (E.D. Mich. 1977) (ordering that defendants provide annual reports detailing manner in which they had complied with judgment and directing that "[t]he reporting aspects of the injunction may terminate after five (5) full years of substantial compliance with the terms hereof").  The court finds that such a period will be sufficient to "insur[e] that no future violations of the [FHA] occur and remov[e] any lingering effects of past discrimination." *See Jamestown*, 557 F.2d at 1080 (collecting cases); *see also Ueno*, 2007 WL 1395517, at *6 (adopting three-year limitation period because, *inter alia*, it "should . . . be enough time to monitor the defendants' rental practices to ensure that they are not discriminatory, while limiting the burden imposed upon the court as well as the defendants by the imposition of injunctive relief"); *Rogers v. 66-36 Yellowstone Blvd. Coop. Owners, Inc.*, 599 F. Supp. 79, 85-86 (E.D.N.Y. 1984) (recognizing that two years was best suited for advancement towards these two goals);  *Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth.*, 493 F. Supp. 1225, 1251 (S.D.N.Y. 1980) (holding that court had "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future") (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)).

The court finds that a five-year period is necessary because progress toward ensuring

that no future violations of the FHA occur and of removing any lingering effects of past discrimination will be measured according to reports of LIHTC awards that (as to 9% tax credits) are made on an annual cycle.  And because various factors can influence where applicants choose to develop projects in a particular annual cycle, the court must have a sufficiently broad empirical basis to enable it to assess whether the FHA violation in this case has in fact been remedied.  By retaining jurisdiction for five years, the court will be able to evaluate the impact of several QAPs on the allocation of LIHTC.  *Cf. Rogers*, 599 F. Supp. at 85-86 (recognizing that one-year duration for injunctive order would not be sufficient to permit a "newly implanted open housing program to take root").  During this period, the parties will have opportunities to request modifications to the remedial plan.  This will enable the court to reduce TDHCA's remedial obligations in fewer than five years if they are no longer warranted, or to increase the remedial requirements in the plan now adopted that do have the intended effect of ensuring that no future violations of the FHA occur and removing any lingering effects of past discrimination.

*   *   *

For the reasons explained, the court adopts in part TDHCA's Plan, and it enters judgment today in accordance with its memorandum opinions and orders in this case and the

remedial plan adopted today.

**SO ORDERED.**

August 7, 2012.


_____
SIDNEY A. FITZWATER
CHIEF JUDGE