IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC., | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:08-CV-0546-D |
| VS. | § § | |
| THE TEXAS DEPARTMENT OF HOUSING AND COMMUNITY AFFAIRS, et al., | § § § § | |
| Defendants. | § § | |

MEMORANDUM OPINION

On remand from the Supreme Court and the Fifth Circuit, and applying a materially

different (and more onerous) prima facie case burden of proof than the one applied originally,

the court must decide as trier of fact whether plaintiff The Inclusive Communities Project,

Inc. ("ICP") has proved a prima facie case and may therefore proceed to the next sequential

step of its disparate impact claim under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

("FHA").  For the reasons that follow,[1] the court finds that ICP has not proved a prima facie

---

[1]Pursuant to Fed. R. Civ. P. 52(a)(1), the court sets out its findings of fact and conclusions of law in this memorandum opinion.  Although the court has carefully considered the record, this memorandum opinion has been written to comply with the level of detail required in this circuit for findings of fact and conclusions of law.  *See, e.g., Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standards).  The court has not set out its findings and conclusions in punctilious detail, slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis.  It has instead written a memorandum opinion that contains findings and conclusions that provide a clear understanding of the basis for the court's decision.  *See id.*

case, and it dismisses ICP's disparate impact claim.

I

This is an action by ICP against defendants Texas Department of Housing and Community Affairs and its Executive Director and board members in their official capacities (collectively, "TDHCA") challenging TDHCA's allocation of Low Income Housing Tax Credits ("LIHTC") in the Dallas metropolitan area.[2]   ICP sought relief for intentional discrimination based on race, in violation of the Equal Protection Clause of Fourteenth Amendment (actionable under 42 U.S.C. § 1983) and 42 U.S.C. § 1982. *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 860 F.Supp.2d 312, 313 (N.D. Tex. 2012) (Fitzwater, C.J.) ("*ICP III*"), *rev'd*, 747 F.3d 275 (5th Cir. 2014), *aff'd and remanded*, ___ U.S. ___, 135 S.Ct. 2507 (2015).   ICP also alleged that TDHCA was liable under §§ 3604(a) and 3605(a) of the FHA on a disparate impact theory. *Id.*  Following the entry of partial summary judgment in ICP's favor, and a bench trial, the court found in favor of ICP on its FHA-based disparate impact claim and against ICP on all other claims. *Id.* at 314.

At the time the court first decided this case on the merits, the Fifth Circuit had not "determined the legal standards that should be applied in disparate impact housing discrimination cases." *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 280-81 (5th Cir. 2014) ("*ICP V*"), *aff'd and remanded*, ___ U.S. ___, 135 S.Ct. 2507 (2015).   Absent controlling precedent from the Supreme Court or the Fifth

---

[2]Intervenor Frazier Revitalization Inc.—who is aligned with TDHCA—has obtained leave to intervene.

Circuit, this court essentially followed the approach of the Second Circuit in *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir.), *aff'd in part*, 488 U.S. 15 (1988), but without engaging in a process of balancing the factors identified in *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977). *ICP III*, 860 F.Supp.2d at 322 n.17.   Before trial, the court granted partial summary judgment holding that ICP had made a prima facie showing that TDHCA had violated the FHA based on ICP's disparate impact theory. *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 749 F.Supp.2d 486, 499-500 (N.D. Tex. 2010) (Fitzwater, C.J.) ("*ICP II*").   At trial, the court decided ICP's disparate impact claim on the merits using as a starting point its summary judgment ruling that ICP had established a prima facie case.

> In *ICP II* the court held that ICP was entitled to summary judgment establishing that it had made a prima facie showing of disparate impact. . . .   Because ICP has made this showing, the burden has shifted to defendants to prove by a preponderance of the evidence that their actions were in furtherance of a legitimate governmental interest.

*ICP III*, 860 F.Supp.2d at 322.   But as the court explains below, the court's conclusion that ICP had established a prima facie case beyond peradventure was reached without the benefit of the Supreme Court's decision in this case, and rested on understandings such as that TDHCA "essentially [did] not contest ICP's prima facie cases," *ICP II*, 749 F.Supp.2d at 498, that "ICP's prima facie burden [was] not a heavy one," *id.* at 499, and that "ICP ha[d] adduced evidence that [was] uncontested," *id.* at 500.

On appeal, the Fifth Circuit reversed and remanded. *ICP V*, 747 F.3d 275. It held that this court had "correctly noted [that a] violation of the FHA can be shown either by proof of intentional discrimination or by proof of disparate impact." *Id.* at 280. But the Fifth Circuit also noted that it had "not previously determined the legal standards that should be applied in disparate impact housing discrimination cases," *id.* at 280-81; that other circuits "have applied multiple different legal standards to similar claims under the FHA," *id.* at 281; and that "after [this] court's decision in this case, [the U.S. Department of Housing and Urban Development ("HUD")] issued regulations regarding disparate impact claims under the FHA," *id.* at 282. The panel adopted the burden-shifting approach of the new HUD regulations for disparate impact claims brought under the FHA, *id.* at 282, and it remanded the case for this court "to apply this legal standard to the facts in the first instance," *id.* at 283.[3]

The Supreme Court then granted certiorari to decide whether disparate impact claims are cognizable under the FHA. Affirming the judgment of the Fifth Circuit, the Supreme Court held that disparate impact claims are cognizable. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, ___ U.S. ___, 135 S.Ct. 2507 (2015) ("*ICP VI*"). Following the Supreme Court's remand to the Fifth Circuit, the panel then "remand[ed] this case . . . for further proceeding consistent with [its] opinion and the opinion of the Supreme Court."

---

[3]The Fifth Circuit made clear that it was not requiring that this court "must retry the case," and that it was leaving "it to the sound discretion of [this] court to decide whether any additional proceedings are necessary or appropriate." *ICP V*, 747 F.3d at 283.

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 795 F.3d 509 (5th Cir. 2015) (per curiam).

This court, in turn, requested that the parties propose how the case should proceed on remand. *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 2015 WL 5916220, at *1 (N.D. Tex. Oct. 8, 2015) (Fitzwater, J.). ICP maintained that the briefing should commence at step two of the three-part burden-shifting approach—that TDHCA[4] should be required to address the justification element, followed by ICP's addressing the less discriminatory alternative element. *Id.* at *3. ICP "posit[ed] that the court should adhere to its summary judgment decision that ICP ha[d] established the first element (prima facie case)." *Id.* TDHCA and intervenor Frazier Revitalization Inc. contended that "the court should reconsider whether ICP ha[d] pleaded and proved a prima facie case," and that "TDHCA should not be required to address the justification prong unless ICP meets its obligation to plead and prove a prima facie case." *Id.*

The court concluded "that the interests of justice and fundamental fairness require[d] that [the court] first consider on the current (or a supplemented) trial record whether ICP ha[d] established a prima facie case." *Id.* This was so because, although the court had granted partial summary judgment in *ICP II* holding that ICP had established a prima facie case on its disparate impact claim, it had done so without the benefit of the Supreme Court's opinion; it had not given the prima facie requirement the same emphasis that the Supreme

---

[4]The court uses TDHCA to refer to defendants collectively. ICP actually referred to defendants.

Court had given it—for example, the court had stated that ICP's prima facie burden was not a heavy one, and it had concluded that ICP need only provide evidence that raised an inference of discrimination; and the court arguably had "not analyze[d] ICP's evidence through the prism of the 'robust causality requirement' envisioned by the Supreme Court." *Id*.

The court also reasoned that TDHCA had not had the benefit of the Supreme Court's decision, and, therefore, "a pellucid sense of its importance in the equation of proving FHA disparate impact liability." *Id.* at *4. In *ICP II* the court pointed out that, in opposing ICP's summary judgment motion, defendants essentially had not contested ICP's prima facie cases, and ICP had established a prima facie case based on evidence that was "uncontested." *Id*. (quoting *ICP II*, 749 F.Supp.2d at 500). The court reasoned that TDHCA should therefore be permitted to challenge ICP's prima facie showing "based on a clearer understanding of the requirements and consequences of ICP's establishing a prima facie case." *Id*.

Finally, the court concluded:

> given the significant developments in this case on appeal, . . . the interests of justice and fundamental fairness require not only that ICP's disparate impact claim be decided anew under the burden-shifting regimen adopted by HUD and the Fifth Circuit, but that the court start with whether ICP has established a prima facie case.

*Id.*

The parties have submitted their prima facie case briefing and have supplemented the record, and the court has heard oral argument.

II

ICP is a non-profit organization that seeks racial and socioeconomic integration in the Dallas metropolitan area. To that end, ICP assists low-income, predominantly African-American families who are eligible for the Dallas Housing Authority's Section 8 Housing Choice Voucher program ("Section 8") in finding affordable housing in predominately Caucasian, suburban neighborhoods. Because under the LIHTC program a development that receives tax credits cannot refuse housing solely because a person is using a Section 8 voucher, it is important to ICP where the developments are located in the Dallas metropolitan area.

Under § 42 of the Internal Revenue Code ("I.R.C."), the government provides tax credits (here, LIHTC) that a state (here, Texas) distributes to developers through a designated state agency (here, TDHCA). *See* Tex. Gov't Code Ann. § 2306.053(b)(10) (West 2008). Developers apply to TDHCA for tax credits, which can be sold to finance construction of a housing project. ICP alleges that TDHCA's allocation of LIHTC in the Dallas metropolitan area has a disparate impact on the location of low-income housing in the area. ICP complains of TDHCA's allocation of two different types of tax credits: the 4% credit, and the 9% credit.

Nine percent tax credits are distributed on an annual cycle and are generally oversubscribed. Certain federal and state laws dictate, at least in part, how TDHCA selects applications for 9% tax credits. First, I.R.C. § 42 requires that the designated state agency adopt a "Qualified Allocation Plan" ("QAP") that prescribes the "selection criteria" for 9%

tax credits.  *Id*. at § 42(m)(1)(A)-(B).  The QAP must include, *inter alia*, certain criteria and preferences; otherwise, zero housing credit dollars will be provided.  § 42(m)(1)(A)-(C).  Second, the Texas Government Code regulates how TDHCA administers the LIHTC program: it requires that TDHCA adopt annually a QAP and corresponding manual, *id.* at § 2306.67022, and sets out how TDHCA should evaluate applications, *id.* at § 2306.6710(a).  First, TDHCA must "determine whether the application satisfies the threshold criteria" in the QAP.  *Id*. at § 2306.6710(a).  Applications satisfying the "threshold criteria" are then "score[d] and rank[ed]" by a point system that "prioritizes in descending order" ten listed statutory criteria (also called "above-the-line criteria"), which directly affects TDHCA's discretion in creating "selection criteria" in each QAP.  *Id*. at § 2306.6710(b).  TDHCA is also permitted to consider other criteria and preferences (also called "below-the-line" criteria), but it "lacks discretionary authority to intersperse other factors into the ranking system that will have greater points than" the statutory criteria.  Tex. Att'y Gen. Op. No. GA-0208, 2004 WL 1434796, at *6 (2004).

Once the TDHCA adopts a QAP, it submits it to the Governor, who can "approve, reject, or modify and approve" it.  Tex. Gov't Code Ann. § 2306.6724(b)-(c) (West 2001).  The TDHCA staff then review applications, underwrite applications to determine their financial feasibility and appropriate level of tax credits, and submit recommendations to the TDHCA.  § 2306.6710(b)(1)(A) & (d), § 2306.6724(e).  The TDHCA reviews the staff recommendations and issues final commitments in accordance with the QAP.  *Id.* at § 2306.6724(e)-(f).

Unlike 9% tax credits, 4% tax credits are awarded according to non-competitive criteria, available to applicants on a year-round basis, and generally are not oversubscribed. In awarding a 4% tax credit, the TDHCA "reviews the application for threshold, eligibility and then the development is underwritten." P. Ex. 1 at 20; *see also* Tex. Gov't Code Ann. § 2306.67021 (West 2001). Applications for the 4% tax credit are not subject to scoring under the selection criteria and are not decided under a competitive scoring model.

III

The Supreme Court held in *ICP VI* that disparate impact claims are cognizable under the FHA. *ICP VI*, 135 S. Ct. at 2514-15. The Court did not disturb the Fifth Circuit's adoption of the HUD burden-shifting regimen, but it prescribed several limitations on disparate impact liability, and it questioned whether ICP can prove liability in this case. The Court cautioned that disparate impact liability should not be established "based solely on a showing of statistical disparity," *id*. at 2522; and that it properly results in the removal of "artificial, arbitrary, and unnecessary barriers," but does not eschew "valid governmental policies," *id.*

As a result of the Fifth Circuit's decision adopting the HUD regulations, and the Supreme Court's affirmance (without altering the burden-shifting approach), the following proof regimen now applies to ICP's disparate impact claim under the FHA:

> We now adopt the burden-shifting approach found in 24 C.F.R.
> § 100.500 for claims of disparate impact under the FHA. *See* 24
> C.F.R. § 100.500.  First, a plaintiff must prove a prima facie
> case of discrimination by showing that a challenged practice
> causes a discriminatory effect, as defined by 24 C.F.R. §
> 100.500(a). 24 C.F.R. § 100.500(c)(1).  If the plaintiff makes a
> prima facie case, the defendant must then prove "that the
> challenged practice is necessary to achieve one or more
> substantial, legitimate, nondiscriminatory interests . . . ." *Id.* §
> 100.500(c)(2).  If the defendant meets its burden, the plaintiff
> must then show that the defendant's interests "could be served
> by another practice that has a less discriminatory effect." *Id.* §
> 100.500(c)(3).

*ICP V*, 747 F.3d at 282.

In the first step of proving its prima facie case, ICP must "point to [TDHCA's] policy or policies causing that [statistical] disparity." *ICP VI*, 135 S.Ct. at 2523.  "[A] one-time [housing] decision may not be a policy at all." *Id*. at 2523.  Importantly, "'racial imbalance . . . does not, without more, establish a prima facie case of disparate impact.'" *Id*. (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)).  This "robust causality requirement . . . protects defendants from being held liable for racial disparities they did not create." *Id*.  The Court noted that, in cases such as this one, "it may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units." *Id.* at 2523-24.  Accordingly, this court must "examine with care whether a plaintiff has made out a prima facie case of disparate impact, and prompt resolution of these cases is important." *Id*. at 2523.

"A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate

- 10 -

impact." *Id.* The Court specifically noted Judge Jones's specially concurring opinion in *ICP V*, in which she observed that "if the ICP cannot show a causal connection between the Department's policy and a disparate impact—for instance, because federal law substantially limits the Department's discretion—that should result in dismissal of this case." *Id.* at 2524 (citing *ICP V*, 747 F.3d at 283-84). The Court cautioned that, "[u]nlike the heartland of disparate-impact suits targeting artificial barriers to housing, the underlying dispute in this case involves a novel theory of liability," *id.* at 2522, and that "[t]his case, on remand, may be seen simply as an attempt to second-guess which of two reasonable approaches a housing authority should follow in the sound exercise of its discretion in allocating tax credits for low-income housing." *Id.* at 2523.

## IV

The heart of ICP's complaint is the allocation of 9% tax credits for low-income housing developments.[5] ICP alleges that the policy or practice of permitting the TDHCA to use its discretion in allocating 9% tax credits perpetuates racial segregation, in violation of the FHA. ICP complains of the TDHCA's exercise of discretion on the whole and in specific ways. Because ICP must identify a specific policy or practice that causes a statistically significant disparity in the location of low-income housing, *see ICP VI*, 135 S. Ct. 2507, the court will separately address ICP's challenges to TDHCA's discretion on the whole and in

---

[5]The court addresses ICP's challenges to the 4% program and the 9% program separately because the allocation of each type of credits is done separately and the programs are administered in different ways.

specific contexts.

## A

The court first decides whether TDHCA's exercise of discretion in deciding how to allocate 9% tax credits is a specific, facially neutral policy sufficient to establish a prima facie case of disparate impact liability.

### 1

ICP alleges that the exercise of TDHCA's discretion in the 9% tax credit program has caused the exclusion of all but 6% of the LIHTC units from Caucasian areas in the City of Dallas and all but 26% of the LIHTC units from Caucasian areas in the Dallas metropolitan area. Between 1999 and 2008, applications for 9% tax credits for units located in minority tracts had a 41% approval rate, while applications for units located in Caucasian tracts had a 21% approval rate. As evidence of disparate impact, ICP points to TDHCA's decisions to deny or approve applications for specific applications for 9% tax credits between 1999 and 2008. ICP alleges that the use of TDHCA discretion in the aggregate resulted in an approval rate for units located in Caucasian areas of nearly half the approval rate for units located in minority areas.

TDHCA responds that ICP has not identified a specific, facially-neutral policy that caused a racially disparate impact sufficient to establish a prima facie case under the FHA. It argues that discretion itself is not a policy; ICP has not accounted for the actions, policies, or preferences of third parties—such as Congress, the Texas Legislature, developers, and local communities—that impact the location of LIHTC units; ICP relies on several specific

exercises of discretion—such as the use of set-asides for elderly units—but does not allege any facts demonstrating a statistical disparity caused by that use of discretion; and ICP challenges statewide policies but claims only localized statistical disparity.  TDHCA also maintains that ICP is not actually challenging TDHCA's use of discretion; rather, ICP is seeking to require TDHCA to use its discretion in a specific way, that is, to provide desegregated housing opportunities for ICP's clients and to remedy historical housing segregation.

ICP replies that discretion can be a policy sufficient to state a disparate impact claim, and that federal laws establishing a preference for providing low-income housing in minority areas did not cause the statistical disparity in low-income housing.

2

To prove a disparate impact claim, the plaintiff must first identify a facially-neutral policy that has resulted in the disparate impact.  *See ICP VI*, 135 S.Ct. at 2522-24; *see also City of Miami v. Bank of Am. Corp.*, 2016 WL 1072488, at *4-5 (S.D. Fla. Mar. 17, 2016) (applying *ICP VI*).[6]  As the Supreme Court explained, disparate impact claims seek to remove impermissible barriers; therefore, ICP must identify a specific policy that has created barriers to fair housing.  *See City of Los Angeles v. Wells Fargo & Co.*, 2015 WL 4398858, at *8 (C.D. Cal. July 17, 2015) (applying *ICP VI*).  ICP must affirmatively identify a specific

---

[6]As the Supreme Court explained, disparate impact cases "interpreting Title VII and the ADEA provide essential background and instruction" in this case.  *ICP VI*, 135 S.Ct. at 2518.

- 13 -

policy that produced a disparate impact, rather than point to a lack of policy that caused it. *See id.* Nor is it sufficient for ICP to point to a generalized policy that leads to a disparate impact. *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 100 (2008) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)). This is not a "trivial burden." *Id.*

The offending policy or practice must be specifically identified for at least two reasons. First, the court cannot evaluate whether the offending policy caused a statistically significant disparity without knowing the offending policy with precision. *Meacham*, 554 U.S. at 100 (explaining that plaintiff must specifically identify the offending policy so that the court can ensure that employers are not liable for "the myriad of innocent causes that may lead to statistical imbalances."); *Hanrahan v. Blank Rome LLP*, 142 F.Supp.3d 349, 354 (E.D. Pa. 2015) (dismissing disparate impact claim where plaintiff failed to identify and isolate a specific employment policy). Especially where the defendant has combined discretionary or subjective decision-making with objective criteria, "the plaintiff is in our view responsible for isolating and identifying the specific . . . practices that are allegedly responsible for any observed statistical disparities." *Wards Cove*, 490 U.S. at 656; *see also Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1283-85 (5th Cir. 1994). If the plaintiff does not identify a specific policy or practice, the court cannot determine whether that policy or practice has created a barrier to fair housing or has resulted in a statistical disparity. *See Wells Fargo*, 2015 WL 4398858, at *8 (citing *ICP VI*, 135 S.Ct. at 2523). In *Anderson*, an employment discrimination case, the plaintiff asserted that the cumulative effects of the defendant's employment practices caused a racial disparity in promotions. *Anderson*, 26

F.3d at 1284.  The Fifth Circuit affirmed the dismissal of the plaintiff's disparate treatment impact claim and noted that the plaintiff had failed to identify a specific policy that caused the racial disparity.  *Id.*

Likewise, ICP has failed to point to a specific, facially neutral policy that purportedly caused a racially disparate impact.  By relying simply on TDHCA's exercise of discretion in awarding tax credits, ICP has not isolated and identified the specific practice that caused the disparity in the location of low-income housing.  Like the plaintiff in *Anderson*, ICP has pointed to the "cumulative effects" of TDHCA's decision-making process over a multi-year period.  ICP cannot rely on this generalized policy of discretion to prove disparate impact.

Identification of a specific policy or practice is also essential for determining how to remedy the disparate impact.  Although the court need not now decide what remedy, if any, is required in this case, consideration of the potential remedies for disparate impact claims demonstrates what kinds of policies are offending.  The Supreme Court requires that "[r]emedial orders in disparate-impact cases . . . concentrate on the elimination of the offending practice, and courts should strive to design race-neutral remedies."  *ICP VI*, 135 S.Ct. at 2512.  The Court cautioned that lower courts should be careful not to "impose racial targets or quotas," because doing so "might raise difficult constitutional questions."  *Id.*  In sum, any remedy must focus on removing the offending practices and must be race-neutral.

ICP has not identified any offending policy for which there exists a constitutionally-sound remedy.  To remedy disparate impact, the court must craft a race-neutral remedy that removes the offending practice.  For example, if ICP complained that TDHCA's use of bonus

points for certain types of housing developments had a disparate impact, the court could order a remedy that adjusted how the TDHCA awarded such bonus points. Here, ICP has not identified any barriers to housing that the court can remove. Although ICP complains of TDHCA's exercise of discretion in housing decisions, it does not ask the court to prohibit TDHCA from using its discretion; rather, it asks the court to require that TDHCA exercise its discretion in a specific way: to desegregate housing. For example, ICP implies that TDHCA should be required to award bonus points for developments that provide opportunities for desegregation and to subtract points for developments in areas of slum and blight.[7] Because ICP has not sufficiently identified a specific, facially-neutral policy that has caused a statistical disparity, the court cannot fashion a remedy that removes that policy.

B

ICP's disparate impact claim must be dismissed for an additional reason: regardless of the label ICP places on its claim, it is actually complaining about disparate treatment, not disparate impact.[8] The purpose of disparate impact liability is to root out a facially neutral policy that has an unintended discriminatory result. *Phillips v. Cohen*, 400 F.3d 388, 398 (6th Cir. 2005) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988)). But

---

[7]Additionally, in response to TDHCA's proposed remedial plan, ICP argued that TDHCA "can and should use its discretion to remedy the violation" to "accomplish the remedial purpose of the plan." ICP 6/18/12 Resp. to Ds. Proposed Remedial Plan at 10.

[8]ICP originally asserted claims for disparate treatment and disparate impact, both rooted in the TDHCA's allocation of tax credits for low-income housing. The court ruled against ICP on its disparate treatment claim. *ICP III*, 860 F.Supp.2d at 314.

a claim for intentional discrimination is evaluated under the disparate treatment framework, which requires a showing of targeted discrimination. *Wards Cove*, 490 U.S. at 666. Where the plaintiff establishes that a subjective policy, such as the use of discretion, has been used to achieve a racial disparity, the plaintiff has shown disparate treatment. *See, e.g., Johnson v. Metro. Gov't of Nashville & Davidson Cnty.*, 2008 WL 3163531, at *4-6 (M.D. Tenn. Aug. 4, 2008) (citing *Phillips* and *Wards Cove*). On the other hand, where the plaintiff establishes that the existence of the policy itself, rather than how the policy is applied, resulted in a racial disparity, the plaintiff has shown disparate impact. *Id.*

These examples are illustrative. In *Johnson* the plaintiffs alleged that the defendant-employer applied a promotion method that had an adverse effect on white male employees. *Id.* Rather than challenge the method itself, plaintiffs challenged the results of the employer's application of the method to them, and argued that the method was used to avoid promoting white male employees. *Id.* The court held that plaintiffs' claim was one for disparate treatment because they argued that the method was used to intentionally discriminate against them, even if they did not label their claim as such.

Similarly, in *Reminder v. Roadway Express, Inc.*, 215 Fed. Appx. 481 (6th Cir. 2007) (per curiam), the plaintiff asserted a disparate impact claim, arguing that his employer's method of downsizing resulted in a disproportionate termination of employees over age 40. *Id.* at 485. The Sixth Circuit held that the plaintiff "clearly" asserted a disparate treatment—not disparate impact—claim despite its label because the plaintiff did not identify a specific neutral policy but rather the impact of the downsizing methods that targeted

persons over age 40. *Id.*

ICP likewise complains of disparate treatment. Although ICP labels its claim as one for disparate impact, a fair reading of ICP's arguments reveals that it is complaining about the results of TDHCA's discretion, not the existence of the discretion. *See, e.g.*, ICP 2/25/16 Prima Facie Reply Br. at 10 ("This longstanding result [of TDHCA's decisions] is consistent with the use of a race based cap on the percentage of LIHTC family units to be allowed in Caucasian areas."); at 15-16 (arguing that TDHCA's stated reasons for its decisions are pretextual). If ICP were challenging the existence of TDHCA's discretion rather than how the discretion is used, ICP would seek to enjoin that discretion and to mandate a points-only system or another wholly objective method of awarding tax credits. Instead, ICP maintains that TDHCA's exercise of discretion should be the means to achieve a specific end: to provide increased opportunities for desegregated low-income housing. Because ICP is actually complaining of the results of TDHCA's exercise of discretion rather than of the existence of that discretion, ICP has not established a claim for disparate impact.

C

Even assuming *arguendo* that TDHCA's use of discretion is a specific, facially neutral policy, ICP has not established that the exercise of that discretion caused the disparity in the location of low-income housing.

1

"A disparate-impact claim relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *ICP VI*, 135 S.Ct. at

- 18 -

2523.  This causality requirement is "robust" to ensure that "defendants do not resort to the use of racial quotas" to avoid liability for statistical disparities.  *Id.*  The plaintiff must demonstrate that the statistical disparity is caused by the defendant's policy or policies, rather than by other factors.  *Id.* (citing CFR § 100.500(c)(1) (2014)).  Accordingly, to establish a prima facie case of disparate impact, ICP must prove facts that plausibly demonstrate a causal link between the challenged policy or practice and a statistical disparity.  *Id.*; *see also Ellis v. City of Minneapolis*, 2015 WL 5009341, at *10 (D. Minn. Aug. 24, 2015) (applying *ICP VI* ).  The use of discretion "should itself raise no inference of discriminatory conduct." *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1369 (5th Cir. 1992) (citing *Watson*, 487 U.S. 989).

2

ICP has not proved that TDHCA's policy of allowing discretion in allocating 9 % tax credits caused a statistically-significant disparity.  ICP has established that (1) TDHCA has discretion in how it allocates 9% tax credits and (2) as of 2008, 26% of LIHTC units in the Dallas metropolitan area are located in Caucasian areas and 74% are located in minority areas.  ICP has not proved that it was TDHCA's exercise of discretion—and not something else—that caused the difference in the number of LIHTC units in each area.  Put differently, ICP has not demonstrated that, had TDHCA not been permitted to exercise any discretion when allocating 9% tax credits, and had those decisions been made strictly by the points system, there would be no, or significantly less, disparity in the location of LIHTC units.

Nor has ICP proved what the distribution of LIHTC units or the percentages of

approved 9% applications would have been had TDHCA awarded credits based strictly on points—had it exercised no discretion. It is therefore possible that, based strictly on points, the statistical disparity would be the same, lesser, or even greater. For example, ICP adduced evidence that, in 1999, TDHCA awarded credits to the Rosemont at Arlington Park development, a family development with 100 units in a predominately minority area of Dallas, with 92 points. ICP 1/7/16 Prima Facie Br. App. at 728. The highest scoring application in 1999, with 95 points, was the Columbia Valley Townhomes, a family development with 160 units in a predominately minority area of Dallas. *Id*. Accordingly, had the TDHCA awarded credits based strictly on points, it would have created a greater disparity in the number of LIHTC units in minority areas and in Caucasian areas: it would have awarded credits to 160 units in a minority area instead of 100 units. In 2005, the TDHCA's awards would have been the same had it awarded credits based solely on points. *Id*. at 738. And as TDHCA explained at oral argument, from 2004 to 2008, TDHCA approved 12 applications for tax credits for low-income housing in minority areas and 12 applications for tax credits for low-income housing in Caucasian areas.

Nor has ICP accounted for other potential causes of the statistical disparity. TDHCA argues that "ICP does not account for the actions, policies, or preferences of third parties like Congress, the Texas Legislature, developers, and local communities that impact the location of LIHTC units." Ds. 2/4/16 Prima Facie Resp. Br. at 19. It points to other potential causes of the statistical disparity: the preference under federal law for placement of LIHTC properties in low-income communities and the corresponding "basis boost" received by

applications for tax credits for developments in low-income communities; the preference under state law for financial feasibility and community participation; developers' decisions regarding the locations of housing projects; and the decisions and preferences of local governments regarding zoning and approval of specific projects.

ICP replies that the existing statistical disparity cannot be caused by the federal preference for placement of LIHTC properties in low-income communities because the statistical disparity predated the federal preference.   And according to ICP, "[t]he uncontested facts rule out the possibility that either third parties or other factors are causing the perpetuation of segregation."  ICP 2/25/16 Prima Facie Reply Br. at 18.  ICP offers the example of two applications for 9% tax credits for housing projects in Caucasian tracts that were eligible for credits but denied.  ICP reasons that, because these two projects were not eligible for the federal "basis boost," TDHCA's exercise of discretion was the only cause for the denial of the applications.

ICP has not proved that TDHCA's exercise of discretion—and not other factors—caused the statistical disparity.  The Supreme Court recognized in *ICP VI* "[i]t may be difficult [for ICP] to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units."  *ICP VI*, 135 S.Ct. at 2524.  Therefore, "if the ICP cannot show a causal connection between [TDHCA's] policy and a disparate impact—for instance, because federal law substantially limits [TDHCA's] discretion—that should result in dismissal of this case."  *Id.* (citing Jones, J., specially concurring in *ICP V*, 747 F.3d at 283-84).  ICP has failed to demonstrate that local zoning

rules, community preferences, or developers' choices did not contribute to the statistical disparity. For example, TDHCA asserted at oral argument, and ICP does not refute, that no developers have applied for credits for developments in predominately Caucasian areas in the City of Dallas since 1995. Accordingly, TDHCA has neither granted nor denied any such application, and it is not TDHCA's discretion that has caused the lower number of LIHTC units in the City of Dallas.

ICP also attempts to causally link to a cumulative statistical disparity TDHCA's exercise of discretion in a case-by-case review during an annual-cycle over a multi-year period. The facts belie ICP's position. Each year, TDHCA decides whether to approve or deny applications for 9% tax credits submitted that year. Because there is a fixed number of credits that TDHCA can award, it must compare the applications during each annual cycle and decide which ones to award. TDHCA does not, however, compare applications submitted in one year to applications submitted in a different year. In other words, TDHCA's approval of an application in 2000 should have no effect on its denial of an application in 2003, and vice versa. Accordingly, ICP's reliance on a statistical disparity that has accumulated over a multi-year period is misplaced; the disparity cannot be causally linked to the exercise of discretion in a single year.

Finally, ICP acknowledges that the discretion exercised by TDHCA has changed from year to year. In other words, the policy to which ICP attributes a cumulative disparity has in fact changed during that time period. For example, from 1995 to 2011, the QAP permitted TDHCA to award forward commitments. But TDHCA has not been authorized to award

forward commitments since 2011.  The point system set forth in the QAP has also changed from year to year.  Because the challenged policy has changed from year to year in each QAP, ICP cannot point to a specific policy that caused an aggregate statistical disparity over a multi-year period.  *See, e.g., City of Miami*, 2016 WL 1072488, at \*5 & n.3 (holding that plaintiff failed to demonstrate disparate impact where it "lump[ed] together eight years of data" over which time period defendant's policies had changed).

## D

In addition to challenging TDHCA's general policy of exercising discretion in awarding tax credits, ICP also challenges several specific ways in which TDHCA exercises its discretion.  For the reasons explained *supra* at § IV(A)(2), the court holds that TDHCA's use of discretion is not a specific, facially neutral policy that can support a claim for disparate impact.  But assuming *arguendo* that ICP can prove a disparate impact claim based on a specific exercise of discretion, the court must still decide whether ICP has proved that the exercise of discretion has caused a statistically significant disparity in the approval of 9% tax credits.  ICP relies on the following specific exercises of discretion: (1) "discretionary forward commitments in the 9% program"; (2) "other exercises of discretion in taking factors other than point totals into account in the 9% program"; (3) "discretion in the scoring of 9% selection criteria"; (4) "the discretionary decision to eliminate taking into account in individual allocation decisions whether the project would provide desegregated housing opportunities in connection with court ordered desegregation remedies"; (5) "using discretion to allocate 9% tax credits for units restricted to elderly only residents"; (6) "discretion in

- 23 -

selecting groups of applications for guaranteed allocations through set asides"; and (7) "the exercise of discretion to approve rather than disapprove projects that would be located in areas marked by conditions of slum and blight, high crime rates, noxious industrial uses, adverse environmental conditions, and concentrations of LIHTC units."  ICP 1/7/16 Prima Facie Br. at 2.

1

ICP complains of TDHCA's discretion to award forward commitments to applications seeking 9% tax credits.  According to ICP, each QAP from 1995 to 2011 permitted TDHCA to award any eligible 9% tax credit application an allocation of credits from the following year's allocation rather than from the current year's allocation.  For example, TDHCA could deny an application for tax credits in 1999 but commit to award the applicant tax credits in 2000.  ICP alleges that, although no QAP from 2012 to the present expressly gives TDHCA discretion to award forward commitments, pertinent regulations governing the award of tax credits permit TDHCA to exercise such discretion today.

TDHCA responds that it used its discretion to award forward commitments on a case-by-case basis to award credits for projects that were "uniquely deserving" but that did not have enough points to be awarded credits in the application year; the current QAP does not allow for forward commitments, and ICP's complaint is moot; ICP has not identified a policy of awarding forward commitments sufficient to state a prima facie case; and ICP has not alleged facts demonstrating a statistical imbalance caused by the approval or denial of forward commitments.

ICP has not satisfied the robust causality requirement.  Although ICP has proved that TDHCA gave forward commitments to several applications for 9% tax credits, ICP has not proved a statistical disparity caused by the forward commitments.  For example, ICP has not proved how many applications were awarded forward commitments that would not otherwise have been awarded tax credits in their application years or in the following year, or what applications would have been awarded had the applications been denied instead of forwarded.  ICP has not proved how the statistical disparity would have lessened if TDHCA had no discretion to award forward commitments.[9]

2

ICP also complains of TDHCA's discretion to take into account factors other than point totals, and its discretion in scoring applications for tax credits.  TDHCA responds that ICP has not isolated and identified a specific policy causing a disparity, as required by the Supreme Court, and that this court therefore cannot craft a remedial order eliminating the offending policy.  TDHCA also argues that what ICP is actually seeking is for the court to engineer a QAP so as to remedy racial imbalance in housing and to achieve ICP's ideal distribution of LIHTC units, and that the Supreme Court has cautioned that such remedies raise serious constitutional concerns.

ICP has not proved that TDHCA's exercise of discretion in scoring or in taking other factors into account has caused a statistically-significant disparity.  As discussed *supra* at §

---

[9]TDHCA also argues that, because the QAP no longer grants TDHCA discretion to award forward commitments, there is nothing for the court to remedy.  The court agrees.

IV(A)(2), ICP has not demonstrated a specific policy that the court could remedy, or that TDHCA's discretion to consider factors other than points has caused a statistically-significant disparity.

3

ICP complains of TDHCA's decision not to consider whether a proposed development would provide desegregated housing opportunities.  According to ICP, until 1994, TDHCA awarded additional points for developments located in Caucasian areas.  After 1994, TDHCA could in its discretion award additional points for desegregated developments, but chose not to do so.

TDHCA responds that ICP has failed to allege any facts demonstrating that, had TDHCA awarded additional points to applications for developments in Caucasian areas, those applications would have been approved, or that approval of such applications would have lessened the statistical disparity.

ICP has failed to prove that TDHCA's decision not to award additional points for projects that provide desegregated housing caused any statistical disparity.  In addition, ICP does not seek any constitutionally-sound remedy—i.e., the "elimination of the offending practice." *ICP VI*, 135 S.Ct. at 2524.  ICP does not seek to *remove* a specific barrier to fair housing, but to *impose* on TDHCA the requirement that it award additional points for housing that furthers desegregation.  The Supreme Court has made clear that such remedies are constitutionally suspect, and the court declines to impose such remedy.  *See id.*; *see also Wells Fargo*, 2015 WL 4398858, at *8 (holding that absence of policy cannot form basis for

- 26 -

disparate impact claim because there is nothing to remedy).

4

ICP challenges TDHCA's discretion to allocate tax credits to units for elderly-only residents and the use of set-asides for elderly-only units.  TDHCA has the discretion to "set aside" certain types of applications and to score these applications in their subset, rather than against the general application pool.  From 2001 to 2003, TDHCA set aside a certain number of 9% tax credits for units for elderly residents.  ICP complains that TDHCA did not establish a set-aside for applications for units located in Caucasian areas, and it challenges TDHCA's use of elderly-only set-asides.

TDHCA responds that ICP does not explain how TDHCA's decision to set aside a certain number of tax credits for elderly-only developments caused the placement of more LIHTC units in minority areas than in Caucasian areas, and that ICP has not proved that, had TDHCA not set aside any tax credits for elderly-only developments, the racial disparity would have been lessened.

ICP has not proved that TDHCA's use of set-asides or other allocation of LIHTC for elderly-only units has caused a statistically-significant disparity, and it has not proved how tax credits for elderly-only units in Caucasian areas contributes to racial disparity in housing.  To the extent ICP asks the court to require that TDHCA implement a new set-aside for applications for family units in Caucasian areas, such a remedy is not constitutionally sound, does not eliminate an offending practice, and may result in the use of racial quotas.  *See ICP VI*, 135 S.Ct. at 2524.

5

Finally, ICP maintains that TDHCA has used its discretion to approve projects located in areas of slum and blight, with high crime rates, adverse environmental conditions, and where there is a high concentration of LIHTC units. TDHCA responds that ICP's concerns are exaggerated, and that ICP has not demonstrated that the decision to approve projects in certain areas causes a statistically-significant disparity.

ICP has not established that TDHCA's approval of projects in areas of slum and blight caused a racially disparate impact, and ICP does not seek a constitutionally-permissible remedy. ICP does not seek to restrict TDHCA's discretion or to remove a challenged policy; instead, ICP asks the court to preclude the TDHCA from granting tax credits for developments in areas with certain conditions. For the reasons explained *supra* at § IV(A)(2), the court declines to grant such remedy.

V

The court turns next to the question whether ICP has proved a prima facie case of disparate impact with respect to the allocation of 4% tax credits.

A

ICP contends that TDHCA exercised its discretion to implement specific discretionary policies, practices, and decisions affecting the allocation of 4% tax credits, and that the exercise of discretion caused the perpetuation of racial segregation. According to ICP, TDHCA consistently used its discretion to approve applications for 4% tax credits for units in minority areas that maintained racial disparity across the Dallas metropolitan area, already

had a high concentration of LIHTC units, and were plagued by slum and blight. ICP complains that, once in 1999 and once in 2003, the TDHCA exercised its discretion and denied applications for 4% tax credits for projects located in Caucasian tracts in the Dallas metropolitan area for reasons that were not applied to applications for 4% tax credits for similar projects located in minority areas. ICP maintains that TDHCA's exercise of discretion resulted in the approval of 4% tax credits for 4,896 of the 7,283 units in minority areas in the City of Dallas.

TDHCA responds that discretion in and of itself is not a specific policy sufficient to prove disparate impact based on a violation of the FHA; each decision to approve or deny a tax credit is the result of numerous individual policy decisions, many of which are outside TDHCA's control; the 4% tax credit program is not oversubscribed, and ICP has not alleged that TDHCA approved a 4% tax credit for a project in a minority area that required it to deny a 4% tax credit for a project in a Caucasian area; ICP only identifies two projects for which TDHCA denied applications for 4% tax credits over a span of 17 years; and ICP has not acknowledged that, unless developers seek 4% tax credits for projects in Caucasian areas, TDHCA cannot allocate such credits.

ICP replies that TDHCA perpetuated racial segregation by using its discretion to approve applications for 4% tax credits in minority areas with undesirable site conditions, and by denying two applications for 4% tax credits for projects in Caucasian areas.

- 29 -

B

Even assuming *arguendo* that ICP has proved that TDHCA had a facially neutral policy or practice in allocating 4% tax credits—the use of discretion in the allocation of 4% tax credits—ICP has not proved that TDHCA's exercise of discretion caused a statistically-significant disparity in the location of low-income housing.

ICP maintains that TDHCA in its discretion denied the applications of two projects for 4% credits, even though the projects met the stated criteria for approval.  In 1999, TDHCA rejected an application for 4% credits for the Treymore at Duck Creek, a project in a Caucasian tract in Garland, Texas.  TDHCA's stated reasons for the denial were the "desires of the elected officials of the City of Garland," i.e., that Garland had sufficient low-income housing and did not need additional units.  ICP casts doubt on the TDHCA's stated reason and alleges that the following year, TDHCA approved an application for 4% tax credits for a low-income housing development in a minority tract in Garland.

In 2003, TDHCA exercised its discretion to deny an application for 4% tax credits for the Primrose at Stonebrook, a housing development in Frisco, Texas.  The Stonebrook was a proposed development of three-bedroom units located in a Caucasian area in Frisco, and TDHCA denied the project because it lacked diversity in the type of units.  ICP argues that TDHCA's proffered reason is pretextual because TDHCA waived unit-mix requirements for other applications and approved other developments containing only three- or four-bedroom units.

ICP has not satisfied the robust causality requirement of *ICP VI*.  *See ICP VI*, 135

S.Ct. at 2523.   ICP states, without explanation or supporting evidence, that TDHCA's discretion in awarding 4% credits has resulted in the approval of 4,896 of the 7,283 units for 4% tax credits located in minority areas in the Dallas metropolitan area.   Although ICP states that "TDHCA did consistently use its discretion to approve 4% application[s] for units in minority areas that maintained the racial segregation," ICP 1/7/16 Prima Facie Br. at 42, ICP does not explain how TDHCA's exercise of discretion in denying two applications over a 17-year period has maintained racial segregation.

ICP has not established that TDHCA's denial of two applications over a 17-year period is a "policy" that can cause a disparate impact.   *See, e.g., ICP VI*, 135 S.Ct. at 2523 (noting that a "one-time decision may not be a policy at all").   Nor has ICP proved that TDHCA's denial of two applications for 4% tax credits over that time period has caused any statistically-significant disparity in the location of low-income housing.

ICP has also failed to prove that factors other than TDHCA's discretion—such as developers' preferences for building projects in certain areas, local and state laws, and the expressed needs of communities and local officials—have not caused or contributed to any disparity in the location of housing developments receiving 4% tax credits.   Because TDHCA has approved the vast majority of applications for 4% tax credits since 1999, any disparity is likely caused by factors other than TDHCA's exercise of discretion.

\*   \*   \*

For the reasons explained, the court finds and concludes that ICP has failed to prove a prima facie case of discrimination by showing that a challenged practice caused a discriminatory effect, as defined by 24 C.F.R. § 100.500(a).   Accordingly, the court dismisses ICP's disparate impact claim and enters judgment today in favor of defendants.

August 26, 2016.


SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 32 -